# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**LOUISIANA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL.**

**CIVIL ACTION**

**VERSUS**

**NO. 19-479-JWD-SDJ**

**STATE OF LOUISIANA, ET AL.**

## RULING AND ORDER

This matter comes before the Court on two motions to dismiss filed under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). The first is *Defendant's Motion to Dismiss Plaintiff's Complaint* (Doc. 27) filed by the State of Louisiana (the "State"). The second is the *Motion to Dismiss by Defendant, R. Kyle Ardoin, Louisiana Secretary of State* ("Ardoin") (Ardoin and the State are collectively, "Defendants") (Doc. 28). Plaintiffs, the Louisiana State Conference of the National Association for the Advancement of Colored People ("Louisiana NAACP"), Anthony Allen, and Stephanie Anthony (collectively, "Plaintiffs") oppose the motions (Docs. 34–35), and Defendants have filed replies (Docs. 36–37). Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, Defendants' motions are denied.

## I.    Relevant Factual Background

### A.    The Voting Rights Act

This suit is brought under the Voting Rights Act of 1965, 52 U.S.C. § 10301 *et seq.* Section 2 of this act provides, in relevant part:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the

United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

52 U.S.C.A. § 10301(a), (b).

## B. Allegations of the *Complaint*

### 1. Introduction

Plaintiffs in this action are the Louisiana NAACP, Anthony Allen, and Stephanie Anthony. (*Original Complaint for Declaratory and Injunctive Relief* ("*Complaint*") ¶¶ 10–13, Doc. 1.) The Louisiana NAACP is a "state subsidiary of the National Association for the Advancement of Colored People, Inc." (*Id.* ¶ 10.) The Louisiana NAACP is the "oldest and one of the most significant civil rights organizations in Louisiana, and it works to ensure the political, educational, social, and economic equality of African Americans and all other Americans." (*Id.*) The "[t]wo central goals of the Louisiana NAACP are to eliminate racial discrimination in the democratic process, and to enforce federal laws and constitutional provisions securing voting rights." (*Id.*) The *Complaint* states, "[t]oward those ends, the Louisiana NAACP has participated in lawsuits to protect the right to vote, regularly engages in efforts to register and educate African-American voters, and encourages African Americans to engage in the political process by turning out to vote on Election Day." (*Id.*) Critically, the *Complaint* provides, "The mission of the Louisiana NAACP is frustrated by the current Supreme Court districts, which inhibit the organization's ability to fulfill its objectives, including the promotion of political equality for black voters." (*Id.*) Further, the Plaintiffs assert that the "Louisiana NAACP has members throughout the State, including

members whose votes are unlawfully diluted by the current Supreme Court districts and whose injury would be redressed by the creation of a second majority-black district in the State." (*Id.* ¶ 11.)

Plaintiffs Anthony Allen and Stephanie Anthony are both adult African-American citizens who reside in East Baton Rouge Parish. (*Compl.* ¶¶ 12–13, Doc. 1.) Both are registered to vote there as well. (*Id.*) Plaintiffs claim that, "[a]s a result of the demonographies of [their] Supreme Court district and racially polarized voting, [Allen and Anthony's] vote[s] [are] unlawfully diluted." (*Id.*) Plaintiffs maintain that, "[a] majority-black district including [Allen's and Anthony's] home[s] could be drawn to provide a remedy for the Section 2 violation." (*Id.*)

Defendants in this action are the State of Louisiana and R. Kyle Ardoin, the Louisiana Secretary of State. (*Id.* ¶¶ 14–15.) Ardoin is sued in his official capacity and is alleged to be the "State's chief election officer." (*Id.* ¶ 15 (citing La. R.S. § 18:421).)

In their *Complaint*, Plaintiffs allege that the voting age population of Louisiana is approximately 30% African American, but this group only makes up a majority of one of the seven Louisiana Supreme Court electoral districts (or about 14% of the districts). (*Compl.* ¶ 2, Doc. 1.) Plaintiffs claim that "the demographics of [these] districts and racially polarized voting" prevent African Americans "from equal participation in the election of justices to the Court." (*Id.*) Indeed, Louisiana has had in its history only two African Americans on the Supreme Court, both of which have come from the "sole majority-black district in the State—a district created as a result of voting rights litigation." (*Id.* ¶ 3.) Plaintiffs assert:

> [ ] Louisiana's African-American population and its voting-age population are sufficiently large and geographically compact to constitute a majority in two fairly drawn, constitutional single-member districts for the Supreme Court; the State's African Americans are politically cohesive; and the State's white voting-age majority votes sufficiently as a bloc to enable it to defeat African-American voters' preferred candidates in six of Louisiana's seven Supreme Court districts. Because

of these circumstances, as well as the historical, socioeconomic, and electoral conditions of Louisiana, the Supreme Court districts as currently drawn violate Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 ("Section 2"). *Thornburg v. Gingles*, 478 U.S. 30 (1986).

[ ] For these reasons, Plaintiffs request that this Court (a) declare that the current single-member districts for the Louisiana Supreme Court violate Section 2 of the Voting Rights Act, (b) enjoin the further use of the current Supreme Court districts, and (c) require the State to redraw the Louisiana Supreme Court districts so that future elections can be conducted in compliance with the Constitution of the United States and the Voting Rights Act.

(*Id.* ¶¶ 4–5.)

## 2. The Consent Judgment: Allegations

In their *Complaint*, Plaintiffs also discuss *Chisom v. Roemer*, 501 U.S. 380, 111 S. Ct. 2354, 115 L. Ed. 2d 348 (1991), where minority plaintiffs challenged the original electoral process for the Louisiana Supreme Court, which had consisted of six judicial districts, five of which were single-member districts and one of which was multi-member, encompassed Orleans Parish, and elected two justices. (*Compl.* ¶¶ 23–24, Doc. 1.)   *Chisom v. Roemer* held that "elections for appellate judges could not unlawfully dilute minority votes under the Voting Rights Act." (*Id.* ¶ 24.)

Following *Chisom*, the Louisiana legislature enacted Act 512 in 1992, "which created a temporary eighth Supreme Court seat for the sub-district of Orleans." (*Id.* ¶ 25 (citing 1992 La. Acts No. 512, § 1.)  The *Complaint* then provides:

An August 21, 1992 federal consent decree memorializing Act 512 stipulated that (a) the State would split the multi-member district into two single-member districts upon expiration of the temporary seat, and (b) one of those districts would consist of most of Orleans Parish and a portion of neighboring Jefferson Parish, making it majority African-American.

(*Id.*)  The specific language of the *Consent Judgment* in *Chisom* will be discussed in greater detail below.

4

After the election of two African-Americans in the "*Chisom* seat", "in 1999 – the most recent reapportionment of Supreme Court districts – the Louisiana legislature drew seven single-member districts, consistent with the *Chisom* consent decree." (*Id.* ¶ 28.)

### 3. Plaintiff's Section 2 Allegations

Next follows a discussion of "Section 2 Vote Dilution" and the "*Thornburg v. Gingles* Analysis." The three "*Gingles* preconditions" for a vote dilution claim under Section 2 of the Voting Rights Act are:

> a. The minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"';
>
> b. The minority group must be politically cohesive"; and
>
> c. The majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."

(*Compl* ¶ 33, Doc. 1 (citing *Thornburg v. Gingles*, 478 U.S. 30, 50–51, 106 S. Ct. 2752, 92 L. Ed. 2d 25 (1986)).)   Plaintiff claims, "Louisiana's African-American population and voting-age population are sufficiently numerous and geographically compact to form a majority of the total population and voting-age population in two properly-apportioned, constitutional single-member Supreme Court districts in a seven-district plan." (*Id.* ¶ 34.)  Additionally, Plaintiffs allege that, "Louisiana's African-American voters are politically cohesive. They vote overwhelmingly for different candidates than those supported by white voters." (*Id.* ¶ 35.)  Moreover, "Louisiana's white electorate votes as a bloc in support of different candidates than those supported by African-American voters. In non-majority-black districts, bloc voting by white members of the electorate consistently defeats the candidates preferred by African-American voters." (*Id.* ¶ 36.)

Plaintiffs then aver how the "totality of the circumstances show that African-American voters have less opportunity than other members of the electorate to participate in the political

process and to elect candidates of their choice to the Supreme Court in violation of Section 2 of the Voting Rights Act." (*Compl.* ¶ 37, Doc. 1.)  Plaintiffs cite to the "long, well-documented history of voting-related discrimination" in Louisiana and the more recent challenges to voting districts which increased the number of African-American judges in Louisiana from a "half-dozen before 1992 to approximately six-dozen today, all, or almost all, in majority black districts." (*Id.* ¶¶ 38–40.)  Additionally, before *Chisom*, "the two-member Supreme Court district that included New Orleans unlawfully diluted minority voting strength." (*Id.* ¶ 41.)

Plaintiffs also discuss the dispute between Justice Victory and Justice Johnson in 2012 over who would succeed Justice Kimball as Chief Justice. (*Compl.* ¶ 42, Doc. 1.) The disagreement centered on whether Justice Johnsons' years on the Supreme Court would be counted toward her seniority under the *Chisom* consent decree. (*Id.*)  In *Chisom v. Jindal*, "a federal district court issued an order enforcing the terms of the consent decree, holding that Justice Johnson's service as the *Chisom* justice must be credited in determining her tenure on the Court." (*Id.* (citing *Chisom v. Jindal*, 890 F. Supp. 2d 696 (E.D. La. 2012)).)

Plaintiffs also point to a recent case from 2017 where "the Louisiana legislature was found to have intentionally discriminated against African Americans by maintaining an electoral scheme that unlawfully diluted black votes under Section 2." (*Id.* ¶ 44 (citing *Terrebonne Par. Branch NAACP v. Jindal* (*Terrebonne III*)*,* 274 F. Supp. 3d 395 (M.D. La. 2017), *appeal dismissed sub nom. Fusilier v. Edwards,* No. 17-30756, 2017 WL 8236034 (5th Cir. Nov. 14, 2017)).)

### 4. Other Allegations Related to District 5

Also relevant here, Plaintiffs focus on certain "Enhancing Practices" used to curtail minority representation:

> Louisiana employs a majority-vote requirement for all Supreme Court elections, which further enhances discrimination against black voters. Under the current

single-member Supreme Court districts and the open primary system, the 50% requirement disadvantages black voters. Specifically, African-American voters may coalesce around a particular candidate in a primary but, due to their minority status and racially polarized voting, fail to reach majority-support in the runoff election. Instead, white voters comprising the majority of an electorate can coalesce behind a single candidate to defeat the minority preferred candidate.

[] The discriminatory effects of a majority-vote requirement are not merely theoretical. In the 2012 primary for Supreme Court District 5, John Michael Guidry, the only African American in the race, earned the most votes with 27.5% of the total. Jefferson Hughes, a white candidate, secured the second highest vote count— 21.2% of the total votes—and advanced to a runoff against Guidry. ln the runoff election, Hughes defeated Guidry 52.8% to 47.2%.

[] Supreme Court District 5 is as an unusually large Supreme Court district that also enhances discrimination against black voters. District 5—which is centered around the Baton Rouge area but is majority-white—is, by far, the largest district in the state by population.

(*Compl.* ¶¶ 46–48, Doc. 1.)

Plaintiffs also refer to socio-economic disparities of Louisiana's African-American residents. (*Id.* ¶¶ 49–54.) Further, they cite racial appeals in campaigns, including the following:

For example, the 2012 campaign for Supreme Court District 5 was characterized by racial appeals. Justice Hughes included images of John Guidry throughout his campaign materials and went so far as to darken his image in some of those materials. Justice Hughes also labeled Guidry as an 'affirmative action Democrat' and sent targeted campaign materials to parts of the district that linked Guidry to Chief Justice Johnson of the Louisiana Supreme Court, included their pictures, and expressed the need to elect Hughes to prevent Chief Justice Johnson from exercising power.

(*Id.* ¶¶ 55–56.) Additionally, Plaintiffs emphasize the history of underrepresentation of African Americans in public offices. (*Id.* ¶¶ 57–65.)

### 5. Claim and Prayer for Relief

In Plaintiffs' Claim for Relief, they allege:

Louisiana's African-American population is sufficiently numerous and geographically compact to provide for two properly-apportioned, majority-black, constitutional single-member Louisiana Supreme Court districts in a seven-district



plan. In these two remedial districts, the African-American population would constitute a majority of both the total population and the voting-age population.

[] Louisiana's African-American voters are politically cohesive, and judicial and non-judicial elections reflect a clear pattern of racially polarized voting that allows the bloc of white voters to defeat the African-American community's preferred candidate in all but one Louisiana Supreme Court district.

[] The totality of the circumstances establishes that, as currently apportioned, the Louisiana Supreme Court districts have the effect of denying African-American voters an equal opportunity to participate in the political process and to elect candidates of their choice, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

[] Violations of Section 2 occur with each Louisiana Supreme Court election. Unless enjoined by order of this Court, Defendants will continue to act in violation of Section 2 of the Voting Rights Act by administering, implementing, and conducting future elections for the Louisiana Supreme Court using an unlawful election method.

(*Compl.* ¶¶ 67–70, Doc. 1.) Plaintiffs pray that the Court, among other things:

[] Declare that the current apportionment of Louisiana Supreme Court districts violates Section 2 of the Voting Rights Act;

[] Enjoin Defendants, their agents and successors in office, and all persons acting in concert with, or as an agent of, any Defendants in this action, from administering, implementing, or conducting any future elections for the Louisiana Supreme Court under the current method of election; [and]

[] Order the implementation of a new method of election for the Louisiana Supreme Court that complies with the Constitution of the United States and Section 2 of the Voting Rights Act, 52 U.S.C. § 10301[.]

(*Id.* at 15.)

### C.  The *Chisom* Decree

#### 1. The Consent Judgment

The Consent Judgment in the *Chisom* case is attached to the State's motion. (Doc.

27-3.) The Consent Judgment begins with the following Preamble:

The current apportionment of the Louisiana Supreme Court is governed by La. Const. Art. V, Section 4 and La. Rev. Stat. Section 13:101. Under Section

13:101, Orleans Parish is contained within the multimember First Supreme Court district along with Jefferson, Plaquemines, and St. Bernard Parishes.

The Chisom plaintiffs and the United States claim that the multimember district system for electing justices of the Louisiana Supreme Court in the First Supreme Court District [first district] dilutes black voting strength in violation of section 2 of the Voting Rights Act of 1965 as amended, 42 U.S.C. 1973 [Section 2], because black citizens have less opportunity than other members of the electorate to participate in the political process and elect justices of their choice. In June 1992, the Louisiana Legislature passed and the Governor signed Act No. 512 (S.B. 1255) (1992), which provides, inter alia, for a change in the method of electing the Louisiana Supreme Court; for the assignment of the judge elected to the newly-created position from the first district (Orleans Parish) of the Fourth Circuit Court of Appeal to the Louisiana Supreme Court; and for the assigned judge to participate and share equally in the cases and duties of the justices of the Supreme Court during this period of assignment. The Chisom plaintiffs and the United States contend that the provisions contained in Act No. 512 (1992) and in this Consent Judgment are necessary to bring the system for electing the Louisiana Supreme Court into compliance with Section 2. While the defendants do not agree with this contention and only enter into this compromise agreement to resolve extensive and costly litigation, they believe that the relief contained in this consent judgment will ensure that the system for electing the Louisiana Supreme Court is in compliance with Section 2 of the Voting Rights Act.

Accordingly, the parties to this litigation desire to [a]ffect a settlement of the issues raised by the complaint and subsequent proceedings without the necessity of further litigation, and therefore consent to entry of the following final and binding judgment as dispositive of all issues raised in this case:

(Doc. 27-3 at 2–3.) It was thus ordered, *inter alia*, that: "The relief contained in this consent judgment will ensure that the system for electing the Louisiana Supreme Court is in compliance with Section 2 of the Voting Rights Act." (*Id.* at 4.)

The Consent Judgment then describes how, "[c]onsistent with Louisiana Act No. 512 (1992) and the remedial objectives of the Voting Rights Act, the defendants shall take the following actions[.]" (*Id.*) The defendants agreed to create a Supreme Court district solely of New Orleans for the purpose of electing a Supreme Court justice and a new Fourth Circuit Court of Appeal judge for the Supreme Court. (*Id.* at 4–5.) "The Fourth Circuit Court of Appeal judge assigned to serve on the Supreme Court shall receive the same compensation, benefits, expenses, and emoluments of offices as now or hereafter are

provided by law for a justice of the  Louisiana Supreme Court." (*Id.* at 5.)  The Consent Judgment goes on to give the Fourth Circuit judge an equal share in the "cases, duties, and powers of the Louisiana Supreme Court," and puts an expiration on the position at the election of the Supreme Court district. (*Id.*)  The Consent Judgment also describes what happens if the Fourth Circuit seat becomes vacant before the prescribed election. (*Id.* at 6–7.)

Further, one of the specific orders provided by the Consent Judgment states:

Legislation will be enacted in the 1998 regular session of the Louisiana Legislature which provides for the reapportionment of the seven districts of the Louisiana Supreme Court in a manner that complies with the applicable federal voting law, taking into account the most recent census data available. The reapportionment will provide for a single-member district that is majority black in voting age population that includes Orleans Parish in its entirety. The reapportionment shall be effective on January 1, 2000, and future Supreme Court elections after the effective date shall take place in the newly reapportioned districts.

(Doc. 27-3 at 7.)

The Consent Judgment also provides that:

E. Defendants agree that, in order to comply with the Voting Rights Act, and in order to ensure black voters in the Parish of Orleans have an equal opportunity to participate in the political process and to elect candidates of their choice, the Chisom plaintiffs and the United States are to be considered the prevailing parties in this litigation.

F. This judgment is a restructuring of the Supreme Court of Louisiana by federal court order within the meaning of Act No. 1063 of 1991 (R.S. 11:558(A) (5)), and the benefits of R.S. 11:558(A) (5) (a) (ii) shall be available to the current members of the Court.

G. The Chisom plaintiffs' constitutional claims under the Fourteenth and Fifteenth Amendments, as well as their statutory claim alleging that the present electoral system violates Section 2 because it was intentionally enacted or maintained for discriminatory reasons, are hereby dismissed with prejudice.

10

(*Id.* at 8.)  The Consent Judgment was deemed a final judgment in the action and was "binding on all parties and their successors in office." (*Id.*) Further, "[t]he parties agree[d] to take all steps necessary to effectuate this decree." (*Id.* at 9.)

Finally, the Consent Judgment stated, "The Court shall retain jurisdiction over this case until the complete implementation of the final remedy has been accomplished." (Doc. 27-3 at 9.)

### 2. The Amendment to the Consent Judgment

On January 3, 2000, the *Chisom* parties filed a joint motion to amend the Consent Judgment. (Doc. 27-4.)  Citing paragraph 8 of the original Consent Judgment, the Amendment explains how, because Orleans Parish was split between District 1 and District 7, the new Louisiana Acts 1997, No. 776 was not "in strict conformity with the Consent Judgment, but" it nevertheless "[met] the intent of all parties to this litigation for final resolution of the matter." (*Id.* at 3–4.)

### D.  *Chisom v. Jindal*: Justice Johnson's Tenure

As stated above, in *Chisom v. Jindal*, 890 F. Supp. 2d 696 (E.D. La. 2012), the Eastern District of Louisiana evaluated Justice Johnson's years of seniority on the Supreme Court to determine if she or Justice Victory was to be the Chief Justice to succeed Justice Kimball.  The district court first decided that it had jurisdiction over the matter:

> There has been no affirmative ruling by this Court that the Consent Judgment has been completely satisfied and thus has been vacated or terminated, nor has there been any request that this be done. Because the Court finds that the "final remedy" under the Consent Judgment has not yet been accomplished, the Court has continuing jurisdiction and power to interpret the Consent Judgment as requested by Justice Johnson and the *Chisom* Plaintiffs. The explicit terms of the Consent Judgement provide the Court continuing jurisdiction over this dispute, stating that the Court "shall retain jurisdiction over this matter until the complete implementation of the final remedy has been accomplished." While it is true "that district courts enjoy no free-ranging 'ancillary' jurisdiction to enforce consent decrees," and are "instead constrained by the terms of the decree and related order," *Pigford v. Veneman,* 292 F.3d 918, 924 (D.C. Cir. 2002) (citing *Kokkonen v.*

*Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 381, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994)), the very terms of the Consent Judgment in this case provide the Court with a sufficient jurisdictional basis to resolve the dispute pending before it. This is true after the 2000 amendment to the Consent Judgment, even though the amendment did not include this same "continuing jurisdiction" language. The amendment did not replace the terms of the original Consent Judgment, but instead supplemented them.

Because, as will be explained in the pages to follow, the Court finds that the Consent Judgment calls for Justice Johnson's tenure from November 16, 1994, until October 7, 2000, to be credited to her for all purposes under Louisiana law, the Court finds that the "final remedy" in the Consent Judgment has not yet been implemented. By law and by the terms of the Consent Judgment, this Court expressly retains jurisdiction over this case until that final remedy is implemented. This Order is an exercise of the Court's discretion to enforce and protect its orders. *See Vukovich,* 720 F.2d at 920.

*Id.* at 711.

The Court then went on to interpret the Consent Judgment, its Amendment, and Louisiana

Acts 1997, No. 776, explaining:

The Court turns now to the four corners of the Consent Judgment to determine whether or not it is ambiguous with respect to tenure and seniority. The Consent Judgment, as entered into in August 1992, states that "the Fourth Circuit Court of Appeal Judge assigned to serve on the Supreme Court shall receive the same compensation, benefits, expenses, and emoluments of offices as now or hereafter are provided by law for a justice of the Supreme Court." It provides further that "the Fourth Circuit Court of Appeal Judge assigned to serve on the Supreme Court shall participate and share equally in the cases, duties, and powers of the Louisiana Supreme Court," and that "[t]he assigned judge and the seven Supreme Court justices shall participate fully and share equally in all other duties and powers of the Supreme Court, including, but not limited to, those powers set forth by the Louisiana Constitution, the laws of Louisiana, and the Louisiana Rules of Court." . . .

With the addition of the emphasized provision of Act 776, the terms of the Consent Judgment with regard to the issue of tenure become clear and unambiguous. The Consent Judgment, as amended, provides that "tenure on the supreme court gained by [the Chisom Judge] while so assigned to the supreme court shall be credited to such judge." As a result, the Court finds that the Consent Judgment provides that Justice Johnson's service from November 16, 1994, to October 7, 2000, shall be credited to her for all purposes under Louisiana law, including for the purpose of determining seniority.

*Id.* at 713–15.

## II.    Discussion on the State's Motion

### A.  Rule 12(b)(1) Standard

"Motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allow a party to challenge the subject matter jurisdiction of the district court to hear a case." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing Fed. R. Civ. P. 12(b)(1)). "Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id.* (citing *Barrera–Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)).

"The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Id.* (citing *McDaniel v. United States*, 899 F. Supp. 305, 307 (E.D. Tex. 1995)). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* (citing *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)).

"When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming*, 281 F.3d at 161 (citing *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977) (per curiam)).  "In examining a Rule 12(b)(1) motion, the district court is empowered to consider matters of fact which may be in dispute." *Id.* (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)). "Ultimately, a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Id.* (citing *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998)).

### B.  Effect of the *Chisom* Decree

#### 1. Parties' Arguments

The State first contends that this Court lacks subject matter jurisdiction over cases involving elections to the Louisiana Supreme Court.  Rather, the Eastern District of Louisiana has jurisdiction pursuant to the Consent Judgment in the *Chisom* case.   According to the State, the Eastern District retains jurisdiction until the final remedy under the Consent Decree has been achieved. The Eastern District must issue a "final remedy" saying that the Consent Judgment has been accomplished.

Plaintiffs respond that "Defendant's arguments should be given short shrift." (Doc. 34 at 6.)  First, the Consent Decree in the Eastern District had nothing to do with the issues that are in this case.  Plaintiffs call this a "ploy to move this case to the forum of Defendant's choice." (*Id.*) But Plaintiffs' choice of forum should control.

The State's reply focuses almost entirely on the *Chisom* Consent Judgment, which the State says controls.  The Consent Decree governs restructuring of every Supreme Court District, including internal operations of the State's Supreme Court like selection of the Chief Justice, and it binds the State to the terms of the Consent Judgment as long as it is in effect.  The Eastern District confirmed jurisdiction as recently as 2012.   Further, the *Complaint* does not limit Plaintiffs' relief to the Fifth District but instead asks that the Court to "[d]eclare that the current apportionment of Louisiana Supreme Court districts violates Section 2 of the Voting Rights Act." (Doc. 37 at 3.)  Nothing in the Claim for Relief mentions the Fifth District either.  Thus, "the Court should entirely disregard Plaintiffs' *post hoc* rationalizations regarding the Fifth District." (*Id.*) Further, Plaintiff's attempt in their Opposition to focus solely on the Fifth District merely highlights the fact that they have not adequately satisfied the *Twombly* requirements.  Lastly, any

redrawing of the Fifth District would necessarily impact the surrounding districts, including the other seven. Plaintiffs' promise to not touch the First District "only serves to further highlight their pleading failures." (*Id*. at 4.)

After beginning its consideration of the motion, the Court ordered the following supplemental briefing:

> Notice to Counsel: The State cites *Thaggard v. Jackson*, 687 F.2d 66, 68 (5th Cir. 1983) for the propositions that, "[O]nly the district court supervising implementation of the decree [has] subject matter jurisdiction to modify the decree[] . . ." and that, "It is settled that a consent decree is not subject to collateral attack." (Doc. 27-1 at 4 (citing *Thaggard*, 687 F.2d at 68, 69 n.3).) The parties are hereby given seven (7) days to submit supplemental briefs not to exceed five (5) pages that address *Martin v. Wilks*, 490 U.S. 755, 109 S. Ct. 2180, 104 L. Ed. 2d 835 (1989) (particularly its holding and footnotes 2 and 3) and *Texas v. Dep't of Labor*, 929 F.3d 205, 210–11 (5th Cir. 2019) (and the concept of adequate representation).

(Doc. 39 (cleaned up).)

In response, Defendants urge that "*this* court lacks jurisdiction, not *all* federal courts." (Doc. 40-2 at 1 (all caps omitted).) Defendants assert that they are not arguing that Plaintiffs are "barred writ large by an estoppel theory." (*Id.*) Rather, Defendants merely contend that Plaintiffs are precluded from obtaining relief in the Middle District by virtue of the *Chisom* decree in the Eastern District. "Plaintiffs should . . . be required to bring their claims—through intervention or other mechanism—in the Eastern District of Louisiana." (*Id.* at 2.) Defendants contend that *Martin* is distinguishable because the issue isn't whether Plaintiffs are precluded from challenging the [C]onsent [D]ecree; it is just a question of where they can seek relief. Further, the key to *Martin* was that the preclusive effect of the collateral attack was inconsistent with Federal Rules of Civil Procedure 19 and 24, but, again, Defendants are not seeking an absolute bar on all challenges, just challenges outside the Eastern District. Defendants further note that (1) Congress legislatively overturned *Martin* in employment actions; (2) *Texas v. Dep't of Labor* is distinguishable on the

15

same grounds; and (3) Rules 19 and 24 are "somewhat at odds with . . . claims affecting electoral districts." (*Id.* at 2 & n5.)  Defendants then go on to raise a number of other theories not raised in their original memoranda (including the first-to-file rule and transfer of venue) (*id.* at 3–5), but, as the Court previously recognized, the Court will not consider these new arguments with the instant motion. (*See* Doc. 41.)

Plaintiffs also filed a supplemental brief.  Plaintiffs assert that the "short and complete answer is that the concept of collateral attack – and for that matter the concept of adequacy of representation and privity discussed in those cases – have no applicability to this case, because this case in no way presents a collateral attack on the *Chisom* Decree." (Doc. 42-2 at 2.)  Plaintiffs reiterate by footnote their offer to stipulate that the remedy here will not affect the *Chisom* case. (*Id.* at 2 n.1.)  Plaintiffs' next section largely re-urges arguments made in their original briefing. For example, *Chisom* involved a class action by Orleans Parish African Americans about the First District, while this is an action involving the Fifth District in Baton Rouge.  As to *Martin* and *Texas v. Department of Labor*, Plaintiff say that "[b]oth . . . support this Court's retaining jurisdiction over this case":

> *Wilks* stands for the settled propositions that in an action brought as a collateral attack on a consent decree, "a person cannot be deprived of his legal rights in a proceeding to which he is not a party." *Martin v. Wilks*, 490 U.S. 755, 759 (1989), and *Texas* for the similarly sound rule "that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Texas v. Dep't of Labor*, 929 F.3d 205, 210 (5th Cir. 2019) (quoting *Taylor v. Sturgell*, 553 U.S. 880, 884 (2008)).

(*Id.* at 4.)  Plaintiffs hammer again that adequate representation has no bearing here because "enforcing the *Chisom* Decree against any of the parties in this case has absolutely no bearing on the issues in this case." (*Id.* at 5.)  Plaintiffs also note how *Martin* rejected *Thaggard* but argue that this is irrelevant because "Plaintiffs are not, in any way, mounting a collateral attack on the *Chisom*

Decree." (*Id.*)   Plaintiffs close by stating, "The two cases [(*Chisom* and the instant case)] differ so greatly in subject matter—both in time and geography—and in the relief sought that Defendants will never be able to demonstrate the existence of the 'types of relationships sufficiently close to justify preclusion.' " (*Id.* at 6.)

### 2. Applicable Law

#### a.   Consent Decrees Generally

Again, in *Chisom v. Jindal*, Judge Morgan was faced with an issue involving the interpretation of the Consent Decree at issue here, and she articulated the following principles that guide this Court as well:

> It is well-settled that a federal court has the inherent authority to enforce its own orders, including consent decrees agreed to by parties and approved by the Court. *See, e.g. United States v. Alcoa, Inc.,* 533 F.3d 278, 287 (5th Cir. 2008). Indeed, "[f]ederal courts are not reduced to approving consent decrees and hoping for compliance. Once entered, a consent decree may be enforced." *Frew v. Hawkins,* 540 U.S. 431, 440, 124 S. Ct. 899, 157 L. Ed. 2d 855 (2004). "Once approved, the prospective provisions of the consent decree operate as an injunction." *Williams v. Vukovich,* 720 F.2d 909, 920 (6th Cir. 1983) (citing *Plummer v. Chemical Bank,* 668 F.2d 654, 659 (2d Cir. 1982); *Carson v. Am. Brands,* 450 U.S. 79, 84 n. 9, 101 S. Ct. 993, 67 L. Ed. 2d 59 (1981); *United States v. City of Miami,* 664 F.2d 435, 441 (5th Cir. 1981) (en banc)).

> The U.S. Court of Appeals for the Ninth Circuit has explained why a consent decree is considered to be in the nature of an injunction:

>> A judgment issued by a court in the exercise of its equitable or admiralty jurisdiction is called a decree, and when a decree commands or prohibits conduct, it is called an injunction. Consent decrees differ from contested injunctions in that, instead of being won in contested litigation, they are issued by the court pursuant to an agreement of the parties. A consent decree is therefore "in some respects contractual in nature," but the equitable decree based on the agreement "is subject to the rules generally applicable to other judgments and decrees."

> *Gates v. Shinn,* 98 F.3d 463, 468 (9th Cir. 1996) (internal citations omitted); *see also Smyth v. Rivero,* 282 F.3d 268, 280 (4th Cir. 2002) ( "[T]he consent decree does not merely validate a compromise but, by virtue of its injunctive provisions,

reaches into the future and has continuing effects."). As the U.S. Court of Appeals for the Sixth Circuit in *Vukovich* has explained: "The injunctive quality of consent decrees compels the court to: 1) retain jurisdiction over the decree during the term of its existence . . . 2) protect the integrity of the decree with its contempt powers; . . . and 3) modify the decree should 'changed circumstances' subvert its intended purpose." *Id.* (internal citations omitted).

So long as the final remedy under a consent decree has not been achieved, the court entering the decree retains subject matter jurisdiction to interpret and enforce the decree's terms. *See, e.g., Nehmer v. U.S. Dept. of Veterans Affairs,* 494 F.3d 846, 856 (9th Cir. 2007). The court entering the consent judgment is also the tribunal with the power to determine whether it has been fully complied with and should be dissolved or vacated. *See, e.g., Bd. of Educ. of Okla. City Pub. Schs. v. Dowell,* 498 U.S. 237, 247–50, 111 S. Ct. 630, 112 L. Ed. 2d 715 (1991) (stating that a district court's clear, affirmative ruling that the consent decree is no longer necessary in its current form is required for the parties to it to no longer be bound by it); *see also Frew,* 540 U.S. at 442, 124 S. Ct. 899 (2004). Exactly how a court should enforce and protect its orders is an issue largely left to the discretion of the court entering the order, so long as that discretion is exercised reasonably.

*Chisom v. Jindal*, 890 F. Supp. 2d at 710–11.

### b. Effect of Consent Decrees on Third Parties

The State cites *Thaggard v. Jackson*, 687 F.2d 66, 68 (5th Cir. 1983) for the propositions that, "[O]nly the district court supervising implementation of the decree [has] subject matter jurisdiction to modify the decree[] . . . ," and that, "It is settled that a consent decree is not subject to collateral attack." (Doc. 27-1 at 4 (citing *Thaggard*, 687 F.2d at 69 n.3).)  But *Thaggard* appears to no longer be good law.

Specifically, *Thaggard* was criticized by the U.S. Supreme Court in *Martin v. Wilks*, 490 U.S. 755, 109 S. Ct. 2180, 104 L. Ed. 2d 835 (1989).  *Martin* involved an action by a group of white firefighters against the city of Birmingham, Alabama and a county board claiming that the "City and the Board were making promotion decisions on the basis of race in reliance on certain consent decrees, and that these decisions constituted impermissible racial discrimination in violation of the Constitution and federal statutes." *Id.*, 490 U.S. at 758, 109 S. Ct. at 2182.  The

18

district court found that "the white firefighters were precluded from challenging employment decisions taken pursuant to the decrees, even though these firefighters had not been parties to the proceedings in which the decrees were entered." *Id*, 490 U.S. at 758–59, 109 S. Ct. at 2183.  The Eleventh Circuit had "held that, '[b]ecause . . . [the *Wilks* respondents] were neither parties nor privies to the consent decrees, . . . their independent claims of unlawful discrimination are not precluded.' " *Id.*, 490 U.S. at 761, 109 S. Ct. at 2184 (citing *In re Birmingham Reverse Discrimination Emp't Litig.*, 833 F.2d 1492, 1498 (11th Cir. 1987)).

The Supreme Court agreed and found that the district court's "holding contravenes the general rule that a person cannot be deprived of his legal rights in a proceeding to which he is not a party." *Id.* , 490 U.S. at 759, 109 S. Ct. at 2183.  The Supreme Court went on to explain:

> All agree that "[i]t is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Hansberry v. Lee,* 311 U.S. 32, 40, 61 S. Ct. 115, 117, 85 L. Ed. 22 (1940). See, *e.g., Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 327, n. 7, 99 S. Ct. 645, 649, n. 7, 58 L. Ed. 2d 552 (1979); *Blonder–Tongue Laboratories, Inc. v. University Foundation,* 402 U.S. 313, 328–329, 91 S. Ct. 1434, 1442–1443, 28 L. Ed. 2d 788 (1971); *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 110, 89 S. Ct. 1562, 1569, 23 L. Ed. 2d 129 (1969). This rule is part of our "deep-rooted historic tradition that everyone should have his own day in court." 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4449, p. 417 (1981) (hereafter 18 Wright). A judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings.
>
> Petitioners argue that, because respondents failed to timely intervene in the initial proceedings, their current challenge to actions taken under the consent decree constitutes an impermissible "collateral attack." They argue that respondents were aware that the underlying suit might affect them, and if they chose to pass up an opportunity to intervene, they should not be permitted to later litigate the issues in a new action. The position has sufficient appeal to have commanded the approval of the great majority of the Federal Courts of Appeals, [(citing, *inter alia*, *Thaggard*, *supra*),] but we agree with the contrary view expressed by the Court of Appeals for the Eleventh Circuit in these cases.

*Id.*, 490 U.S. at 761–63, 109 S. Ct. at 2184–85.  The High Court found, "A voluntary settlement in the form of a consent decree between one group of employees and their employer cannot possibly 'settle,' voluntarily or otherwise, the conflicting claims of another group of employees who do not join in the agreement." *Id.*, 490 U.S. at 768, 109 S. Ct. at 2188,

A leading treatise has noted that, while Congress has abrogated *Martin* in one area (specifically, employment discrimination cases), its reasoning and approach remains viable in others:

> Congress has adopted a specific scheme regulating the preclusion effects of both litigated and consent judgments resolving claims of employment discrimination under the Constitution or federal civil rights laws. This statute, described in detail in a later section, is limited to employment practices cases. There is nothing in it to undermine directly for other cases the approach taken by the Court.

18A Charles A. Wright and Arthur R. Miller, *Federal Practice & Procedure* § 4443 (3d ed. 2019).

It is also important that *Martin* noted certain exceptions to the principle that a decree "does not conclude the rights of strangers to those proceedings":

> We have recognized an exception to the general rule when, in certain limited circumstances, a person, although not a party, has his interests adequately represented by someone with the same interests who is a party. See *Hansberry v. Lee,* 311 U.S. 32, 41–42, 61 S. Ct. 115, 117–118, 85 L. Ed. 22 (1940) ("class" or "representative" suits); Fed. Rule Civ. Proc. 23 (same); *Montana v. United States,* 440 U.S. 147, 154–155, 99 S. Ct. 970, 974–975, 59 L. Ed. 2d 210 (1979) (control of litigation on behalf of one of the parties in the litigation). Additionally, where a special remedial scheme exists expressly foreclosing successive litigation by nonlitigants, as for example in bankruptcy or probate, legal proceedings may terminate preexisting rights if the scheme is otherwise consistent with due process. See *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 529–530, n. 10, 104 S. Ct. 1188, 1198, n. 10, 79 L. Ed. 2d 482 (1984) ("[P]roof of claim must be presented to the Bankruptcy Court ... or be lost"); *Tulsa Professional Collection Services, Inc. v. Pope,* 485 U.S. 478, 108 S. Ct. 1340, 99 L. Ed. 2d 565 (1988) (nonclaim statute terminating unsubmitted claims against the estate). Neither of these exceptions, however, applies in these cases.

*Martin*, 490 U.S. at 762 n.2, 109 S. Ct. at 2184.  However, the Fifth Circuit has recognized how limited this concept of adequate representation is:

20

For privity, federal courts have deemed three types of relationships sufficiently close to justify preclusion: (1) a non-party who has succeeded to a party's interest in property, (2) a non-party who controlled the original suit, and (3) a non-party whose interests were represented adequately by a party in the original suit. As to the third type, adequate representation does not exist where a nonparty is merely interested in the same issue or same set of facts, or because the issue being litigated is one that might affect their interests by providing a judicial precedent that would be applied in a subsequent action. . . . Ultimately, a determination that privity exists represents a legal conclusion that the relationship between the one who is a party on the record and the non-party is sufficiently close.

. . . We have held that privity by virtue of adequate representation requires the existence of an express or implied legal relationship in which parties to the first suit are accountable to non-parties who file a subsequent suit raising identical issues, and that a showing of parallel interests alone is insufficient.

*Texas v. Dep't of Labor*, 929 F.3d 205, 211 (5th Cir. 2019) (citations and quotations omitted).

### 3. Analysis

The question of whether the relief Plaintiffs seek falls within the scope of the *Chisom* Consent Judgment is a close one. On the one hand, the Consent Decree states, "Legislation will be enacted in the 1998 regular session of the Louisiana Legislature which provides for the reapportionment of the seven districts of the Louisiana Supreme Court in a manner that complies with the applicable federal voting law, taking into account the most recent census data available." (Doc. 27-3 at 7.) And, as Defendants assert, the *Complaint* prays for the enjoining of all "future elections for the Louisiana Supreme Court under the current method of election" and for a declaration that "the current apportionment of Louisiana Supreme Court districts violates Section 2 of the Voting Rights Act." (*Compl.*, Doc. 1 at 15.)

On the other hand, Plaintiffs have the stronger argument. It cannot be questioned that most of the preamble of the Consent Judgment and great majority of the order itself are devoted almost entirely to the creation of the Supreme Court district in Orleans Parish and the operation of its new justice. (*See* Doc. 27-3.) Indeed, *Chisom* was a "class action suit on behalf of all blacks registered

to vote in Orleans Parish" *Chisom v. Edwards*, 659 F. Supp. 183, 183 (E.D. La. 1987), *rev'd*, 839 F.2d 1056 (5th Cir. 1988). Conversely, as will be manifestly clear from this Ruling (particularly the standing section *infra*), a fair reading of the *Complaint* as a whole demonstrates that these Plaintiffs—from East Baton Rouge Parish, and thus outside the *Chisom* class—are in fact seeking relief by the redrawing of Supreme Court District 5 in Baton Rouge. (*See Compl.* ¶¶ 4, 12–13, 34, 46–48. 67, Doc. 1.) Contrary to Defendants' arguments, this relief can easily be accomplished without redrawing District 1 in Orleans Parish, and Plaintiffs' stipulation to this effect reflects that. Moreover, this case is easily distinguishable from *Chisom v. Jindal* and Chief Justice Johnson's dispute, as that suit involved the interpretation of an express provision of the Consent Decree— the one dealing with emoluments and equal participation in the cases, duties, and powers of other justices. *See Chisom v. Jindal*, 890 F. Supp. 2d at 713–15. Thus, the Court agrees with Plaintiffs that the instant case falls outside the jurisdiction of the *Chisom* Consent Judgment, and the State's motion can be denied on this ground alone.

But the State's motion can be denied on one additional ground. The State's position rests on the faulty premise that Plaintiffs cannot collaterally challenge the *Chisom* Decree in a separate action, and this premise appears to be severely undermined by *Martin*. As explained above, in *Martin*, the Supreme Court made clear that non-parties to a consent decree can in fact bring a separate action challenging that decree except in certain narrow exceptions.

None of those exceptions apply here. *Chisom* was a class action, but, again, as Plaintiffs point out, it was a "class action suit on behalf of all blacks registered to vote in Orleans Parish" *Chisom v. Edwards*, 659 F. Supp. at 183. Here, again, Plaintiffs are residents of East Baton Rouge Parish. (*Compl.* ¶¶ 12–13, Doc. 1.) This is also not a case where the Louisiana NAACP "controlled the original suit." *Texas*, 929 F.3d at 211. Finally, there is no privy by adequate representation.

Again, "adequate representation requires the 'existence of an express or implied legal relationship in which parties to the first suit are accountable to non-parties who file a subsequent suit raising identical issues,' and that 'a showing of parallel interests' alone is insufficient.," *id.*, and this case does not present that situation.

Thus, even if Plaintiffs' suit did represent a collateral attack on the *Chisom* Consent Decree (which it is not), Plaintiffs would not be precluded from bringing this action in the Middle District. For these reasons, Defendants' motion is denied.

### C.  Standing and Other Jurisdictional Arguments from the State

#### 1. Introduction

##### a.  Summary of Parties' Arguments

The State next asserts that Plaintiffs lack standing on several grounds.  First, Plaintiffs fail to satisfy the redressability requirement because they have not alleged one of the *Gingles* preconditions—that "the minority group . . . is sufficiently large and geographically compact to constitute a majority in a single member district." (Doc. 27-1 at 7 (citation and emphasis omitted).) Second, the State points to several other challenges that have been rejected by federal courts since *Hays v. State of Louisiana*, 839 F. Supp. 1188, 1191 (W.D. La. 1993), and the 1990 census.  Third, the State argues that the Louisiana NAACP lacks organizational standing and that *Gill v. Whitford*, 138 S. Ct. 1916, 201 L. Ed. 2d 313 (2018), eliminates organizational standing in voting rights cases.  Fourth, the individual Plaintiffs in this case lack standing because (1) Plaintiffs fail to show in what Supreme Court district Plaintiffs reside, and (2) there is no indication that a second majority-minority district could be drawn encompassing either individual Plaintiff.  And fifth, several cases have undermined the Supreme Court's holding in *Chisom v. Roemer* that the Voting Rights Act applies to judicial districts.

23

Plaintiffs oppose dismissal. First, Plaintiffs say they have sufficiently alleged the "*Gingles* preconditions*" to their Section 2 vote dilution claim. Further, Plaintiffs respond that the State's reliance on evidence outside the pleadings is misplaced, but, in any event, the facts of the 1990 census are irrelevant to this case, "which deals with the districting of a single Supreme Court district thirty years later." (Doc. 34 at 7.) Additionally:

> Louisiana NAACP, have easily met the specific standards to support both associational and organizational standing, alleging, first, that its core mission of furthering racial equality is frustrated by the lack of a majority-minority Supreme Court district in the Baton Rouge area and, second, that its members are specifically injured by that circumstance. Contrary to Defendant's claims, there is no requirement that the organization identify such members by name in the Complaint.

(*Id.* at 7.) Moreover, *Gill* had nothing to do with standing in this case and would not bar the Louisiana NAACP from bringing suit. Further, the individual Plaintiffs did in fact allege that their residences would be in the majority-minority district, but, in any event, this is not required. Finally, the Supreme Court's seminal case, *Chisom v. Roemer*, remains good law.

### b. Applicable Law: Standing Generally

"The standing doctrine is a threshold inquiry to adjudication, which defines and limits the role of the judiciary." *In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, 570 F. Supp. 2d 851, 853 (E.D. La. 2008) (citing *McClure v. Ashcroft,* 335 F.3d 404, 408 (5th Cir. 2003)). "It is well settled that unless a plaintiff has standing, a federal district court lacks subject matter jurisdiction to address the merits of the case." *Id.* "In the absence of standing, there is no 'case or controversy' between the plaintiff and defendant which serves as the basis for the exercise of judicial power under Article III of the constitution." *Id.* (citing *Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S. Ct. 2197, 2205, 45 L. Ed. 2d 343 (1975)). "The key question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant federal court jurisdiction." *Id.* (quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S. Ct. 691, 703, 7 L. Ed. 2d 663 (1962)).

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992). "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or hypothetical." *Id.* (internal citations and quotations omitted). "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court." *Id.*, 504 U.S. at 560–61, 112 S. Ct. at 2136 (citations, quotations, and alterations omitted). "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.*, 504 U.S. at 561, 112 S. Ct. at 2136 (citations and quotations omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* (citation omitted).

### c. Summary of Ruling on Standing

In short, the Court will deny the State's motion on each of the above issues. First, Plaintiffs have satisfied the redressability element at the pleading stage. Viewing their *Complaint* as a whole, they have adequately alleged in a nonconclusory way facts from which the inference could be drawn that Louisiana's African-American voting-age population is sufficiently numerous and geographically compact to form a majority of the population in two Supreme Court districts, with the new district being formed from East Baton Rouge Parish in District 5. Based on precedent from this Court, nothing further is required.

Second, the Court finds that the *Hays* line of cases is not controlling. To the contrary, last year, in a case involving the failure to create a second majority-minority congressional district,

this Court held that Plaintiffs had adequately plead standing, and, again, nothing further is required at the pleading stage.

Third, Plaintiffs have adequately alleged both associational and organizational standing for the Louisiana NAACP. As to the former, Plaintiffs have sufficiently alleged that the Louisiana NAACP's members have standing to sue in their own right, and there is no requirement for them to name specific members at the pleading stage. Further, the interests the Louisiana NAACP seeks to protect are clearly germane to its purpose, and neither the claim nor relief sought requires the participation of any of its members in the lawsuit. As to organizational standing, Plaintiffs have sufficiently alleged that the Louisiana NAACP will counteract the allegedly unlawful districting scheme with the Louisiana Supreme Court and that its purposes (and, implicitly, its ability to provide other services) would be perceptibly impaired by these wrongful districts. Because the organization's injury-in-fact "need not measure more than an identifiable trifle," Plaintiffs have adequately alleged standing at the pleading phase. Finally, *Gill* does not bar the Louisiana NAACP's claim for a number of reasons: (1) *Gill* was resolved while in a different procedural posture; (2) *Gill*'s plaintiffs were individuals, not organizations; and (3) most importantly, the Supreme Court expressly left open the question of what impact the decision would have on organizational plaintiffs.

Fourth, viewing the *Complaint* liberally, Plaintiffs Allen and Anthony have adequately alleged an injury-in-fact. They specifically allege that their votes are being diluted and that a majority-minority district including their homes could be drawn to provide a remedy for the Section 2 violation. Nothing further need be alleged at this time.

And fifth, *Chisom v. Roemer* remains viable. The State has failed to point to any law or case directly on point that has overruled or abrogated *Chisom v. Roemer*. Until a higher court does

so, this Court is bound to follow it.  In any event, this Court has recently reaffirmed the Supreme Court's decision in multiple cases.

### 2. Redressability

#### a.  Parties' Arguments

The State first attacks redressability.  To bring a claim under Section 2 of the Voting Rights Act, Plaintiffs must show, *inter alia*, that "the minority group . . . is sufficiently large and geographically compact to constitute a majority in a single member district." (Doc. 27-1 at 7 (emphasis and citation omitted).)    According to the State, this *Gingles* precondition has two elements: numerosity and compactness; it requires a showing of a compact majority-minority district.  Here, Plaintiffs have failed to plead those elements.  Rather, Plaintiffs have only alleged a formulaic recitation of the elements of the cause of action. (*Id.* (citing *Compl*. ¶ 33, Doc. 1).) Plaintiffs may have alleged numerosity, but they did not allege compactness, which typically requires a showing of a hypothetical redistricting scheme.  In any event, numerosity was not met either because state-wide statistics are insufficient.

Plaintiffs respond that they satisfy this *Gingles* preconditions at the pleading stage. Plaintiffs further rely on precedent from this court in *Johnson v. Ardoin*, No. 18-625, 2019 WL 2329319, at *3 (M.D. La. May 31, 2019), which held that maps are not required at the motion to dismiss stage.  Plaintiffs then cite to and quote specific paragraphs of their *Complaint* that support their position.

The State replies that, though much of Plaintiffs' standing argument is flawed, one specific section requires highlighting.  Plaintiffs' citations to specific paragraphs of the *Complaint* (Doc. 34 at 12–13) merely serves to recite the elements of a cause of action.  Indeed, the second bullet

point conflicts with Plaintiff's argument that he is just impacting the Fifth District, and the other bullets are conclusory.

### b.   Applicable Law: The First *Gingles* Conditions

"To prevail on a claim of vote dilution under Section 2 of the Voting Rights Act, [Plaintiffs] must first meet certain threshold requirements set out by the Supreme Court in *Thornburg v. Gingles,* 478 U.S. 30, 106 S. Ct. 2752, 92 L. Ed. 2d 25 (1986)." *Hall v. Louisiana* (*Hall I*), 974 F. Supp. 2d 978, 992 (M.D. La. 2013).   "The *Gingles* factors are: (1) that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) that the minority group is politically cohesive; and (3) that the white majority votes sufficiently as a bloc to cause it to usually defeat the minority's preferred candidate." *Id.* (citing *Gingles,* 478 U.S. at 49–50, 106 S. Ct. 2752). " 'Failure to establish all three of these elements defeats a Section 2 claim.' " *Gonzalez v. Harris Cty., Tex.*, 601 F. App'x 255, 258 (5th Cir. 2015) (per curiam) (quoting *Sensley v. Albritton*, 385 F.3d 591, 595 (5th Cir. 2004)). But, "[i]f [Plaintiffs] make[] these three threshold showings, the question becomes whether under the totality of the circumstances [they have] demonstrated a violation of Section 2." *Hall I*, 974 F. Supp. 2d at 992 (citing *Westwego Citizens for Better Government v. Westwego,* 946 F.2d 1109, 1116 (5th Cir. 1991)).

The Court agrees that this district's recent case of *Johnson v. Ardoin,* No. 18-625, 2019 WL 2329319 (M.D. La. May 31, 2019), *motion to certify appeal denied,* No. 18-625, 2019 WL 4318487 (M.D. La. Sept. 12, 2019), is highly relevant to the instant action.  *Johnson* involved an action by African-American voters in Louisiana who challenged Louisiana's 2011 Congressional Plan on the ground that it impermissibly diluted African-American voting strength. *Johnson*, 2019 WL 2329319, at *1.  Defendant Secretary of State challenged standing by arguing that "Plaintiffs

have failed to produce any proof that: (1) any of the plaintiffs would actually live in either newly

created majority-minority district; and (2) the newly formed districts containing Plaintiffs would

be reasonably compact." *Id.* at \*3. Chief Judge Dick noted that " '[s]atisfying the first *Gingles*

precondition—compactness—normally requires submitting as evidence hypothetical redistricting

schemes in the form of illustrative plans.' " *Id.* (quoting *Gonzalez*, 601 F. App'x at 258). But

Judge Dick rejected this contention, writing:

> [A]t the pleading stage, Plaintiffs have alleged that an additional majority-minority
> district could be drawn incorporating the entirety of the parish where each Plaintiff
> resides. Additionally, Plaintiffs cite to maps that were introduced as amendments
> to the 2011 Congressional Plan to the Legislature but were ultimately rejected.
> Plaintiffs allege that the maps demonstrate that all parishes in which the Plaintiffs
> in CDs 5 and 6 could be included in a new majority-minority district. Defendant
> contends that "simply pointing to plans submitted by various members of the
> Legislature does nothing to fix Plaintiffs' lack of pleaded facts." However, the
> *Amended Complaint* contains allegations that Plaintiffs live in areas which could
> constitute part of a new majority. At this stage of the proceedings, the Court finds
> Plaintiffs' allegations sufficient to confer standing.

*Id.* at \*3.

### c.  Analysis

The Court finds that Plaintiffs have satisfied the redressability element at the pleading

stage. Plaintiffs allege, "Louisiana's African-American population and its voting-age population

are sufficiently large and geographically compact to constitute a majority in two fairly drawn,

constitutional single-member districts for the Supreme Court." (*Compl.* ¶ 4, Doc. 1.) Further,

Plaintiffs Allen and Anthony are both alleged to reside in East Baton Rouge Parish, and the

*Complaint* expressly provides that "[a] majority-black district including [their] home[s] could be

drawn to provide a remedy for the Section 2 violation." (*Id.* ¶¶ 12–13.) The *Complaint* also states,

"Louisiana's African-American population and voting-age population are sufficiently numerous

and geographically compact to form a majority of the total population and voting-age population

in two properly-apportioned, constitutional single-member Supreme Court districts in a seven-district plan." (*Id.* ¶ 34.)  Plaintiffs also detail information about Supreme Court District 5, stating that, in the last primary there, "John Michael Guidry, the only African American in the race, earned the most votes with 27.5% of the total" but ultimately lost in the runoff and that District 5 is "unusually large," "enhances discrimination against black voters," is "majority-white," and "is, by far, the largest district in the state by population." (*Id.* ¶¶ 46–48.)  Finally, Plaintiffs claim:

> Louisiana's African-American population is sufficiently numerous and geographically compact to provide for two properly-apportioned, majority-black, constitutional single-member Louisiana Supreme Court districts in a seven-district plan. In these two remedial districts. the African-American population would constitute a majority of both the total population and the voting-age population.

(*Id.* ¶ 67.)

Reading all of these parts of the *Complaint* together, the Court finds that Plaintiffs have adequately alleged, in a non-conclusory way, facts from which the inference could be drawn  that "the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district." *Hall*, 974 F. Supp. 2d at 992 (citation omitted).  Like *Johnson*, "At this stage of the proceedings, the Court finds Plaintiffs' allegations sufficient to confer standing." *Johnson*, 2019 WL 2329319, at *3.[1]

---

[1] The Court notes that, for the same reasons highlighted by *Johnson*, *Gonzales* is distinguishable.  In *Gonzales*, following a bench trial and a "158-page opinion contain[ing] exhaustive findings of fact and conclusions of law, including extremely detailed charts, statistics, and analyses of testimony and other evidence[,]" the district court ruled that, while numerosity was met, the plaintiffs "failed to satisfy the compactness precondition because their plans did not respect traditional districting principles." *Gonzales*, 601 F. App'x at 257. The Fifth Circuit affirmed. *Id.* at 263. Here, again, we are only at the pleading phase.

### 3. *Hays* and the Effect of Other Challenges

#### a. Parties' Arguments

The State next argues that, on several occasions, challenges such as these have been rejected by federal courts, specifically in the *Hays v. State of Louisiana* line of cases. This is significant because the total African-American population has changed little since *Hays* and the 1990 census.

Plaintiffs first dispute the use of extra-record facts, as attacks on the merits must be evaluated from the pleadings and under Rule 12(b)(6). In any event, the *Hays* line of cases cited by Defendant are distinguishable, as they arise from a thirty-year-old congressional voting district case with "unique political dynamics, and congressional-specific constitutional requirements" that "are not at issue in this case." (Doc. 34 at 14.) Plaintiffs again cite to *Johnson v. Ardoin* in support.

#### b. Analysis

In short, the Court agrees with Plaintiffs. In *Johnson v. Ardoin*, plaintiffs specifically alleged that "Louisiana's failure to create a second majority-minority congressional district in its 2011 Congressional Plan has resulted in the dilution of African-American voting strength in Violation of section 2 of the Voting Rights Act." *Johnson*, 2019 WL 2329319, at *1. Again, the defendant argued there, as here, that plaintiffs lacked standing. But Judge Dick rejected this argument, writing, "At this stage of the proceedings, the Court finds Plaintiffs' allegations sufficient to confer standing." *Id.* at *3. Thus, contrary to the State's position, *Johnson* serves as an example of a case involving the creation of a second majority-minority district that has survived the pleading stage.

Additionally, the Court agrees with Plaintiffs that the *Hayes* line of cases is distinguishable. In *Hays I*, the Western District evaluated the constitutionality of a second majority-minority

district named District 4 that , " '[l]ike the fictional swordsman Zorro, when making his signature mark, . . . slash[ed] a giant but somewhat shaky "Z" across the state.' " *Hays v. State of Louisiana* (*Hays IV*), 936 F. Supp. 360, 363 (W.D. La. 1996) (quoting *Hays v. State of Louisiana*, 839 F. Supp. 1188, 1196 n.21 (W.D. La.1993) [hereinafter *Hays I*], *vacated*, 512 U.S. 1230, 114 S. Ct. 2731, 129 L. Ed. 2d 853 (1994)).  In *Hays I*, the Western District found District 4 unconstitutional and enjoined its use. *Id.*  The State and United States appealed the decision to the Supreme Court, but, while pending, the Legislature repealed the District 4 redistricting plan and replaced it with Act I. *Id.* at 364.

The new District 4 was formed from Act 1 and "resemble[d] an inkblot which has spread indiscriminately across the Louisiana map." *Id.* (citing *Hays v. State of Louisiana*, 862 F. Supp. 119, 126 (W.D. La. 1994) [hereinafter *Hays II* ] (Shaw, C.J., concurring), *vacated*, 515 U.S. 737, 115 S. Ct. 2431, 132 L. Ed. 2d 635 (1995)). The Western District declared Act 1 unconstitutional and enjoined its enforcement. *Id.* at 364–35.  On appeal, the Supreme Court concluded that the plaintiffs lacked standing because they resided outside the boundaries of District 4 and vacated the order. *Id.* at 365 (citing *United States v. Hays*, 515 U.S. 737, ——, 115 S. Ct. 2431, 2436, 132 L. Ed. 2d 635 (1995) [hereinafter *Hays III* ]).

On remand, in *Hays IV*, the Western District allowed the complaint to be amended to substitute new plaintiffs with standing and conducted a fourth evidentiary hearing largely receiving the same evidence as prior hearings.  *Hays IV*, 936 F. Supp. at 366–67.  *Hays IV* then held:

> With those preliminary issues clarified, we address the heart of the matter: Does District 4 of Act 1 constitute a racial gerrymander in violation of the Equal Protection Clause of the United States Constitution? We held in *Hays II* that it does; nothing has changed factually; the law from the Supreme Court is even clearer; and thus we conclude again that such a violation did and continues to occur.

32

*Id.* at 367. In finding that Section 2 of the Voting Rights Act did not compel the creation of District 4, the Western District found that the plaintiffs could not satisfy the first *Gingles* precondition of numerosity and compactness, as:

> District 4 meanders for roughly 250 miles from the northwestern corner of the state to the southeast, dividing parishes and municipalities while surgically agglomerating pockets of minority populations along the way. The reasons that it does so is obvious: Outside New Orleans, the black population of Louisiana is so widely and evenly dispersed that, to create a Congressional district that meets the one-person-one-vote criterion *and* has even a simple majority black population, resort must be had to graphic design that constitutes racial Rorschach-ism. The threshold compactness requirement of *Gingles* has not been met and cannot be met, so § 2 of the VRA—like § 5—cannot be relied on as a compelling governmental interest to justify the enactment of Act 1.

*Id.* at 370.

Thus, as Plaintiffs assert, *Hays* involved two specific attempts over twenty years ago to create a second majority-minority district formed in odd shapes throughout the state which the Western District declared to be unconstitutional after several evidentiary hearings. Conversely, here, Plaintiffs seek at the pleading stage the creation of a second majority-minority district from Supreme Court District 5, with a special eye toward East Baton Rouge Parish. Whether Plaintiffs will ultimately be successful remains to be seen, but, as *Johnson* demonstrates, at the very least, Plaintiffs have survived the motion to dismiss stage.

### 4. Organizational Standing and Injury-in-Fact

#### a. Parties' Arguments

The State next maintains that the Louisiana NAACP lacks standing as an organization and on behalf of its members. As to organizational standing, Defendant points to a 2018 Supreme Court case stating that "harm of vote dilution . . . is 'individual and personal in nature.' " *Gill*, 138 S. Ct. at 1935 (Kagan, J., concurring). Since Plaintiffs bring a vote-dilution claim and not a constitutional violation, the Louisiana NAACP as an organization lacks standing. The Louisiana

NAACP also lacks associational standing, as there is no specific allegation of harm to a specific member of the organization.  Second, there's no allegation of any second majority-minority district, and there's no showing that a member of the Louisiana NAACP would live in the remedial district.  Finally, organizational standing fails for the same reasons as associational standing post-*Gill.*

Plaintiffs respond that they have adequately alleged both types of organizational standing. Plaintiffs allege that the individual members of the Louisiana NAACP have standing to sue. Further, contrary to Defendant's reasoning, many cases have allowed the NAACP to bring an action despite not naming specific members.  In any event, Plaintiffs have sufficiently alleged that members are injured by the current districts and that the injury would be redressed by full compliance.  Plaintiffs also cite the specific allegations of the *Complaint* that establish direct organizational standing, as its mission is frustrated by the current districts. (Doc. 34 at 16–17 (citing *Compl.* ¶ 10).)  Further, *Gill* has nothing to do with standing in this case, as organizational or associational standing was not pled there and as the *Gill* plaintiffs claimed their challenge was "statewide in nature." (Doc. 34 at 17.)

Defendants' reply is largely silent on organizational and associational standing.

### b.  Introduction

"An association or organization can establish an injury-in-fact through either of two theories, appropriately called 'associational standing' and 'organizational standing' " *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017) (quoting *NAACP v. City of Kyle, Tex.*, 626 F.3d 233, 237 (5th Cir. 2010)).   The Court will address each of these theories in turn. The Court will then address the Supreme Court's *Gill* decision.  In short, the Court finds that the Louisiana NAACP has both types of standing, and nothing in *Gill* changes that fact.

34

### c. Associational Standing

### i. Applicable Law

" 'Associational standing' is derivative of the standing of the association's members, requiring that they have standing and that the interests the association seeks to protect be germane to its purpose." *Id.* (citing *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006)). Phrased another way, "an association may have standing to bring suit on behalf of its members when:

> [1] its members would otherwise have standing to sue in their own right; [2] the interests it seeks to protect are germane to the organization's purpose; and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hancock Cty. Bd. of Sup'rs v. Ruhr*, 487 F. App'x 189, 195 (5th Cir. 2012) (unpublished) (quoting *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977))). "The first prong of the associational standing test requires that at least one member of the association satisfy the Article III elements and have standing to sue in his or her own right." *Id.* at 195–96 (citing *Benkiser*, 459 F.3d at 587–88); *see also Warth v. Seldin*, 422 U.S. 490, 511, 95 S. Ct. 2197, 2211–12, 45 L. Ed. 2d 343 (1975) ("The association must allege that its members, or any one of them, are suffering immediate or threatened injury. . . .").

Thus, for example, in *City of Kyle,* the NAACP and local branches thereof sued a city under the Fair Housing Act after the town had changed certain ordinances. 626 F.3d at 235–36. Following a bench trial, the district court denied plaintiffs' request for declaratory and injunctive relief and "presume[d] without deciding that Plaintiffs have standing to bring this action." *Id.* at 236. On appeal, one of the central questions was whether the NAACP groups had associational and organizational standing. For the former, the Fifth Circuit explained:

As to the NAACP's associational-standing claim, there is no evidence in the record showing that a specific member of the NAACP has been unable to purchase a residence in Kyle as a result of the revised ordinances that went into effect in 2003. There is also no evidence showing when and how the revised ordinances may deprive a NAACP member of the opportunity to acquire a new residence in Kyle. Instead, Plaintiffs have pointed only to evidence suggesting, in the abstract, that some minority members may be less able to afford such residences due to the revised ordinances. This is insufficient for associational standing because the alleged injury is neither concrete nor imminent. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992) (requiring an injury in fact that is concrete and actual or imminent, not conjectural or hypothetical); *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006) (requiring that, for associational standing, the members must independently meet the Article III standing requirements).

*Id.* at 237.

Conversely, in. *Ruhr*, local branches of the NAACP brought suit against Mississippi officials alleging that "the county's supervisor districts violated the Fourteenth Amendment's 'one person, one vote' " guarantee." *Ruhr*, 487 F. App'x at 192. They sought declaratory and injunctive relief. *Id.* The district court dismissed the various complaints for lack of standing, but the Fifth Circuit vacated this order. *Id.*

In its discussion, the Fifth Circuit quoted the *Lujan* factors and then stated, " 'At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.' " *Id.* at 195 (quoting *Lujan*, 504 U.S. at 561, 112 S. Ct. 2130 (internal quotation marks and alterations omitted); and citing *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009) ("At the pleading stage, allegations of injury are liberally construed.")).

As to the institutional NAACP's standing, the Fifth Circuit easily dispensed with the second and third elements of associational standing, explaining:

36

Maintaining proportional districts, protecting the strength of votes, and safeguarding the fairness of elections are surely germane to the NAACP's expansive mission. Furthermore, adjudicating a "one person, one vote" claim does not demand factual development about any individual NAACP member; no factual inquiry is necessary beyond the fact that the member is a voter in an overpopulated, under-represented district. Likewise, to determine whether to grant the requested relief of delaying election deadlines and elections, the district court would not need individualized information about NAACP members.

*Id.* at 197–98 (citations omitted).

Defendants instead complained that the NAACP branches did not adequately allege an injury-in-fact on behalf of their members. *Id.* at 198. Defendants specifically argued that "no complaint identified, by name, any member of the local NAACP branch who was a voter from an overpopulated, under-represented district and who thereby suffered a 'one person, one vote' injury." *Id*. Defendants urged:

a complaint cannot be said to allege a concrete, particularized injury without setting forth the name of an NAACP member who was allegedly injured; an NAACP branch may not establish associational standing by asserting, in the abstract, that some of its members reside in overpopulated, under-represented districts. In other words, according to appellees, the NAACP branches must name names.

*Id.* The Fifth Circuit rejected this argument, explaining:

Yet appellees offer no authority for the proposition that an NAACP branch must identify a particular NAACP member *at the pleading stage.* We are aware of no precedent holding that an association must set forth the name of a particular member in its complaint in order to survive a Rule 12(b)(1) motion to dismiss based on a lack of associational standing. *Cf. Church of Scientology v. Cazares,* 638 F.2d 1272, 1279 (5th Cir. 1981) ("[I]n determining whether an association has standing to bring suit on behalf of its members, neither unusual circumstances, inability of individual members to assert rights nor an explicit statement of representation are requisites."). Additionally, the NAACP branches were not merely alleging that some members *might* suffer a "one person, one vote" violation. The NAACP branches were alleging that some members *were* suffering such a violation. By alleging that some of its members were voters from overpopulated and under-represented districts, the NAACP branches adequately alleged that some of its members were suffering a concrete, particularized injury. We conclude that each NAACP branch adequately pleaded the elements of associational standing.

*Id.* at 198–99.  The Fifth Circuit noted, "*City of Kyle* is distinguishable not only because of the difference in procedural posture, but also because an allegation that an NAACP member is a voter in an overpopulated, under-represented district *is* an allegation of a concrete, imminent injury." *Id.* at 199 n.6.  The appellate court concluded, "Overall, we hold that the NAACP plaintiffs and any individual plaintiff who is alleged to be a voter in an overpopulated, under-represented district has adequately alleged facts supporting standing. We disagree with those portions of the district court orders dismissing the complaints for lack of standing." *Id.* at 199.

### ii.    Analysis

The Court finds that the Plaintiff has adequately alleged associational standing for the Louisiana NAACP.  Construing the *Complaint*'s allegations "liberally" as the Court is required to do at the pleading stage, *Ruhr*, 487 F. App'x at 195 (quoting *Little*, 575 F.3d at 540), the Court finds that these allegations (specifically those in ¶¶ 10–13) satisfy the three requirements for associational standing.  As in *Ruhr*, Plaintiffs easily meet the second and third prerequisites.  The interests the Louisiana NAACP seeks to protect are clearly germane to the organization's purpose, as Plaintiffs allege that its "[t]wo central goals . . are to eliminate racial discrimination in the democratic process, and to enforce federal laws and constitutional provisions securing voting rights." (*Compl.* ¶ 10, Doc. 1.)  *See also Ruhr*, 487 F. App'x at 197–98 ("Maintaining proportional districts, protecting the strength of votes, and safeguarding the fairness of elections are surely germane to the NAACP's expansive mission.").  Further, the Section 2 dilution claim and the relief sought (a redrawing of the districts to create a majority-minority district in District 5) do not require the participation of individual members of the suit.

The State mainly complains about Plaintiffs' failure to name specific members, but *Ruhr* specifically rejected this argument. *Ruhr*, 487 F. App'x at 198 ("We are aware of no precedent

holding that an association must set forth the name of a particular member in its complaint in order to survive a Rule 12(b)(1) motion to dismiss based on a lack of associational standing. . . *at the pleading stage*.").  Moreover, *City of Kyle* is distinguishable for the same reasons highlighted by *Ruhr*: (1) *City of Kyle* was in a different procedural posture (after trial), and (2) here, Plaintiffs allege a specific, concrete injury of its members, namely that "The Louisiana NAACP has members throughout the State, including members whose votes are unlawfully diluted by the current Supreme Court districts and whose injury would be redressed by the creation of a second majority-black district in the State." (*Compl.* ¶¶ 11, Doc. 1.)  Contrary to the State's arguments, the specific district is identified as well, as the allegations related to Plaintiffs Allen and Anthony state that "[a] majority-black district including [their] home[s] . . . in East Baton Rouge Parish. . . could be drawn to provide a remedy for the Section 2 violation." (*Id.* ¶¶ 12–13.)

Construing all of these paragraphs together and liberally, it is clear that Plaintiff has adequately alleged the requirements for associational standing, and that is all they are required to do at the pleading stage.  This part of the State's motion is thus denied.

### d.  Organizational Standing

#### i.    Applicable Law

"By contrast [to associational standing], 'organizational standing' does not depend on the standing of the organization's members. The organization can establish standing in its own name if it 'meets the same standing test that applies to individuals.' "  *OCA-Greater Hous.*, 867 F.3d at 610 (quoting *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999)). *See also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79, 102 S. Ct. 1114, 71 L. Ed. 2d 214 (1982).

Thus, for example, in *OCA-Greater Houston*, a Chinese voting rights organization claimed as its injury-in-fact the " 'additional time and effort spent explaining the Texas provisions at issue to limited English proficient voters' because 'addressing the challenged provisions frustrate[d] and complicate[d] its routine community outreach activities.' "*OCA-Greater Hous.*, 867 F.3d at 610. The Fifth Circuit explained:

> The undisputed summary-judgment evidence established that OCA's primary mission is voter outreach and civic education, particularly "getting out the vote" among its members. Because a substantial portion of OCA's membership consists of people with limited English proficiency, Texas's voter interpreter restriction has deterred some of them from voting. In response, OCA calibrated its outreach efforts to spend extra time and money educating its members about these Texas provisions and how to avoid their negative effects. Specifically, OCA employees and volunteers must carefully explain to those it contacts, in the language they understand, that when they bring an interpreter to a Texas polling location, the interpreter must identify his or herself as an "assistor" rather than as an "interpreter" to avoid being turned away under Texas law like Das's son was. And OCA explains that these in-depth conversations take more time than merely explaining the requirements of the VRA, and therefore OCA must spend more time on each call (and reach fewer people in the same amount of time) because of Texas's law.

*Id.*

Defendants, on the other hand, relied on *City of Kyle*, where the Fifth Circuit found no organizational standing. *Id.* at 611. The Fifth Circuit rejected Defendant's position and explained:

> The *City of Kyle* plaintiffs were dedicated lobbying groups who claimed their lobbying and litigation-related expenses as their injury. It is fundamental that no plaintiff may claim as injury the expense of preparing for litigation, for then the injury-in-fact requirement would pose no barrier. The key fact in *City of Kyle* was that every claimed "injury" either was undertaken to prepare for litigation (such as the commissioning of a $15,000 study on the impact of the ordinances—a study that the plaintiffs then relied on at trial to demonstrate disparate impact) or was no different from the plaintiffs' daily operations (such as the vice president's spending time reviewing ordinances).
>
> Here, by contrast, OCA is not a lobbying group. It went out of its way to counteract the effect of Texas's allegedly unlawful voter-interpreter restriction—not with a view toward litigation, but toward mitigating its real-world impact on OCA's members and the public. For instance, it undertook to educate voters about Texas's assistor-versus-interpreter distinction to reduce the chance that other voters would

be denied their choice of interpreter in the way that Das was—an undertaking that consumed its time and resources in a way they would not have been spent absent the Texas law. Hence, the Texas statutes at issue "perceptibly impaired" OCA's ability to "get out the vote" among its members. [*See Havens Realty*, 455 U.S. at 379, 102 S. Ct. 1114 (holding that a housing counselling service's "ability to provide counselling and referral services for low- and moderate-income homeseekers" was "perceptibly impaired" by the defendant's allegedly unlawful practices, so "there [could] be no question that [it] suffered injury in fact").]

*Id.* at 611–12.   The appellate court also rejected Defendant's attempt to disqualify all "prelitigation" expenses:

> Every qualifying injury-in-fact will necessarily occur "prelitigation," and an expense can be incurred before litigation but still be *related* to the future litigation. The bar against claiming litigation expenses as injury is not one of temporal relation, but one of substantive relation. In *City of Kyle*, the expenses occurred prelitigation but were related to litigation. Here, the expenses occurred prelitigation and are unrelated to litigation. That is the critical distinction.

*Id.* at 612.  The Fifth Circuit concluded its analysis:

> To be sure, OCA's injury was not large. But the injury alleged as an Article III injury-in-fact need not be substantial; "it need not measure more than an 'identifiable trifle.' " [*Fowler*, 178 F.3d at 358.] This is because "the injury in fact requirement under Article III is qualitative, not quantitative, in nature." [*Id.* at 357–58.] Our remark in *City of Kyle* that those plaintiffs could have established standing by "identif[ying] any specific projects that the HBA had to put on hold or otherwise curtail in order to respond to the revised ordinances[,]" [*City of Kyle*, 626 F.3d at 238,] was not a heightening of the *Lujan* standard, but an example of how to satisfy it by pointing to a non-litigation-related expense. Indeed, the Supreme Court has commanded that, in determining whether an organization has organizational standing, "we conduct the same inquiry as in the case of an individual." [*Havens Realty*, 455 U.S. at 378, 102 S. Ct. 1114.] So to the extent that Texas would read *City of Kyle* as imposing a higher burden on organizations seeking to establish standing, we must disagree. We rather agree with the district court that OCA has satisfied its burden under *Lujan* to show an injury-in-fact.

*Id.*

Similarly, in *Greater New Orleans Fair Housing Action Center v. Kelly*, 364 F. Supp. 3d 635, 647 (E.D. La. 2019), Judge Vance found in a sex-based housing discrimination case that an organization had adequately pled standing. Looking at the above cases, she began her discussion:

Nonprofit organizations can suffer an Article III injury when a defendant's actions frustrate their missions and force them to "divert significant resources to counteract the defendant's conduct." *N.A.A.C.P. v. City of Kyle, Texas*, 626 F.3d 233, 238 (5th Cir. 2010) (citing *Havens Realty Corp.*, 455 U.S. at 379, 102 S. Ct. 1114); *OCA-Greater Houston*, 867 F.3d at 612. For instance, the Fifth Circuit has held that an organization devoted to promoting civic participation among Chinese and Asian Pacific Americans suffered an Article III injury when it diverted its resources to educate the community about how to avoid the alleged discriminatory effects of a Texas voting law. *OCA-Greater Houston*, 867 F.3d at 612.

*Id.* at 646. In finding that plaintiff had adequately alleged standing, the court explained:

Here, plaintiff alleges that it has been injured because defendants have frustrated its mission of combating housing discrimination in the New Orleans community. Specifically, plaintiff alleges it has expended resources, including "staff time and organizational funds," to "engage in education and outreach activities to counteract the effects" of defendants' alleged discrimination. These activities allegedly include creating and circulating brochures and advertisements addressing sex discrimination and sexual harassment in housing, as well as making presentations on these topics to student groups. Plaintiff asserts that as a result of these expenditures, it has been forced to divert resources away from other planned projects and activities, including (1) other investigative initiatives; (2) recruitment of financial sponsors for its annual fair housing summit; and (3) development and publication of new fair housing educational materials. This diversion of resources has allegedly caused plaintiff to suffer decreased funding and a delay in providing its usual educational services to the community.

These factual allegations are sufficient to plead an Article III injury, because plaintiff alleges that it has diverted its resources toward education and outreach activities to address the impact of defendants' alleged discriminatory practices. *See id.* at 610-12; *Havens Realty Corp.*, 455 U.S. at 379, 102 S. Ct. 1114 (plaintiff sufficiently pleaded Article III injury by alleging it "had to devote significant resources to identify and counteract the defendant's racially discriminatory steering practices"). Importantly, plaintiff specifically alleges that it undertook these activities to counteract the effects of defendants' alleged discrimination, and not to prepare for this litigation. *See OCA-Greater Houston*, 867 F.3d at 611 ("It is fundamental that no plaintiff may claim as injury the expense of preparing for litigation, for then the injury-in-fact requirement would pose no barrier."). Plaintiff has also identified with sufficient particularity other projects it has had to put on hold or curtail in order to address the impact of defendants' alleged actions—*i.e.*, preparing for its annual fair housing summit and publishing new educational materials. *Cf. City of Kyle*, 626 F.3d at 238 (ruling that plaintiff lacked standing in part because at trial it failed to specify what other specific projects it had to put on hold to respond to defendant's alleged discriminatory ordinance). Finally, it is immaterial that this alleged injury may have amounted to only a minimal expenditure of plaintiff's resources, because an Article III injury "need not measure

more than an identifiable trifle." *OCA-Greater Houston*, 867 F.3d at 612 (quoting *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999)).

*Id.* at 646–47.[2]  The Court also distinguished another Fifth Circuit case by empathizing that this decision was reached at the pleading phase:

> Because the case here is merely at the pleading stage, plaintiff need not *prove* that its efforts have led to a drain on its resources. Plaintiff need only allege facts demonstrating each element of standing. *Spokeo, Inc.*, 136 S. Ct. at 1547; *Lujan*, 504 U.S. at 561, 112 S. Ct. 2130 (the plaintiff must establish each element of standing "with the manner and degree of evidence required at the successive stages of the litigation"). Plaintiff has met this requirement for each element of Article III standing.

*Id.* at 648.

### ii.    Analysis

The Court also finds that Plaintiffs have adequately alleged organizational standing for the Louisiana NAACP.  Again, the *Complaint* provides:

> The Louisiana NAACP is the oldest and one of the most significant civil rights organizations in Louisiana, and it works to ensure the political, educational, social, and economic equality of African Americans and all other Americans. Two central goals of the Louisiana NAACP are to eliminate racial discrimination in the democratic process, and to enforce federal laws and constitutional provisions securing voting rights. Toward those ends, the Louisiana NAACP has participated in lawsuits to protect the right to vote, regularly engages in efforts to register and educate African-American voters, and encourages African Americans to engage in the political process by turning out to vote on Election Day. The mission of the

---

[2] The Court also noted:

> Plaintiff also alleges that it has been injured because of its expenditures on "witness interviews and testing" to "identify defendants' unlawful discrimination." *Id.* at 18 ¶ 105. These expenses qualify as an Article III injury to the extent they were undertaken solely to identify or confirm defendants' alleged discriminatory practices, and not to prepare for litigation. *See Havens Realty Corp.*, 455 U.S. at 379, 102 S. Ct. 1114; *OCA-Greater Houston*, 867 F.3d at 611; *City of Kyle*, 626 F.3d at 238 (plaintiff's expenditure of $ 15,000 for a study on the impact of defendant's allegedly discriminatory ordinance, which plaintiff then relied upon at trial to prove the ordinance's disparate impact, was not an Article III injury); *Fowler*, 178 F.3d at 358 (compilation of statistical evidence regarding the impact of an allegedly discriminatory voter registration law, when put together "in connection" with the lawsuit, was not an Article III injury). As already addressed, plaintiff has sufficiently pleaded a constitutional injury even without this allegation.

*Id.* at 647 n.87.

> Louisiana NAACP is frustrated by the current Supreme Court districts, which inhibit the organization's ability to fulfill its objectives, including the promotion of political equality for black voters.

(*Compl.* ¶ 10, Doc. 1.)

Construing the *Complaint* "liberally," *Ruhr*, 487 F. App'x at 195 (quoting *Little*, 575 F.3d at 540), Plaintiffs demonstrate that the Louisiana NAACP, like the voting rights organization in *OCA-Greater Houston*, will likely go "out of its way to counteract the effect of [Louisiana's] allegedly unlawful [Supreme Court districting scheme]—not with a view toward litigation, but toward mitigating its real-world impact on [Louisiana NAACP's] members and the public." *OCA-Greater Hous.*, 867 F.3d at 612; *See also Kelly*, 364 F. Supp. 3d at 647 ("Importantly, plaintiff specifically alleges that it undertook these activities to counteract the effects of defendants' alleged discrimination, and not to prepare for this litigation." (citing *OCA-Greater Hous.*, 867 F.3d at 611)); *Compl.* ¶ 10, Doc. 1 ("Two central goals of the Louisiana NAACP are to eliminate racial discrimination in the democratic process, and to enforce federal laws and constitutional provisions securing voting rights. Toward those ends, the Louisiana NAACP has participated in lawsuits to protect the right to vote, regularly engages in efforts to register and educate African-American voters, and encourages African Americans to engage in the political process by turning out to vote on Election Day.").

Moreover, as in *Havens Realty*, the Louisiana NAACP's "ability to provide" other services to its members is "perceptibly impaired" by the allegedly wrongful Supreme Court districts, so "there can be no question that [it] suffered injury in fact." *Havens Realty*, 455 U.S. at 379, 102 S. Ct. at 1124. *See also Kelly*, 364 F. Supp. 3d at 647 ("These factual allegations are sufficient to plead an Article III injury, because plaintiff alleges that it has diverted its resources toward education and outreach activities to address the impact of defendants' alleged discriminatory

44

practices."). Again, the *Complaint* specifically alleges, "Louisiana NAACP is frustrated by the current Supreme Court districts, which inhibit the organization's ability to fulfill its objectives, including the promotion of political equality for black voters." (*Compl.* ¶ 10, Doc. 1.)

And, as *OCA-Greater Houston* recognized, it is irrelevant that Plaintiffs have not identified "specific projects that [they] had to put on hold or otherwise curtail," as that is "but an example of how to satisfy" the *Lujan* standard. *OCA-Greater Hous.*, 867 F.3d at 612. As the Fifth Circuit said, "an Article III injury-in-fact need not be substantial; 'it need not measure more than an "identifiable trifle" .' " *Id.*; *see also Kelly*, 364 F. Supp. 3d at 647 (same).

Lastly, as *Kelly* recognized, since this is "merely at the pleading stage, plaintiff need not *prove* that its efforts led to a drain on its resources. Plaintiff need only allege facts demonstrating each element of standing." *Kelly*, 364 F. Supp. 3d at 648 (citations omitted). Here, Plaintiffs satisfy that standard, so the State's motion is denied.

### e. *Gill* Does Not Bar Plaintiffs' Action

Finally, *Gill* does not prevent the Louisiana NAACP from having standing. Defendants are correct that *Gill* stated that the Supreme Court has "long recognized that a person's right to vote is 'individual and personal in nature.' " *Gill*, 138 S. Ct. at 1929 (citing *Reynolds v. Sims*, 377 U.S. 533, 561, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964)). Further, *Gill* said that, consequently, " 'voters who allege facts showing disadvantage to themselves as individuals have standing to sue' to remedy that disadvantage." *Id.* (quoting *Baker*, 369 U.S. at 206, 82 S. Ct. at 704). However, several other aspects undermine Defendants' position.

First, in *Gill*, the Supreme Court stated at the outset that "[c]ertain of the plaintiffs before us alleged that they had [standing] in this case, but never followed up with the requisite proof."

*Gill*, 138 S. Ct. at 1923.  The Supreme Court specifically stated that the "case proceeded to trial[.]" *Id.* at 1924.  This case, conversely, remains at the pleading stage.

Second, the *Gill* plaintiffs were "twelve Wisconsin voters" who "identified themselves as 'supporters of the public policies espoused by the Democratic Party and of Democratic Party candidates.' " *Id.* at 1923.  This case, on the other hand, was brought by individuals and an organization—the Louisiana NAACP.  Thus, Plaintiffs are quite correct that organizational standing could not have possibly been at issue in *Gill*.

And third, and perhaps most importantly, *Gill* specifically declined to address whether organizations would continue to have standing in voting cases:

> We leave for another day consideration of other possible theories of harm not presented here and whether those theories might present justiciable claims giving rise to statewide remedies. Justice KAGAN's concurring opinion endeavors to address "other kinds of constitutional harm," see *post*, at 1938, perhaps involving different kinds of plaintiffs, see *post*, at 1938 – 1939, and differently alleged burdens, see *ibid*. But the opinion of the Court rests on the understanding that we lack jurisdiction to decide this case, much less to draw speculative and advisory conclusions regarding others. *See Public Workers v. Mitchell*, 330 U.S. 75, 90, 67 S. Ct. 556, 91 L. Ed. 754 (1947) (noting that courts must "respect the limits of [their] unique authority" and engage in "[j]udicial exposition ... only when necessary to decide definite issues between litigants"). The reasoning of this Court with respect to the disposition of this case is set forth in this opinion and none other. And the sum of the standing principles articulated here, as applied to this case, is that the harm asserted by the plaintiffs is best understood as arising from a burden on those plaintiffs' own votes. In this gerrymandering context that burden arises through a voter's placement in a "cracked" or "packed" district.

*Id.* at 1931.  Justice Kagan's concurrence specifically refers to such associational or organizational standing. *See id.* at 1938 (Kagan, J., concurring) ("But partisan gerrymanders inflict other kinds of constitutional harm as well. Among those injuries, partisan gerrymanders may infringe the First Amendment rights of association held by parties, other political organizations, and their members.").  Thus, contrary to the State's position, *Gill* did not definitively resolve the issue for organizations like the Louisiana NAACP.  In fact, it left the question open.

For all these reasons, the Court finds that Plaintiffs have adequately alleged associational and organizational standing. *Gill* does not change that fact. Accordingly, the State's motion to dismiss on this issue is denied.

### 5. Individual Standing and Injury-in-Fact

#### a. Parties' Arguments

According to the State, the individual Plaintiffs also lack standing because they have suffered no injury-in-fact. First, there is no showing of what Supreme Court district Plaintiffs reside in. Second, there is no indication that a second majority-minority district could be drawn encompassing either individual Plaintiff.

In response, the individual Plaintiffs say they have standing. Plaintiffs point to specific paragraphs of the *Complaint* which reflect this. (Doc. 34 at 18 (citing *Compl.* ¶¶ 12–13).) According to Plaintiffs, nothing more need be said at this point, and nothing further could be alleged since the reapportionment and maps will be up to the State Legislature, subject to review by the Court.

#### b. Analysis

In short, Plaintiffs have adequately alleged standing for both Plaintiffs Allen and Anthony. Both are alleged to reside in East Baton Rouge Parish. (*Compl.* ¶¶ 12–13, Doc. 1.) Moreover, Plaintiffs specifically claim that, "[a]s a result of the demonographies of [their] Supreme Court district and racially polarized voting, [Allen and Anthony's] vote[s] [are] unlawfully diluted" and that, "[a] majority-black district including [their] home[s] could be drawn to provide a remedy for the Section 2 violation." (*Id.* ¶¶ 12–13.)

These allegations must also be read in conjunction with later paragraphs about District 5, "which is centered around the Baton Rouge area but is majority-white" and which is "an unusually

47

large Supreme Court district that . . . enhances discrimination against black voters." (*Id.* ¶ 48.) This district awarded 27.5% of the vote total in the primary to the only African American in the race and yet Guidry was defeated in the runoff. (*Id.* ¶ 47.)

Construing all of these allegations together, the Court finds that Plaintiffs have sufficiently shown in what district Anthony and Allen reside and that a majority-minority district could be drawn from the "unusually large" District 5.  For these reasons, Defendants' motion to dismiss is denied.

### 6. Continued Viability of *Chisom v. Roemer*

#### a.  Parties' Arguments

The State next argues that later decisions of the Supreme Court call into question the continued viability of *Chisom v. Roemer*, which the State concedes held that "elected judges fall 'within the ambit of §2 [of the Voting Rights Act] as amended[.]" (Doc. 27-1 at 16.)  Judges are not "representatives" or politicians in the same sense as legislators or executives. Judges do not have "constituencies" either. "Put another way, it would be a pointless exercise to elect a candidate of choice when that candidate is not expected, and in fact should not, represent the interests of the community that elected that candidate." (*Id.* at 18.)  In sum:

> The Supreme Court's holdings since *Chisom v. Roemer* therefore compel the conclusion that Section 2 of the Voting Rights Act no longer applies to judicial elections because judges and judicial elections are so distinct from elections of other government officials who are representatives. At least three Supreme Court decisions since *Chisom v. Roemer*, along with basic principles of statutory construction indicate that *Chisom v. Roemer*'s holding on this point is no longer good law.

(*Id.* at 19.)

Plaintiffs assert that the Voting Rights Act applies to judicial districts. The Supreme Court's decision in *Chisom* controls, and none of the State's authority involve Voting Rights Act claims or give an indication that the Supreme Court has reversed itself.

### b. Analysis

In short, the Court will deny Defendant's motion to dismiss on this issue. At the outset, the Court notes that at least two recent cases in this Court have recognized (either explicitly or implicitly) that, under *Chisom v. Roemer*, a "challenge to the electoral system of judges is cognizable under the [Voting Rights Act]." *Hall v. Louisiana*, 108 F. Supp. 3d 419, 427 (M.D. La. 2015) (citing *Chisom v. Roemer*, 501 U.S. 380, 111 S. Ct. 2354). *See also Terrebonne III*, 274 F. Supp. 3d at 407 (M.D. La. 2017) (finding, after bench trial, "that . . . the use of at-large voting for election to the 32nd JDC effectively . . . [for the] elect[ion of] judicial candidates . . . deprives black voters of the equal opportunity to elect candidates of their choice in violation of Section 2, and it has been maintained for that purpose, in violation of Section 2 and the United States Constitution."). At least one other district Court in this circuit has recently recognized the same. *See Lopez v. Abbott*, No. 2:16-CV-303, 2017 WL 1209846, at *7 (S.D. Tex. Apr. 3, 2017) ("But the Supreme Court has already held that Section 2 of the Voting Rights Act applies to state judicial elections." (citing *Chisom v. Roemer*, 501 U.S. at 404.)). Thus, the Court begins by viewing the State's position with a certain degree of skepticism.

The State's position requires a close reading of *Chisom v. Roemer*. Writing for the majority, Justice Stevens began the Court's analysis by recognizing the limited nature of its holding:

> Our decision today is limited in character, and thus, it is useful to begin by identifying certain matters that are not in dispute. No constitutional claims are before us. . . . *.[T]his case presents us solely with a question of statutory construction. That question involves only the scope of the coverage of § 2 of the*

> *Voting Rights Act as amended in 1982.* We therefore do not address any question concerning the elements that must be proved to establish a violation of the Act or the remedy that might be appropriate to redress a violation if proved.
>
> *It is also undisputed that § 2 applied to judicial elections prior to the 1982 amendment, and that § 5 of the amended statute continues to apply to judicial elections*, *see Clark v. Roemer*, 500 U.S. 646, 111 S. Ct. 2096, 114 L.Ed.2d 691 (1991). Moreover, there is no question that the terms "standard, practice, or procedure" are broad enough to encompass the use of multimember districts to minimize a racial minority's ability to influence the outcome of an election covered by § 2. The only matter in dispute is whether the test for determining the legality of such a practice, which was added to the statute in 1982, applies in judicial elections as well as in other elections.

*Chisom v. Roemer*, 501 U.S. at 390–91, 111 S. Ct. at 2361–62 (emphasis added).

The Supreme Court rejected the respondents' argument that Congress intended by the 1982 amendments to Section 2 to "exclude vote dilution claims involving judicial elections from the coverage of § 2" because the Supreme Court was "convinced that if Congress had such an intent, Congress would have made it explicit in the statute, or at least some of the Members would have identified or mentioned it at some point in the unusually extensive legislative history of the 1982 amendment." *Id.*, 501 U.S. at 396, 111 S. Ct. at 2364.

The State appears to focus on the following part of the *Chisom v. Romer* opinion:

> Both respondents and the [*League of United Latin American Citizens Council No. 4434 v. Clements*, 914 F.2d 620 (5th Cir. 1990) (hereinafter *LULAC* )] majority place their principal reliance on Congress' use of the word "representatives" instead of "legislators" in the phrase "to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973. When Congress borrowed the phrase from *White v. Regester*, it replaced "legislators" with "representatives." This substitution indicates, at the very least, that Congress intended the amendment to cover more than legislative elections. Respondents argue, and the majority agreed, that the term "representatives" was used to extend § 2 coverage to executive officials, but not to judges. We think, however, that the better reading of the word "representatives" describes the winners of representative, popular elections. If executive officers, such as prosecutors, sheriffs, state attorneys general, and state treasurers, can be considered "representatives" simply because they are chosen by popular election, then the same reasoning should apply to elected judges.

*Id.*, 501 U.S. at 398–99, 111 S. Ct. at 2366.

It must be emphasized that Justice Stevens (writing for the majority) looked at other parts of the language of the Voting Rights Act to reach this conclusion.  For example, Justice Stevens wrote:

> Respondents suggest that if Congress had intended to have the statute's prohibition against vote dilution apply to the election of judges, it would have used the word "candidates" instead of "representatives." Brief for Respondents 20, and n. 9. But that confuses the ordinary meaning of the words. The word "representative" refers to someone who has prevailed in a popular election, whereas the word "candidate" refers to someone who is seeking an office. Thus, a candidate is nominated, not elected. When Congress used "candidate" in other parts of the statute, it did so precisely because it was referring to people who were aspirants for an office. See, *e.g.,* 42 U.S.C. §§ 1971(b) ("any candidate for the office of President"), 1971(e) ( "candidates for public office"), 1973i(c) ("any candidate for the office of President"), 1973i(e)(2) ("any candidate for the office of President"), 1973*l*(c) ("candidates for public or party office"), 1973ff–2 ("In the case of the offices of President and Vice President, a vote for a named candidate"), 1974 ("candidates for the office of President"), 1974e ("candidates for the office of President").

*Id.*, 501 U.S. at 399–400, 111 S. Ct. at 2366.  Similarly, Justice Stevens said:

> The close connection between §§ 2 and 5 further undermines respondents' view that judicial elections should not be covered under § 2. Section 5 requires certain States to submit changes in their voting procedures to the District Court of the District of Columbia or to the Attorney General for preclearance. Section 5 uses language similar to that of § 2 in defining prohibited practices: "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting." 42 U.S.C. § 1973c. This Court has already held that § 5 applies to judicial elections. *Clark v. Roemer,* 500 U.S. 646, 111 S. Ct. 2096, 114 L. Ed. 2d 691 (1991). If § 2 did not apply to judicial elections, a State covered by § 5 would be precluded from implementing a new voting procedure having discriminatory effects with respect to judicial elections, whereas a similarly discriminatory system already in place could not be challenged under § 2. It is unlikely that Congress intended such an anomalous result.

*Chisom v. Roemer*, 501 U.S. at 401–02, 111 S. Ct. at 2367.

The Supreme Court's conclusion is important as well.  Justice Stevens closed:

> Congress enacted the Voting Rights Act of 1965 for the broad remedial purpose of "rid[ding] the country of racial discrimination in voting." *South Carolina v. Katzenbach,* 383 U.S. 301, 315, 86 S. Ct. 803, 811, 15 L. Ed. 2d 769 (1966). In *Allen v. State Board of Elections,* 393 U.S. 544, 567, 89 S. Ct. 817, 832, 22 L. Ed. 2d 1 (1969), we said that the Act should be interpreted in a manner that provides "the broadest possible scope" in combating racial discrimination. Congress

amended the Act in 1982 in order to relieve plaintiffs of the burden of proving discriminatory intent, after a plurality of this Court had concluded that the original Act, like the Fifteenth Amendment, contained such a requirement. See *Mobile v. Bolden,* 446 U.S. 55, 100 S. Ct. 1490, 64 L. Ed. 2d 47 (1980). Thus, Congress made clear that a violation of § 2 could be established by proof of discriminatory results alone. It is difficult to believe that Congress, in an express effort to broaden the protection afforded by the Voting Rights Act, withdrew, without comment, an important category of elections from that protection. Today we reject such an anomalous view and hold that state judicial elections are included within the ambit of § 2 as amended.

*Id.*, 501 U.S. at 403–04, 111 S. Ct. at 2368.

Nothing in the State's authority undermines *Chisom v. Romer*'s reasoning or holding. For example, in *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 135 S. Ct. 1656, 191 L. Ed. 2d 570 (2015), the issue was whether the First Amendment allowed a prohibition on judges and judicial candidates from "personally soliciting funds for their campaign.[]" *Id.*, 575 U.S. at 437, 135 S. Ct. at 1662. The Supreme Court held "that it does," explaining:

Judges are not politicians, even when they come to the bench by way of the ballot. And a State's decision to elect its judiciary does not compel it to treat judicial candidates like campaigners for political office. A State may assure its people that judges will apply the law without fear or favor—and without having personally asked anyone for money.

*Id.*, 575 U.S. at 437–38, 135 S. Ct. at 1662.

But the simple fact is that treating judges one way for the purpose of the First Amendment does not preclude Courts from treating them another way for purposes of the Voting Rights Act. And this is particularly true given the fact that the *Chisom v. Roemer* court went to great lengths to describe how judges were "representatives" under the Voting Rights Act based on that statute's unique statutory language and legislative history. *See Chisom v. Roemer*, 501 U.S. at 398–99, 111 S. Ct. at 2366.

Similarly, in *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 129 S. Ct. 2252, 173 L. Ed. 2d 1208 (2009), Justice Kennedy summarized the holding as follows:

In this case the Supreme Court of Appeals of West Virginia reversed a trial court judgment, which had entered a jury verdict of $50 million. Five justices heard the case, and the vote to reverse was 3 to 2. The question presented is whether the Due Process Clause of the Fourteenth Amendment was violated when one of the justices in the majority denied a recusal motion. The basis for the motion was that the justice had received campaign contributions in an extraordinary amount from, and through the efforts of, the board chairman and principal officer of the corporation found liable for the damages.

Under our precedents there are objective standards that require recusal when "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S. Ct. 1456, 43 L. Ed. 2d 712 (1975). Applying those precedents, we find that, in all the circumstances of this case, due process requires recusal.

*Caperton*, 556 U.S. at 872, 129 S. Ct. at 2256–57.  Following a discussion on judges and elections,

the Supreme Court found:

We conclude that there is a serious risk of actual bias—based on objective and reasonable perceptions—when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent. The inquiry centers on the contribution's relative size in comparison to the total amount of money contributed to the campaign, the total amount spent in the election, and the apparent effect such contribution had on the outcome of the election.

Applying this principle, we conclude that Blankenship's campaign efforts had a significant and disproportionate influence in placing Justice Benjamin on the case.

*Id.*, 556 U.S. at 884, 129 S. Ct. at 2263–64. This is a far cry from a typical Voting Rights case.

Further, the *Caperton* court appeared to narrow the holding:

Our decision today addresses an extraordinary situation where the Constitution requires recusal. Massey and its *amici* predict that various adverse consequences will follow from recognizing a constitutional violation here—ranging from a flood of recusal motions to unnecessary interference with judicial elections. We disagree. The facts now before us are extreme by any measure. The parties point to no other instance involving judicial campaign contributions that presents a potential for bias comparable to the circumstances in this case.

*Id.*, 556 U.S. at 887, 129 S. Ct. at 2265.

In sum, Defendants point to no authority that has directly overruled or recognized the overruling of *Chisom v. Roemer*.  Until the State does so, this Court is bound to follow *Chisom v. Roemer*'s direct holding.  The State's motion is thus denied on this issue.

### D.  Motion for a More Definite Statement

#### 1. Parties' Arguments

Alternatively, Defendants pray for a more definite statement.  The State argues that "there are so many ambiguities throughout the Complaint that, if dismissal is inappropriate, a more definite statement certainly is appropriate." (Doc. 27-1 at 19.)  The State provides, by way of example, "it is unclear from the face of the Complaint if any remedy is possible, especially considering the previous history found in the various *Hays* cases." (*Id.* at 19–20.)

Plaintiffs respond that a more definite statement is not required.  *Hayes* is not relevant, and, in any event, *Johnson* is controlling.  Further, the Complaint "meets and surpasses the pleading standards under Rule 8 and states each of the necessary elements for a claim under VRA section 2." (Doc. 34 at 20.)

The State does not respond to this argument in its reply.

#### 2. Applicable Law

Rule 12(e) provides that "[a] party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e); *see also Beanel v. Freeport–McCoran, Inc.*, 197 F.3d 161, 164 (5th Cir. 1999) ("If a complaint is ambiguous or does not contain sufficient information to allow a responsive pleading to be framed, the proper remedy is a motion for a more definite statement under Rule 12(e)."). The complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N.A.*, 534 U.S.

506, 512 (2002). A Rule 12(e) motion may be appropriate "[i]f a pleading fails to specify the allegations in a manner that provides sufficient notice." *Id.* at 514.

When evaluating a motion for a more definite statement, the Court must assess the complaint in light of the minimal pleading requirements of Rule 8. *Babcock & Wilcox Co. v. McGriff, Seibels & Williams, Inc.*, 235 F.R.D. 632, 633 (E.D. La. 2006); *see* Fed. R. Civ. P. 8(a)(2) (requiring a "short and plain statement of the claim showing that the pleader is entitled to relief"). Given the liberal pleading standard set forth in Rule 8(a), Rule 12(e) motions are disfavored. *Adams v. Southland Trace*, No. 07-869, 2012 WL 12986191, at *5 (M.D. La. Feb. 29, 2012). The trial judge is given considerable discretion in deciding whether to grant a Rule 12(e) motion. *Id.* Finally, a Rule 12(e) motion is not a substitute for the discovery process. *Ford v. Cain*, No. 15-136, 2016 WL 447617, at *2 (M.D. La. Feb. 4, 2016).

### 3. Analysis

Considering that such motions are "disfavored," the Court will exercise its "considerable discretion" to deny Defendant's motion for a more definite statement.  The State cites to no specific problem with Plaintiffs'' pleading other than the one involving *Hays*, and the Court rejected this argument—along with all of the State's other objections.  Reading the *Complaint* as a whole, the Court finds that it is not "so vague or ambiguous that [the State] cannot reasonably prepare a response." *See* Fed. R. Civ. P. 12(e).  The State has been given "fair notice of what the plaintiff's claim is and the grounds upon which it rests," *Swierkiewicz*, 534 U.S. at 512, so the State's motion is denied.

### III.    The Secretary of State's Motion

#### A.  Ardoin's Rule 12(b)(1) and 12(b)(6) Attacks

##### 1. Rule 12(b)(6) Standard

In *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 135 S. Ct. 346 (2014), the Supreme Court explained: "Federal pleading rules call for 'a short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson*, 574 U.S. at 10–11, 135 S. Ct. at 346–47 (citation omitted).

Interpreting Rule 8(a) of the Federal Rules of Civil Procedure, the Fifth Circuit has explained:

> The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."

*Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 1965 (2007)).

Applying the above case law, the Western District of Louisiana has stated:

> Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009)]; *Twombly*, 55[0] U.S. at 556. This analysis is not substantively different from that set forth in *Lormand, supra*, nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. The standard, under the specific language of Fed. R. Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. The standard is met by the "reasonable inference" the court must make that, with or without discovery, the facts set forth a plausible claim for

relief under a particular theory of law provided that there is a "reasonable expectation" that "discovery will reveal relevant evidence of each element of the claim." *Lormand*, 565 F.3d at 257; *Twombly*, 55[0] U.S. at 556.

*Diamond Servs. Corp. v. Oceanografia, S.A. De C.V.*, No. 10-177, 2011 WL 938785, at *3 (W.D. La. Feb. 9, 2011) (citation omitted).

The Fifth Circuit further explained that all well-pleaded facts are taken as true and viewed in the light most favorable to the plaintiff. *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502–03 (5th Cir. 2014). The task of the Court is not to decide if the plaintiff will eventually be successful, but to determine if a "legally cognizable claim" has been asserted." *Id.* at 503.

### 2. The Parties' Arguments

#### a. Ardoin's Original Memorandum

Aside from incorporating the State's contentions, Ardoin makes the additional argument that the suit does not present a case or controversy as required by Article III of the Constitution. Ardoin cites *Terrebonne Parish NAACP v. Jindal*, 14-069 (M.D. La.) in arguing that the Secretary of State is not liable in a Section 2 Voting Rights Act case. Ardoin urges that his duties are "purely ministerial" and that he has no role in the remedial phase of a Section 2 case. Ardoin asserts that this suit is distinguishable from the earlier ruling in *Terrebonne* because a judgement against the State would bind the Secretary of State. Ardoin cites a Fifth Circuit case for the proposition that, when the interest of the State is adequately represented by one party, the others can be dismissed. Ardoin contends that having him in the suit is duplicative and a waste of judicial resources. Ardoin next argues that he has "no direct stake in the apportionment of the Louisiana Supreme Court election districts" and that his duties are primarily ministerial and concern the mechanics of elections.

Ardoin further asserts that there is no case or controversy because he lacks a sufficient personal stake in the outcome of the case to assure concrete adverseness which sharpens the presentation of issues upon which the court depends.  Ardoin cites *Clerk of Chickasaw County v. Wallace*, 646 F.2d 151, 160 (5th Cir. 1981), which held:

> Because of the judicial nature of their responsibility, the chancery clerks and judges do not have a sufficiently "personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues on which the court so largely depends for illumination of difficult constitutional questions."

*Id.* at 160 (citing *Baker*, 369 U.S. at 204, 82 S. Ct. at 703).  According to Ardoin, the same reasoning from this case applies here, as Plaintiff makes only one allegation about the Secretary of State without providing any allegation of a specific duty or relationship on its part.  The Secretary did not create the Louisiana Supreme Court districts and has no power to change them. There is simply no justiciable adversity between Plaintiffs and the Secretary of State, as reflected in *Chancery Clerk of Chickasaw City*.

Additionally, Plaintiffs' claims against Ardoin fail because their injury is not fairy traceable to the Secretary of State.  There is no causal connection between the injury complained of and Ardoin's conduct which is traceable to the challenged action.  Ardoin asserts:

> The Secretary of State is neither empowered to create judicial districts, establish election methods or enforce laws that do. If the formation of districts or the establishment of election methods have the effect of diluting African American voting strength for elections to the Louisiana Supreme Court, the injury is not traceable to the Secretary of State as a matter of law or a matter of fact. The Secretary of State cannot say what the law is or what it should be. He has no power to change it. He cannot deviate from duties assigned to him by law. All of these matters are assigned to other branches or departments of state government.

(Doc. 28-1 at 12.)  Ardoin cites to *Constitution Party v. Cortes*, 712 F. Supp. 2d 387 (E.D. Pa. 2010) for this proposition.

Further, Plaintiffs lack standing because of the redressability element; Ardoin has no power to redress Plaintiff's injuries.

Next, Ardoin moves to dismiss the *Complaint* on Rule 12(b)(6) grounds.  There is only one allegation against him—that he is the State's chief election officer.  All other allegations are made jointly against all Defendants.  Ardoin asserts:

> Nowhere are facts alleged to show that this defendant, the Secretary of State, has the legal ability to effectuate amendments to Louisiana law. Therefore, his ministerial application of current Louisiana law and a consent decree cannot be attributed to the Secretary of State, and the Complaint lacks any plausible factual allegations to make that link.

(Doc. 28-1 at 15.)

### b.  Plaintiffs' Opposition

Plaintiffs first reply that they do have standing against the Secretary of State.  Plaintiffs again cite *Johnson v Ardoin*, where this Court held that the Secretary of State was a proper defendant in a Voting Rights Act case.  Second, Plaintiffs are not required to allege that the Secretary of State can "effectuate amendments to Louisiana law" or "cure the ill [Plaintiffs] rais[e]." (Doc. 35 at 7.)  Rather, the Secretary is empowered with primary authority to carry out the election laws that are alleged to be unlawful.

As to standing, Plaintiffs first argue that the *Terrebonne Parish* case is distinguishable because here, unlike that case, the Attorney General and Louisiana Governor are not named. Equally important, Plaintiffs make a claim involving the election of judges in a system administered by Ardoin.  Plaintiffs again point to *Johnson v. Ardoin* in support of their position. Plaintiffs also rely on cases outside this district to support their joinder of the Secretary of State.

Plaintiffs next assert that Ardoin's contention that his role is merely "ministerial" is groundless.  Plaintiffs state:

> [I]f a second majority African-American Supreme Court district were created as
> Plaintiffs request, it will be the Secretary's responsibility to certify candidates for
> that new district, assign voters to that district, ensure accurate ballots are created
> and printed, promulgate all election returns, and administer the election laws—
> activities that require an active role by the Secretary, and amount to more than just
> ministerial oversight. Notwithstanding the Secretary's attempt to minimize the
> responsibilities of his elected office, he is not entitled to dismissal.

(Doc. 35 at 12–13.)  Plaintiffs then highlight the Secretary of State's duties with respect to judicial

elections.  Further, if the Court were to declare that a single-member districting plan for the

Supreme Court violates Section 2 of the Voting Rights Act, the Court would necessarily be

required to enjoin the Secretary from holding elections under that plan.  Moreover, unlike the Fifth

Circuit case Ardoin relies upon, here the Secretary of State has the job of enforcing any election

changes mandated by this Court.

As to the Rule 12(b)(6) motion, Plaintiffs urge that Ardoin largely repeats his Rule 12(b)(1)

arguments.  Further, there is no requirement that Plaintiffs list the Secretary of State's duties under

state law, which are defined by statute and discussed in the Court's decisions.

### c.  Ardoin's Reply

Ardoin replies that *Terrebonne* held that the Secretary of State's duties are ministerial and

that he was not a necessary and indispensable party.  Plaintiffs' attempts to distinguish this case

are distinctions without a difference. (Doc. 36 at 2.)  Plaintiffs' cases from other jurisdictions are

also distinguishable.  Finally, *Johnson* is a case pending for *en banc* consideration before the Fifth

Circuit.

### 3. Applicable Law

On several occasions, this Court has rejected similar attempts by the Louisiana Secretary

of State to escape liability in a Voting Rights Act case.  First, in *Hall I*, 974 F. Supp. 2d 978 (M.D.

La. 2013), then Secretary of State Schedler argued (1) "that it is the responsibility of the Louisiana

Legislature, and not the Secretary of State to revise the current Judicial Election Plan"; (2) that

plaintiff had "failed to establish that Scheduler violated Louisiana's Constitution or statutes, which

Schedler contend[ed] govern[ed] judicial elections, or that he engaged in discriminatory conduct";

and (3) that he did not "have the authority to grant [plaintiff] the remedies he [sought]." *Id.* at 991–

92.  The Secretary of State sought dismissal for failure to state a viable claim. *Id.*  In rejecting this

argument, then Chief Judge Jackson explained:

> Hall's Complaint sufficiently alleges that Schedler, in his official capacity as the
> Secretary of State, has some connection with the enforcement of the 1993 Judicial
> Election Plan, or that he is specifically charged with the duty to enforce the Plan
> and is currently exercising and/or threatening to exercise that duty. Further,
> Schedler fails to cite, nor has the Court identified, any law or case to support his
> contention that he is an improperly named defendant in this matter. Indeed,
> Schedler has been named as a defendant in a number of Voting Rights Act cases in
> the State of Louisiana. *See, e.g., Clark v. Marx*, No. 11–2149, 2012 WL 41926, at
> *10, 2012 U.S. Dist. LEXIS 2429, at *31–32 (W.D. La. Jan. 9, 2012) (noting
> Schedler's role in opening qualifying for elected positions, as well as holding and
> conducting state elections). Additionally, given Schedler's role as the "chief
> election officer in the state," La. R.S. § 18:421, it cannot be said that he would not
> be required to comply with the orders of this Court in this matter, or that he would
> not be involved in providing, implementing, and/or enforcing whatever injunctive
> or prospective relief may be granted to Hall. For these reasons, Schedler's request
> that the Court dismiss Hall's claims against him under Section 2 of the Voting
> Rights Act is denied.

*Id.* at 992–93.

Later, in *Johnson*, Chief Judge Dick applied *Hall* to the issue of standing.  There, Ardoin

argued that the "Secretary of State is not the proper party to be sued" in that Voting Rights Act

case. *Johnson*, 2019 WL 2329319, at *3.  *Johnson* quoted *Hall* and stated:

> Considering the Secretary of State's role as the "chief election officer in the state,"
> [La. R.S. § 18:431,] "it cannot be said that he would not be required to comply with
> the orders of this Court in this matter, or that he would not be involved in providing,
> implementing, and/or enforcing whatever injunctive or prospective relief may be
> granted to [the plaintiff]."

*Id.* (quoting *Hall*, 974 F. Supp. 2d at 993).

Lastly, in *Terrebonne Parish NAACP v. Jindal* (*Terrebonne I*), No. 14-069-JJB, 2014 WL 3586549, at *4 (M.D. La. July 21, 2014), the Secretary of State moved to dismiss a dilution case under Section 2 of the Voting Rights Act under Rule 12(b)(1) and (12)(b)(6).  There, as here, the Secretary of State argued that "this Court lacks subject matter jurisdiction over the claims against him because such claims do not present a case or controversy as required by Article III. . . . Alternatively . . ., the Plaintiffs' complaint fails to adduce enough factual matter to state a plausible claim for relief." *Id.* at *2.  Schedler maintained, as Ardoin now does, "that his duties as Secretary of State are primarily ministerial and concerned with the mechanics of conducting elections and therefore, [so] he is without the power to enforce, defend, or change the laws governing the voting schemes in the State." *Id.* at *3.  Thus, according to Schedler, "Plaintiffs' injury [was] neither traceable to his conduct nor redressable by any correction of his conduct." *Id.*  There, as here, the Secretary of State also relied on Fifth Circuit case law for the proposition that the "parties lacked adversity" *Id.*

The late Judge Brady rejected all of these arguments, explaining:

More instructive to the Court's determination is Fifth Circuit precedent that stands for the proposition that state officials may be sued in their official capacities when they have the power to enforce, defend, or apply the law in question. *See Okpalobi v. Foster,* 244 F.3d 405, 426 (5th Cir. 2001) (en banc) (articulating "the long-standing rule that a plaintiff may not sue a state official who is without power to enforce the complained of statute."); *Chancery Clerk of Chickasaw County, Miss. V. Wallace,* 646 F.2d 151, 160 (5th Cir. 1981) (allowing plaintiffs to sue state officials with executive responsibility for defending the challenged laws).

Here, it is uncontested that the Plaintiffs have alleged [an] injury in fact. They have further alleged that this injury in fact was caused by Schedler's conduct as "chief election officer," in which he was responsible for maintaining, executing, and enforcing the at-large voting method. (Doc. 1, at ¶¶ 19–21). Finally, Plaintiffs have alleged that their injury would be redressed if Schedler was enjoined from administering, implementing, and conducting future elections pursuant to the at-large voting method and ordered to administer, implement, and conduct elections in a non-discriminatory way consistent with the law. (*See* Doc. 1, at ¶ 85). Given that the Plaintiffs have alleged an injury in fact which is fairly traceable to

Schedler's conduct and can be redressed by a favorable order of this Court, Schedler cannot be said to be an "impotent defendant." To the contrary, this suit calls into question the legality of Schedler's actions taken pursuant to his duties as the secretary of state and calls upon him to defend those actions. Thus, Plaintiffs have alleged that Schedler has a sufficiently "personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues on which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr,* 369 U.S. 186, 204 (1962); *see also Chancery Clerk of Chickasaw County, Miss.,* 646 F.2d at 160 (maintaining that state officials who were sued based upon their application and enforcement of a challenged statute had the requisite personal stake in the outcome of the suit). Accordingly, the Court finds that Plaintiffs have satisfied all of the requirements of Article III by alleging sufficient factual matter that would entitle them to relief.

*Id.* at *4. In finding that the complaint adequately alleged a Fourteenth Amendment violation, the

Court stated:

[T]he facts pled in the complaint make it facially plausible that Schedler has the authority to take the allegedly illegal actions upon which the Fourteenth Amendment claim is based. The complaint alleges that Schedler, as "chief election officer" has the power and authority to maintain, execute, and enforce the 32nd Judicial District's at-large voting method. (Doc. 1, at ¶¶ 19–21). The complaint's allegations are not conclusory, but rather factual allegations that Plaintiffs support with citations to Louisiana law, which provides that, "The secretary of state ... shall be the chief election officer of the state ... He shall ... promulgate and publish all laws enacted by the legislature ..." LA. CONST. ART. IV, § 7. Black's Law Dictionary defines "enforce" as "To give force or effect to (a law, etc.); to compel obedience to," and "promulgate," inter alia, as "To put (a law or decree) into force or effect." BLACK'S LAW DICTIONARY 608, 1334 (9th ed.2009).

*Terrebonne I,* 2014 WL 3586549, at *6. The Court concluded, "At the very least, it is plausible

that Schedler's role as chief election officer requires him to engage in conduct that gives effect to

the allegedly unlawful voting scheme." *Id.* Judge Brady also relied on the *Hall* decision as finding

that "a plaintiff making similar allegations as those made by Plaintiffs in the instant case had

sufficiently alleged that Schedler had at least some connection with the enforcement of the

challenged judicial election plan." *Id.* The Court qualified:

It is important to observe that the Court's conclusion in the instant matter is in no way a dispositive finding that Schedler has enforcement authority, as such would

63

> be improper at this stage of the litigation. Instead, the Court finds that the factual
> allegations are sufficient to withstand a motion to dismiss.

*Id.*  Judge Brady closed by finding Schedler's argument that the complaint lacked the "requisite

specificity" to be "without merit" and by denying the motion to dismiss this claim. *Id.*

Other decisions from this district also address the arguments Ardoin now makes.  For

instance, later in the *Terrebonne Parish NAACP* case, after the Secretary of State had been

voluntarily dismissed, the Attorney General and Governor moved to dismiss claiming they were

not proper defendants. *Terrebonne Par. NAACP v. Jindal* (*Terrebonne II*)*,* 154 F. Supp. 3d 354,

362 (M.D. La. 2015).  These defendants claimed that (1) the "Louisiana legislature has the plenary

authority to modify the election method in the 32nd JDC," so the Secretary of State was "charged

with enforcing the at-large method of election" there, and that (2) by dismissing the Secretary of

State, plaintiffs had created an issue as to whether the Secretary of State was a necessary and

indispensable party under Rule 19. *Id.*  Judge Brady first listed the various duties the Governor

and Attorney General would have in these elections and concluded, "[b]ased on their powers and

duties, the Court agrees that Jindal and Caldwell will be instrumental in devising and enforcing a

remedy that this Court may potentially order." *Id.* at 363. The Court also cited  *Hall v. Louisiana*,

983 F. Supp. 2d 820, 824–26, 832–33 (M.D. La. 2013), which had also denied a motion to dismiss

the Governor and Attorney General on similar grounds. *Terrebonne II,* 154 F. Supp. 3d at 363. For

these reasons, Judge Brady denied the motion for judgment on the pleadings. *Id.*  Relevant here,

the Court stated:

> Finally, the Court agrees with the plaintiffs that complete relief may be afforded
> amongst the existing parties. The Secretary of State's duties with regard to election
> laws are established by the legislature, and he carries out election laws without
> regard to how election districts are formed or election methods are established. The
> defendants point to no evidence to suggest otherwise. Therefore, at this time the
> Court proceeds on the assumption that the Secretary of State will carry out his
> ministerial duties and conduct elections pursuant to any remedial plan adopted by

the Louisiana legislature or by this Court. Accordingly, the Court concludes that Rule 19 does not provide a basis for dismissal in this case.

*Id.*

Similarly, later in the *Hall* case after the ruling discussed above, Governor Jindal and Attorney General Caldwell moved under Rule 12(b)(6) to dismiss plaintiff's claims, arguing that he "failed to make direct allegations against Jindal and Caldwell, and that the few allegations made by Hall are insufficient to state claims under Section 2 of the Voting Rights Action and Section 1983." *Hall v. Louisiana (Hall II)*, 983 F. Supp. 2d 820, 832 (M.D. La. 2013). Judge Jackson specifically noted that "Defendants make no further arguments, nor do they specifically identify what standards or claims Hall has allegedly failed to meet." *Id.* The Court summarily rejected these arguments, explaining:

> To the extent Defendants attempt to assert that Hall has failed to allege sufficient facts to state a plausible claim under Section 2 of the Voting Rights Act and/or Section 1983, Defendants have failed to identify what elements and/or standards Hall has failed to meet. Indeed, Defendants' motion merely states, "[i]t is clear these allegations are insufficient to state a claim under either Section 1983 or the VRA." (Doc. 39–1, p. 5.) It is not the job of the District Court to make arguments on behalf of the movants. Rather, the Court's obligation is limited to evaluating the arguments made by the movants, and the arguments made in opposition thereto. Accordingly, Defendants' request that the Court dismiss Hall's claims under Section 2 of the Voting Rights Act and Section 1983 is denied.

*Id.* at 833.

### 4. Analysis

Having carefully considered the matter, the Court finds that Plaintiff has adequately pled standing and has stated a viable cause of action against Ardoin. *Hall*, *Johnson*, and *Terrebonne I* all demonstrate that the Secretary of State is a proper party defendant for this Voting Rights Act case. Again, Ardoin is alleged to be Louisiana's "chief election officer in the state" under La. R.S. § 421 (*Compl.*¶ 15, Doc. 1), and "it cannot be said that he would not be required to comply with

the orders of this Court in this matter, or that he would not be involved in providing, implementing, and/or enforcing whatever injunctive or prospective relief may be granted to" Plaintiffs. *Hall*, 974 F. Supp. 2d at 992–93; *Johnson*, 2019 WL 2329319, at *3.  Moreover, in *Terrebonne I*, Judge Brady rejected most of the very same arguments Ardoin now advances. *See Terrebonne I*, 2014 WL 3586549, at **3–4.

Indeed, Plaintiffs' allegations in this case are remarkably similar to what Judge Brady found in *Terrebonne I*.  There, Judge Brady found that it was clear that Plaintiffs "have alleged that their injury would be redressed if [the Secretary of State] was enjoined from administering, implementing, and conducting future elections [to the Supreme Court] and ordered to administer, implement, and conduct elections in a non-discriminatory way consistent with the law" *Terrebonne I*, 2014 WL 3586549, at *4.  Here, Plaintiffs claim:

> Violations of Section 2 occur with each Louisiana Supreme Court election. Unless enjoined by order of this Court, Defendants will continue to act in violation of Section 2 of the Voting Rights Act by administering, implementing, and conducting future elections for the Louisiana Supreme Court using an unlawful election method.

 (*Compl.* ¶ 70, Doc. 1).  In sum, construing the *Complaint* as a whole, these claims, combined with the other allegations in the pleading, are sufficient at this stage.

Moreover, Ardoin's other arguments can be easily rejected.  Ardoin is correct that Plaintiffs have not alleged his specific statutory duties, but the Court agrees with Plaintiffs that these duties operate as a matter of law and need not be set forth in the *Complaint*.  *See* Fed. R. Civ. P. 8(a)(2). ("A pleading that states a claim for relief must contain . . .  a short and plain statement  of the claim that the pleader is entitled to relief"); *Lormand*, 565 F.3d 228, 257 (5th Cir. 2009) ("The complaint (1) on its face (2) must contain enough *factual matter* (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim."

(emphasis added)).  As Judge Brady recognized, the Court should leave for another day whether the Secretary of State does in fact have the statutory duties Plaintiffs assert in their opposition and whether they entitle Plaintiffs to relief.

Similarly, the Court rejects Ardoin's claim that the Secretary of State merely has ministerial duties.  As the Fifth Circuit stated in *OCA-Greater Houston* when looking at standing against the Texas Secretary of State,

> unlike in [*Okpalobi*, 244 F.3d at 427 n.35,] where the defendants had no "enforcement connection with the challenged statute," the Texas Secretary of State is the "chief election officer of the state" and is instructed by statute to "obtain and maintain uniformity in the application, operation, and interpretation of this code and of the election laws outside this code."

*OCA-Greater Hous.*, 867 F.3d at 613–14.  Similarly, Judge Brady wrote of Ardoin's office:

> Louisiana law[] . . . provides that, "The secretary of state ... shall be the chief election officer of the state . . . He shall . . . promulgate and publish all laws enacted by the legislature . . ." LA. CONST. ART. IV, § 7. Black's Law Dictionary defines "enforce" as "To give force or effect to (a law, etc.); to compel obedience to," and "promulgate," inter alia, as "To put (a law or decree) into force or effect." BLACK'S LAW DICTIONARY 608, 1334 (9th ed. 2009).
>
> Viewing the complaint's allegations in light of Louisiana law and these widely accepted definitions, the Court finds that Plaintiffs have pled sufficient factual allegations to make their claim against [Ardoin] plausible on its face. At the very least, it is plausible that [Ardoin's] role as chief election officer requires him to engage in conduct that gives effect to the allegedly unlawful voting scheme.

*Terrebonne I*, 2014 WL 3586549, at *6.  The same reasoning applies here.

Ardoin's other cases are also unavailing.  Unlike *Haspel & Davis Milling & Planting Co. v. Bd. Of Levee Commissioners . . .*, 493 F.3d 570 (5th Cir. 2007), where the question was whether one party is entitled to intervene as a matter of right[3]—which requires a finding that "the

---

[3] *Haspel & Davis Milling & Planting Co. v. Bd. Of Levee Commissioners . . .*, 493 F.3d 570 (5th Cir. 2007), was an action involving property that had been expropriated by a levee board but the mineral rights of which had not been returned. *Id.* at 573.  After a settlement in the state court action, the landowners filed an action in federal court alleging that the levee board's failure to make the required payments constituted a taking. *Id.* at 574.  The district court granted

applicant's interest must be inadequately represented by the existing parties to the suit," *id.* at 578, (citation omitted)—here, the question is whether Plaintiffs have standing to pursue a claim against the Secretary of State and whether they have stated a viable claim. Further, unlike the clerks and judges in *Chancery Clerk of Chickasaw County*, Plaintiffs have alleged the requisite "concrete adverseness" with the Secretary of State, which *Terrebonne I* demonstrated. *See Terrebonne I*, 2014 WL 3586549, at *4.

The Court also rejects Ardoin's argument that Judge Brady's later decision in *Terrebonne II* regarding the Governor and Attorney General preclude an action against the Secretary of State. *Terrebonne II* did not hold that the Secretary of State was never a proper party defendant in a Voting Rights Act case. Rather, *Terrebonne II* merely held, after the Secretary of State was voluntarily dismissed, that the Governor and Attorney General were proper defendants and that the Secretary of State was not a necessary party because complete relief could be afforded in that case among the existing parties—the Governor and Attorney General. *See Terrebonne II,* 154 F. Supp. 3d at 363. Judge Brady's comments about the Secretary of State's ministerial duties was made in this context and should not be read as a limit on Plaintiffs' ability to bring an action against Ardoin, particularly when the Governor and Attorney General are not joined.

Finally, with respect to the Rule 12(b)(6) arguments, *Hall II* is particularly applicable. As in *Hall II*, Ardoin has "failed to identify what elements and/or standards [Plaintiffs have] failed to meet." *Hall II*, 983 F. Supp. 3d at 833. As Judge Jackson stated, "[i]t is not the job of the District

---

summary judgment for the landowners and entered a seventeen-million-dollar judgment. *Id.* As the landowners were trying to execute, the state moved to intervene for the "limited purpose of Louisiana's anti-seizure provisions" in the constitution and Revised Statutes. *Id.* at 577. The State argued on appeal that the levee board did not adequately represent its interests "because it is now dissolved and, even when it was in existence, it had no juridical authority to represent the State because it was a political subdivision and not an agency of the State." *Id.* at 579. The Fifth Circuit noted that the levee board had "very able and persuasive counsel" and found that it adequately represented the State's interests. *Id.*

Court to make arguments on behalf of the movants." *Id.* Without more, there is simply no basis for dismissing Plaintiffs' complaint under Rule 12(b)(6).

For all these reasons, the Court finds that Plaintiffs have satisfied the *Lujan* standard for standing. Under the above cases, Plaintiffs have suffered an injury-in-fact that is traceable to and redressable by the Secretary of State. Moreover, Plaintiffs have stated a viable claim against Ardoin. His motion to dismiss on these issues is thus denied.

### B. Ardoin's Motion to Dismiss Under Rule 19

#### 1. Parties' Arguments

Ardoin lastly moves to dismiss under Rule 21, which purportedly allows the Court to drop a party to protect all parties from unfair prejudice. Ardoin then argues the Rule 19 factors to justify dismissal.

Plaintiffs respond that Ardoin's Rule 21 and 19 analysis are misplaced, as misjoinder is not a basis for dismissal. Further, the Secretary of State is not a party required to be joined if feasible but who cannot be. In any event, the test for joinder is easily met here.

Ardoin replies that he should be dismissed under Rule 21 to serve judicial economy, reduce costs to the state, and reserve judicial resources. Ardoin again relies on *Terrebonne* for this issue.

#### 2. Applicable Law

Rule 21 of the Federal Rules of Civil Procedure states that "Misjoinder of parties is not a ground for dismissing an action." Further, "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party." Fed. R. Civ. P. 21.

The Fifth Circuit has explained that, "[s]ince Rule 21 does not provide any standards by which district courts can determine if parties are misjoined, courts have looked to Rule 20 for

guidance." *Acevedo v. Allsup's Convenience Stores, Inc.*, 600 F.3d 516, 521 (5th Cir. 2010) (per

curiam) (citation omitted). Rule 20(a)(2) provides:

> Persons…may be joined in one action as defendants if: (A) any right to relief is
> asserted against them jointly, severally, or in the alternative with respect to or
> arising out of the same transaction, occurrence, or series of transactions or
> occurrences; and (B) any question of law or fact common to all defendants will
> arise in the action.

Therefore, "Courts have described Rule 20 as creating a two-prong test, allowing joinder of

[parties] when (1) their claims arise out of the 'transaction, occurrence, or series of transactions or

occurrences' and when (2) there is at least one common question of law or fact linking all claims."

*Acevedo*, 600 F.3d at 521 (citations omitted). The Fifth Circuit found "as long as both prongs of

the test are met, 'permissive joinder of [parties] . . . is at the option of the [parties].'" *Id.* (quoting

*Applewhite v. Reichhold Chems., Inc.*, 67 F.3d 571, 574 n.11 (5th Cir. 1995)); *see also United*

*Mine Workers v. Gibbs*, 383 U.S. 715, 724, 86 S. Ct. 1130 (1966) ("Under the Rules, the impulse

is towards entertaining the broadest possible scope of action consistent with fairness to the parties;

joinder of claims, parties and remedies is strongly encouraged.")

   "When applying the two-prong test, the Court considers whether there is a logical

relationship between the claims and whether there is any overlapping proof or legal question."

*Peters v. Singh*, No. 16-842, 2017 WL 5128750, at *2 (M.D. La. Nov. 6, 2017) (citing *Weber v.*

*Lockheed Martin Corp.*, No. 00-2876, 2001 WL 274518, at *1 (E.D. La. Mar. 20, 2001)).

Additionally, "[t]he Court must also consider whether settlement or judicial economy would be

promoted, whether prejudice would be averted by severance, and whether different witnesses and

documentary proof are required for separate claims." *Id.* Thus, "even if this [two-part] test is

satisfied, district courts have the discretion to refuse joinder in the interest of avoiding prejudice

and delay, ensuring judicial economy, or safeguarding principles of fundamental fairness."

*Acevedo*, 600 F.3d at 521 (citation omitted). "[D]istrict courts have considerable discretion to deny joinder when it would not facilitate judicial economy and when different witnesses and documentary proof would be required for plaintiff['s] claims." *Id*. at 522 (citation omitted).

Put another way, the Eastern District applies this standard as a five-factor test to determine whether severance is appropriate:

> (1) whether the claim arose out of the same transaction or occurrence; (2) whether the claims present common questions of law or fact; (3) whether settlement or judicial economy would be promoted; (4) whether prejudice would be averted by severance; and, (5) whether different witnesses and documentary proof are required for separate claims.

*Melancon v. Town of Sorrento*, No. 13-745, 2015 WL 410866, at *5 (M.D. La. Jan. 29, 2015) (citing *E. Cornell Malone Corp. v. Sisters of the Holy Family, St. Mary's Acad. of the Holy Family*, 922 F. Supp. 2d 550, 561 (E.D. La. 2013)); *see In re Rolls Royce Corp.*, 775 F.3d 671, 680 n.40 (5th Cir. 2014) (citing the five-factor test positively without formally adopting it.) "Courts in this circuit have balanced these factors on a case-by-case basis to determine if severance is appropriate." *Gilmore v. Office of Alcohol & Tobacco Control of the Louisiana Dep't of Revenue*, No. 14-434, 2015 WL 5680370, at *1 (M.D. La. Sept. 25, 2015); *see also Parker v. Louisiana Dep't of Pub. Safety & Corr.*, No. 18-1030-JWD-EWD, 2019 WL 5103811, at *6 (M.D. La. Oct. 11, 2019) (deGravelles, J.) (declining to severe because the "factors [were] split", with the "first three factors weigh[ing] in favor of Plaintiff" and the "final two factors favor[ing] the Defendant"); *Melancon*, 2015 WL 410866 at *5 n.3 ("The fourth factor is neutral in this case, leaving four out of the five factors weighing in favor of severance.").

### 3. Analysis

In short, the Court will deny Ardoin's motion.  Preliminarily, it must be emphasized that Rule 21 is clear: "Misjoinder of parties is not a ground for dismissing an action." Fed. R. Civ. P. 21.  On that ground alone, Ardoin does not appear entitled to the relief he seeks.

Even putting this aside, joinder appears appropriate under the Rule 20 test; here, Plaintiffs' claims against the State and Ardoin arise from the same "transaction, occurrence, or series of transactions or occurrences," and there is certainly at least "one common question of law or fact linking all claims." *Acevedo*, 600 F.3d at 521 (citations omitted). Again, "as long as both prongs of the test are met, 'permissive joinder of [parties] . . . is at the option of the [parties].'" *Id*.  There is also clearly "a logical relationship between the claims" in this case and "overlapping proof or legal question[s]" *Peters*, 2017 WL 5128750, at *2.  As to the other factors, the Court specifically finds that neither settlement nor judicial economy would be promoted by the Secretary of State being severed, and prejudice would not be averted. *See Melancon*, 2015 WL 410866, at *5.  Finally, the claims against the State and Secretary of State will require the same "witnesses and documentary proof." *See id.*

For all these reasons, Ardoin's reliance on Rule 19 is misplaced, and he is not entitled to severance under Rule 21.  The Secretary of State's motion to dismiss on this ground is denied.

### IV.   Conclusion

Accordingly,

**IT IS ORDERED** that *Defendant's Motion to Dismiss Plaintiff's Complaint* (Doc. 27) filed by the State of Louisiana and the *Motion to Dismiss by Defendant, R. Kyle Ardoin, Louisiana Secretary of State* are **DENIED.**

Signed in Baton Rouge, Louisiana, on <u>June 26, 2020</u>.

_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**