# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

LOUISIANA STATE CONFERENCE OF
THE NATIONAL ASSOCIATION FOR
THE ADVANCEMENT OF COLORED
PEOPLE, ET AL.

VERSUS

STATE OF LOUISIANA, ET AL.

CIVIL ACTION

NO. 19-479-JWD-SDJ

## RULING AND ORDER

This matter comes before the Court on the *Joint Motion for Certification of Order for Interlocutory Appeal* (the "*Motion for Interlocutory Appeal*") (Doc. 51) pursuant to 28 U.S.C. § 1292(b) filed by Defendants, the State of Louisiana and the Secretary of State of Louisiana (collectively, "Defendants"). Plaintiffs, the Louisiana State Conference of the National Association for the Advancement of Colored People ("NAACP"), Anthony Allen, and Stephanie Allen (collectively, "Plaintiffs"), oppose the motion. (Doc. 54.) Defendants filed a reply. (Doc. 56.) Oral argument is not necessary.  The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, Defendants' motion is granted in part and denied in part.

I.     **Relevant Factual and Procedural Background**

A.  **Factual Background**

Plaintiffs brought suit under the Voting Rights Act of 1965, 52 U.S.C. § 10301 *et seq*. (Doc. 1.) In the *Complaint*, Plaintiffs discuss, *inter alia*, *Chisom v. Roemer*, 501 U.S. 380, 111 S. Ct. 2354, 115 L. Ed. 2d 348 (1991), where minority plaintiffs challenged the original electoral process for the Louisiana Supreme Court, which consisted of six judicial districts, five single-

1

member districts and one multi-member district which encompassed Orleans Parish and which

elected two justices. (*Compl.* ¶¶ 23–24, Doc. 1 at 6–7.) In 1986, several plaintiffs brought suit

alleging violations of the U.S. Constitution and Section 2 of the Voting Rights Act. *Chisom v.

Edwards*, 659 F. Supp. 183 (E.D. La. 1987); *see also Chisom v. Jindal*, 890 F. Supp. 2d 696, 702

(E.D. La. 2012). After a number of appeals to the Fifth Circuit, *see, e.g.*, *Chisom v. Edwards*, 839

F.2d 1056 (5th Cir. 1988), and a decision by the United States Supreme Court, *Chisom v.

Roemer*, 501 U.S. 380, a Consent Decree was entered on August 21, 1992 ("Consent Decree").

(*See* Ex. A, Doc. 27-3). The Consent Judgment begins with the following Preamble:

> The current apportionment of the Louisiana Supreme Court is governed by La. Const. Art. V, Section 4 and La. Rev. Stat. Section 13:101. Under Section 13:101, Orleans Parish is contained within the multimember First Supreme Court district along with Jefferson, Plaquemines, and St. Bernard Parishes.
>
> The Chisom plaintiffs and the United States claim that the multimember district system for electing justices of the Louisiana Supreme Court in the First Supreme Court District [first district] dilutes black voting strength in violation of section 2 of the Voting Rights Act of 1965 as amended, 42 U.S.C. 1973 [Section 2], because black citizens have less opportunity than other members of the electorate to participate in the political process and elect justices of their choice. In June 1992, the Louisiana Legislature passed and the Governor signed Act No. 512 (S.B. 1255) (1992), which provides, inter alia, for a change in the method of electing the Louisiana Supreme Court; for the assignment of the judge elected to the newly-created position from the first district (Orleans Parish) of the Fourth Circuit Court of Appeal to the Louisiana Supreme Court; and for the assigned judge to participate and share equally in the cases and duties of the justices of the Supreme Court during this period of assignment. The Chisom plaintiffs and the United States contend that the provisions contained in Act No. 512 (1992) and in this Consent Judgment are necessary to bring the system for electing the Louisiana Supreme Court into compliance with Section 2. While the defendants do not agree with this contention and only enter into this compromise agreement to resolve extensive and costly litigation, they believe that the relief contained in this consent judgment will ensure that the system for electing the Louisiana Supreme Court is in compliance with Section 2 of the Voting Rights Act.
>
> Accordingly, the parties to this litigation desire to [a]ffect a settlement of the issues raised by the complaint and subsequent proceedings without the necessity of further litigation, and therefore consent to entry of the following final and binding judgment as dispositive of all issues raised in this case[.]

(Ex. A, Doc. 27-3 at 2–3.) It was thus ordered, *inter alia*, that: "The relief contained in this consent judgment will ensure that the system for electing the Louisiana Supreme Court is in compliance with Section 2 of the Voting Rights Act." (Ex. A, Doc. 27-3 at 4.)

The Consent Judgment then describes how, "[c]onsistent with Louisiana Act No. 512 (1992) and the remedial objectives of the Voting Rights Act, the defendants shall take the following actions[.]" (Ex. A, Doc. 27-3 at 4.) The defendants agreed to create "a Supreme Court district comprised solely of Orleans Parish, for the purpose of electing a Supreme Court justice from that district when and if a vacancy occur[ed]" in District 1 before January 1, 2000. (*Id.*) The defendants also agreed to create "one new Fourth Circuit Court of Appeal judicial position" and this judge would be "elected from the first district of the Fourth Circuit, which is comprised of Orleans Parish." (*Id.*) The new additional judge elected from the first district of the Fourth Circuit would then be immediately assigned to serve on the Louisiana Supreme Court.  (*Id.* at 4–5.) "The Fourth Circuit Court of Appeal judge assigned to serve on the Supreme Court shall receive the same compensation, benefits, expenses, and emoluments of offices as now or hereafter are provided by law for a justice of the Louisiana Supreme Court." (*Id.* at 5.) The Consent Judgment goes on to give the Fourth Circuit judge an equal share in the "cases, duties, and powers of the Louisiana Supreme Court" and put an expiration on the position at the date the justice elected takes office. (*Id.*) The Consent Judgment also describes what happens if the Fourth Circuit seat becomes vacant before the prescribed election. (*Id.* at 6–7.)

*Chisom v. Roemer* held that "elections for appellate judges could not unlawfully dilute minority votes under the Voting Rights Act." (*Compl.* ¶ 24, Doc. 1 at 7 (citing *Chisom v. Roemer*, 501 U.S. 380).) Following *Chisom*, the Louisiana Legislature enacted Act 512 in 1992, "which created a temporary eighth Supreme Court seat for the sub-district of Orleans." (*Compl.* ¶

25, Doc. 1 at 7 (citing 1992 La. Acts No. 512, § 1).) The 1992 Consent Decree effectively

memorialized Act 512. *Chisom v. Jindal*, 890 F. Supp. 2d at 703–05 (quoting *Perschall v. State*,

697 So. 2d 240, 245–47 (La. 1997)).

> The 1992 Consent Decree mandated, *inter alia*, that:

> Legislation will be enacted . . . **which provides for the reapportionment of the seven districts of the Louisiana Supreme Court** in a manner that complies with . . . federal voting law, taking into account the most recent census data available. The reapportionment will provide for a single-member district that is majority black in voting age population that includes Orleans Parish in its entirety. . . . [**F**]*uture Supreme Court elections after the effective date shall take place in the newly reapportioned districts.*

(Ex. A, Doc. 27-3 at 8 (emphasis added).)

> The Consent Judgment also provides that:

> E. Defendants agree that, in order to comply with the Voting Rights Act, and in order to ensure black voters in the Parish of Orleans have an equal opportunity to participate in the political process and to elect candidates of their choice, the Chisom plaintiffs and the United States are to be considered the prevailing parties in this litigation . . . .

> F. This judgment is a restructuring of the Supreme Court of Louisiana by federal court order within the meaning of Act No. 1063 of 1991 (R.S. 11:558(A) (5)), and the benefits of R.S. 11:558(A) (5) (a) (ii) shall be available to the current members of the Court.

> G. The Chisom plaintiffs' constitutional claims under the Fourteenth and Fifteenth Amendments, as well as their statutory claim alleging that the present electoral system violates Section 2 because it was intentionally enacted or maintained for discriminatory reasons, are hereby dismissed with prejudice.

(Ex. A, Doc. 27-3 at 8.) The Consent Judgment was deemed a final judgment in the action and

was "binding on all parties and their successors in office." (*Id.*) Further, "[t]he parties agree[d] to

take all steps necessary to effectuate this decree." (*Id.* at 9.) Finally, the Consent Judgment

stated, "The Court shall retain jurisdiction over this case until the complete implementation of

the final remedy has been accomplished." (*Id.* at 9.) Subsequently, Act 776 was enacted in 1997

providing for the reapportionment of the Supreme Court districts as envisioned by the Consent Decree by creating seven single member districts. *Chisom v. Jindal*, 890 F. Supp. 2d at 705–06.

On January 3, 2000, the *Chisom* parties filed a joint motion to amend the Consent Judgment. (Ex. B, Doc. 27-4.)  The parties asserted that because Orleans Parish was split between District 1 and District 7, Act 776 was "not in strict conformity with the Consent Judgment" but the Act still "[met] the intent of all parties to this litigation for final resolution of the matter." (Ex. B, Doc. 27-4 at 3.)

Litigation followed in the Eastern District with respect to the application of the seniority rules for Chief Justice of the Louisiana Supreme Court as it related to the judicial districts created pursuant to the Consent Decree. *Chisom v. Jindal*, 890 F. Supp. 2d at 701. The dispute in this 2012 case was between Justice Victory and Justice Johnson over who would succeed Justice Kimball as Chief Justice. (*Compl.* ¶ 42, Doc. 1 at 10.) Justice Johnson served on the Louisiana Supreme Court from November 16, 1994 to October 7, 2000 pursuant to the Consent Judgment. *See Chisom v. Jindal*, 890 F. Supp. 2d at 701. The disagreement centered on whether Justice Johnson's years on the Supreme Court would be counted toward her seniority under the *Chisom* consent decree. (*Compl.* ¶ 42, Doc. 1 at 10.) The Eastern District first decided whether it had jurisdiction over the matter:

> There has been no affirmative ruling by this Court that the Consent Judgment has been completely satisfied and thus has been vacated or terminated, nor has there been any request that this be done. Because the Court finds that the "final remedy" under the Consent Judgment has not yet been accomplished, the Court has continuing jurisdiction and power to interpret the Consent Judgment as requested by Justice Johnson and the *Chisom* Plaintiffs. The explicit terms of the Consent Judgement provide the Court continuing jurisdiction over this dispute, stating that the Court "shall retain jurisdiction over this matter until the complete implementation of the final remedy has been accomplished." While it is true "that district courts enjoy no free-ranging 'ancillary' jurisdiction to enforce consent decrees," and are "instead constrained by the terms of the decree and related order," *Pigford v. Veneman,* 292 F.3d 918, 924 (D.C. Cir. 2002) (citing *Kokkonen v.*

*Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 381, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994)), the very terms of the Consent Judgment in this case provide the Court with a sufficient jurisdictional basis to resolve the dispute pending before it. This is true after the 2000 amendment to the Consent Judgment, even though the amendment did not include this same "continuing jurisdiction" language. The amendment did not replace the terms of the original Consent Judgment, but instead supplemented them.

Because, as will be explained in the pages to follow, the Court finds that the Consent Judgment calls for Justice Johnson's tenure from November 16, 1994, until October 7, 2000, to be credited to her for all purposes under Louisiana law, the Court finds that the "final remedy" in the Consent Judgment has not yet been implemented. By law and by the terms of the Consent Judgment, this Court expressly retains jurisdiction over this case until that final remedy is implemented. This Order is an exercise of the Court's discretion to enforce and protect its orders. *See Vukovich,* 720 F.2d at 920.

*Chisom v. Jindal*, 891 F. Supp. 2d at 711.

The Eastern District then interpreted the Consent Judgment, its Amendment, and Act 776

explaining:

The Court turns now to the four corners of the Consent Judgment to determine whether or not it is ambiguous with respect to tenure and seniority. The Consent Judgment, as entered into in August 1992, states that "the Fourth Circuit Court of Appeal Judge assigned to serve on the Supreme Court shall receive the same compensation, benefits, expenses, and emoluments of offices as now or hereafter are provided by law for a justice of the Supreme Court." It provides further that "the Fourth Circuit Court of Appeal Judge assigned to serve on the Supreme Court shall participate and share equally in the cases, duties, and powers of the Louisiana Supreme Court," and that "[t]he assigned judge and the seven Supreme Court justices shall participate fully and share equally in all other duties and powers of the Supreme Court, including, but not limited to, those powers set forth by the Louisiana Constitution, the laws of Louisiana, and the Louisiana Rules of Court."

. . . .

. . . With the addition of the emphasized provision of Act 776, the terms of the Consent Judgment with regard to the issue of tenure become clear and unambiguous. The Consent Judgment, as amended, provides that "tenure on the supreme court gained by [the Chisom Judge] while so assigned to the supreme court shall be credited to such judge." As a result, the Court finds that the Consent Judgment provides that Justice Johnson's service from November 16, 1994, to October 7, 2000, shall be credited to her for all purposes under Louisiana law, including for the purpose of determining seniority.

6

*Id.* at 713–15. The Eastern District "issued an order enforcing the terms of the Consent Decree, holding that Justice Johnson's service as the *Chisom* justice must be credited in determining her tenure on the Court." (*Compl.* ¶ 42, Doc. 1 at 10.)

### B. Procedural Background of the Instant Action

Plaintiffs filed the *Complaint* on July 23, 2019. (*Compl.*, Doc. 1.) Plaintiff requested the Court declare, in pertinent part, the current apportionment of Louisiana Supreme Court districts a Section 2 violation, enjoin Defendants from "administering, implementing, or conducting any future elections for the Louisiana Supreme Court," and order the implementation of a new method of elections complying with Section 2 and the U.S. Constitution. (*Compl.*, Doc. 1 at 15.)

Defendants filed two motions (collectively, "*Defendants' Motion to Dismiss*") to dismiss the *Complaint* pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The first was *Defendant's Motion to Dismiss Plaintiffs' Complaint* (Doc. 27) filed by the State of Louisiana (the "State") ("*State's Motion to Dismiss*"). The State argued, *inter alia*, that this action should be dismissed for lack of jurisdiction because the *Chisom* Consent Decree issued by the Eastern District of Louisiana controls. (Doc. 27.) The second was the *Motion to Dismiss by Defendant, R. Kyle Ardoin, Louisiana Secretary of State* ("Ardoin") (*Ardoin's Motion to Dismiss*"). (Doc. 28.) In the latter motion, the Secretary of State adopted and incorporated the *State's Motion to Dismiss* and supporting attachments.  (Doc. 28 at 3.) Plaintiffs opposed the *Defendants' Motion to Dismiss*. (Docs. 34–35.)

On June 26, 2020, the Court issued the Ruling and Order (the "*Order*") which denied the Defendants' motions. The Court explained this case was "easily distinguishable from *Chisom v. Jindal* and Chief Justice Johnson's dispute, as that suit involved the interpretation of an express provision of the Consent Decree . . . ." (Doc. 47 at 22.) Therefore, "the instant case falls outside

of the jurisdiction of the *Chisom* Consent Judgment, and the State's motion can be denied on this ground alone." (Doc. 47 at 22.) The Court also rejected Defendants' argument that Plaintiffs could not collaterally attack the *Chisom* Decree in a separate action because "in *Martin*, the Supreme Court made it clear that non-parties to a consent decree can in fact bring a separate action challenging that decree except in certain narrow exceptions. None of those exceptions apply here." (Doc. 47 at 22 (citing *Martin v. Wilks*, 490 U.S. 755, 109 S. Ct. 2180, 104 L. Ed. 2d 835 (1989)).) The Court concluded that "even if Plaintiffs' suit did represent a collateral attack on the *Chisom* Consent Decree (which it is not), Plaintiffs would not be precluded from bringing this action in the Middle District." (Doc. 47 at 23.)

In response to the *Order*, on July 17, 2020, Defendants jointly filed the instant *Motion for Interlocutory Appeal* (Doc. 51) pursuant to 28 U.S.C. § 1292(b) of the Court's denial of the *Defendants' Motion to Dismiss*. Plaintiffs filed an opposition to the *Motion for Interlocutory Appeal* ("*Opposition*") on August 7, 2020. (Doc. 54.) Defendants filed a reply in support of their *Motion for Interlocutory Appeal* ("*Reply*") (Doc. 56.)

## II. Discussion

### A. Relevant Standard

"Title 28, § 1292(b) of the United States Code permits a court to certify an interlocutory appeal where (1) a controlling question of law is involved, (2) there is substantial ground for difference of opinion about the question of law, and (3) immediate appeal will materially advance the ultimate termination of the litigation." *Rico v. Flores*, 481 F.3d 234, 238 (5th Cir. 2007). "Under § 1292(b), it is the order, not the question, that is appealable." *Castellanos-Contreras v. Decatur Hotels, LLC,* 622 F.3d 393, 398 (5th Cir. 2010) (citing *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205, 116 S. Ct. 619, 623, 133 L. Ed. 2d 578 (1996)). "A

district court cannot certify an order for interlocutory appeal unless all three criteria are present." *Gruver v. Louisiana Through Bd. of Supervisors of Louisiana State Univ. & Agric. & Mech. Coll.*, No. 18-772, 2019 WL 6245421, at *1 (M.D. La. Nov. 22, 2019) (citing *Aparicio v. Swan Lake*, 643 F.2d 1109, 1110 n.2 (5th Cir. 1981)).

The purpose of 28 U.S.C. §§ 1292–1294 was to give "considerable flexibility operating under the immediate, sole and broad control of Judges so that within reasonable limits disadvantages of piecemeal and final judgment appeals might both be avoided." *Hadjipateras v. Pacifica, S.A.*, 290 F.2d 697, 703 (5th Cir. 1961). "Interlocutory appeals are generally disfavored, and statutes permitting them must be strictly construed." *Fannie Mae v. Hurst*, 613 F. App'x 314, 318 (5th Cir. 2015) (quoting *Allen v. Okam Holdings, Inc.*, 116 F.3d 153, 154 (5th Cir. 1997)). An interlocutory appeal should be granted pursuant to 1292(b) only in exceptional cases that meet the statutory criteria. *United States v. Garner*, 749 F.2d 281, 286 (5th Cir. 1985), *opinion supplemented*, 752 F.2d 116 (5th Cir. 1985); *United States v. Bear Marine Servs.*, 696 F.2d 1117, 1119 (5th Cir. 1983) ("The Judicial Code[ ] authorizes appeals from interlocutory orders in exceptional cases such as those in which the potential shortening of litigation warrants such an extraordinary procedure."). "Routine resort to § 1292(b) requests would hardly comport with Congress' design to reserve interlocutory review for 'exceptional' cases while generally retaining for the federal courts a firm final judgment rule." *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 74, 117 S. Ct. 467, 475, 136 L. Ed. 2d 437 (1996); *see also Clark-Dietz & Assocs.-Eng'rs, Inc. v. Basic Constr. Co.*, 702 F.2d 67, 69 (5th Cir. 1983) ("The basic rule of appellate jurisdiction restricts review to final judgments, avoiding the delay and extra effort of piecemeal appeals.").

### B. Parties' Arguments

#### 1. Defendants' Memorandum in Support (Doc. 51-1)

Defendants filed the *Motion for Interlocutory Appeal* in response to the *Order*, wherein the Court denied their request for dismissal for lack of jurisdiction based on the existence of the *Chisom* consent decree. (Doc. 51-1 at 1.) In their *Memorandum in Support*, Defendants claim the denial "puts the State in [an] untenable position of potentially two conflicting rulings from two sister courts governing the same reapportionment map that are in effect at the same time." (Doc. 51-1 at 1.) Defendants argue that electoral districting cases are unique in that "there can only be *one* electoral district map" and the *Order* "paves the way for a situation in which the State may be compelled by this Court's order to violate the Court order of another Court." (Doc. 51-1 at 1.) Defendants contend that "[t]he Court's assertion of jurisdiction over the same map controlled by the continuing jurisdiction of the Eastern District should be certified for interlocutory appeal." (Doc. 51-1 at 4.) This legal issue going to the jurisdiction of this Court "ought to be determined by the Fifth Circuit before this case proceeds." (Doc. 51-1 at 1.)

Defendants argue that the three requirements for a court to order for interlocutory appeal under 28 U.S.C. § 1292(b) are all present here. (Doc. 51-1 at 4–9.) First, Defendants assert that the Court's disposition of *Defendants' Motion to Dismiss* involves a controlling question of law because it has "some impact on the court of litigation" and "reversal of the order would terminate the action." (Doc. 51-1 at 5.) "The impact goes to the Court's jurisdiction." (Doc. 51-1 at 8 (citing *Stratton v. St. Louis Sw. Ry. Co.*, 282 U.S. 10, 16 (1930)).) Defendants assert that "[i]f the Court lacks the power to modify a sister court's consent decree, then any litigation in this Court is a waste of judicial and party resources." (Doc. 51-1 at 8.) Because this issue is potentially

10

dispositive of the action in the Court, Defendants conclude it involves a controlling question of law. (Doc. 51-1 at 8.)

Second, Defendants address the question of whether this Court has authority to "entertain a lawsuit that seeks to modify or overturn a sister court's consent decree" and argue that there is at a minimum has substantial grounds for difference of opinion over the controlling question of law at issue. (Doc. 51-1 at 5.) The laws covering redistricting and reapportionment are unsettled because the issues "are unique in jurisprudence as any specific body of government can only have *one* map setting forth its electoral boundaries at any single point in time." (Doc. 51-1 at 5.) While the *Complaint* seeks to enjoin all "future elections for the Louisiana Supreme Court under the current method of election" and alleges "the current apportionment…violates Section 2 of the Voting Rights Act," (*Compl*., Doc. 1 at 15),  Defendants argue that the current apportionment cannot be a Section 2 violation because it "was implemented by an order of a federal court." (Doc. 51-1 at 6.) Defendants further assert that the applicability of *Martin*, 490 U.S. 755, and the applicability of *Texas v. Dep't of Labor*, 929 F.3d 205 (5th Cir. 2019), are questions to which there are substantial grounds for difference of opinion. (Doc. 51-1 at 7–8.) Defendants argue that these cases do not have authority over the case at hand because they involved regulations unlike this unique area of law involving redistricting matters where there must be a map in place to hold an election. (Doc. 51-1 at 8.)

Third, Defendants assert that an interlocutory appeal will materially advance the ultimate termination of the litigation. (Doc. 51-1 at 8.) They claim that if the Court rules in favor of Plaintiffs only to have the Fifth Circuit subsequently reverse on jurisdictional ground, the result will be "an extraordinary waste of party and judicial resources that can be prevented by this timely request for interlocutory appeal." (Doc. 51-1 at 8–9.) Because "interlocutory review of the

Order may make any further action in this Court either futile or unnecessary," Defendants assert that resolution of the jurisdictional issue will materially advance termination of this litigation. (Doc. 51-1 at 9 (citing *Mitchell v. Hood*, No. 13-5875, 2014 WL 1764779, at *4 (E.D. La. May 2, 2014)).)

### 2. Plaintiffs' Opposition

In the *Opposition*, Plaintiffs argue the Court should deny the interlocutory appeal. (Doc. 54 at 1.) Plaintiffs contend that "the State's entire argument rests on the false premise that this Court asserted 'jurisdiction over the same map controlled by the continuing jurisdiction of the Eastern District' when it denied their motions to dismiss." (Doc. 54 at 3.)

Plaintiffs assert that the interlocutory appeal, if granted, would not terminate this case, so the *Order* does not involve a controlling question of law. (Doc. 54 at 4–5.) Plaintiffs explain that, even if *Defendants' Motion to Dismiss* based on lack of subject matter jurisdiction was valid, it would not terminate the case on its merits because the case would simply transfer venue. (Doc. 54 at 5.) Further, Defendants' reliance on *Chisom* and its complex history mean that the Fifth Circuit would not be able to decide this issue easily and quickly as required to meet the question of law standard. (Doc. 54 at 5–6.)  Thus, Plaintiffs conclude that the issue is not a controlling question of law.

Second, Plaintiffs assert that Defendants failed to prove the substantial ground for difference of opinion concerning the scope of *Chisom* required to satisfy 28 U.S.C. § 1292(b). (Doc. 54 at 6.) Plaintiffs contend that Defendants' arguments on this matter "simply rehash" the *Defendants' Motion to Dismiss* and "show nothing more than their disagreement with the Court's Order." (Doc. 54 at 6.) Plaintiffs reject the assertion that voting rights jurisprudence is unique because any one body of government can only have one map establishing its boundaries. (Doc.

54 at 7.) Instead, Plaintiffs argue this ignores the central aim of *Chisom* "to ensure black voters *in the Parish of Orleans* have an equal opportunity to participate in the political process and to elect candidates of their choice." (Doc. 54 at 7.) Plaintiffs reject the argument that the Eastern District retains jurisdiction over a map forever asserting it "runs counter to the plain language of the *Chisom* Decree and defies common sense." (Doc. 54 at 7.) Plaintiffs maintain that redrawing District 5 in Baton Rouge could be done easily without redrawing District 1, so Defendants' belief that "[a]ny order from this Court ordering any alteration of any boundary of any district would put [them] in a quandary about which map to follow" lacks merit. (Doc. 54 at 7.) Plaintiffs conclude that the *Chisom* order is not implicated as long as this Court does not affect District 1. (Doc. 54 at 7.) For these reasons, Plaintiffs assert Defendants failed to prove there is substantial ground for difference of opinion on this issue.

Third, Plaintiffs assert that the interlocutory appeal would not materially advance the ultimate termination of the litigation. (Doc. 54 at 8.) Rather, Plaintiffs assert, the interlocutory appeal "would result in piecemeal appeals – contrary to the intent of 1292(b) and governing Fifth Circuit law." (Doc. 54 at 8.) Plaintiffs compare this case to *United States v. Louisiana*, No. 11-470, 2016 WL 4522171, at *4 (M.D. La. Aug. 29, 2016), in response to Defendants' assertion that denial of interlocutory appeal could result in wasted time and resources for the Court. (Doc. 54 at 8–9.) Plaintiffs reject this argument based on *United States v. Louisiana* and state that "any error by a court could lead to the additional expense of judicial resources and could 'harm' litigants." (Doc. 54 at 9.) It does not follow, however, that every ruling by a district court should be certified for interlocutory appeal under § 1292(b). (Doc. 54 at 9.) Plaintiffs continue that this is especially true when the party requesting interlocutory appeal failed to show that the question meets the first two elements under 1292(b). (Doc. 54 at 9.)

### 3. Defendants' Reply

In the *Reply*, Defendants reaffirm their arguments set forth in their *Memorandum in Support* and reject Plaintiffs' *Opposition* for offering "no new or unique arguments as to why the Court should deny [their] motion" and for its reliance "on a flawed understanding surrounding the *Chisolm* Consent Decree." (Doc. 56 at 1.) Defendants explain that the jurisdictional issue in this case does in fact involve a controlling question of law that would resolve this case in its entirety because a finding that this Court lacks jurisdiction would end the matter in this Court. (Doc. 56 at 2.) Defendants reject the argument that a second majority-minority district could be drawn in Baton Rouge without touching the First District and thus this Court has jurisdiction. (Doc. 56 at 2–3.) Rather, Defendants assert that the Consent Decree necessarily requires drawing new lines in multiple districts. (Doc. 56 at 3.) Further, Defendants explain that Plaintiffs are mistaken in not deeming this case "exceptional" because this case involves: "(1) a continuing consent decree which touches on the same issues discussed in a case pending in a different district; (2) a court, many years later, confirming the continuing jurisdiction of the consent decree; (3) all while dealing with drawing new judicial district maps while a census is being conducted and redistricting is likely to take place soon thereafter." (Doc. 56 at 3–4.) Because no single case is analogous to this jurisdictional issue, it is an exceptional case involving a controlling question of law that would entirely resolve this case and is sufficient to satisfy the standard to certify a motion for interlocutory appeal. (Doc. 56 at 3–4.)

Defendants' *Reply* also asserts that "courts cannot claim jurisdiction, nor can a party consent to jurisdiction, when there is no jurisdiction to claim or consent to." (Doc. 56 at 4.) Since the Court lacks jurisdiction altogether according to the Defendants, they reject Plaintiffs'

assertion that their stipulation to jurisdiction is enough to justify this Court hearing this case. (Doc. 56 at 4.)

### C.  Analysis

The Court must first determine whether Defendants have established the requirements for certification of an interlocutory appeal under 28 U.S.C. § 1292(b). Again, the Court may grant the instant motion if the *Order* involves 1) a controlling question of law; 2) the controlling question of law has substantial grounds for difference of opinion; and 3) an immediate appeal may materially advance the ultimate termination of the litigation. 28 U.S.C. § 1292(b). For the following reasons, the Court grants Defendants' *Motion for Interlocutory Appeal* in part.

#### 1. Controlling questions of law

In short, the *Order* at issue involves a controlling question of law. In determining if an issue is a controlling question of law, the Court asks whether the issue has "potential to have some impact on the course of the litigation." *United States  v. La. Generating LLC*, No. 09-100, 2012 WL 4588437, at *1 (M.D. La. Oct. 2, 2012) (quoting *Tesco Corp. v. Weatherford Int'l, Inc.*, 722 F. Supp. 2d 755, 766 (S.D. Tex. 2010)). If reversal of an order terminates the action, it is clearly a controlling question of law. *Id.* (citing *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Laura in Amministrazione Straordinaria*, 921 F.2d 21, 24 (2d Cir. 1990)). However, the resolution on appeal does not necessarily need to terminate the action altogether to be considered a controlling question of law. *Id.* It is sufficient to satisfy the controlling question of law standard if resolution on appeal determines the "future course of the litigation." *Tesco Corp.*, 722 F. Supp. 2d at 766 (quoting *Johnson v. Burken*, 930 F.2d 1202, 1206 (7th Cir. 1991)). An issue is not considered a controlling question of law if resolution would have "little or no effect on subsequent proceedings." *United States v. Louisiana*, No. 11-

470, 2016 WL 4522171, at *3 (M.D. La. Aug. 29, 2016) (quoting *La. Generating*, 2012 WL 4588437, at *3).

The Court finds that its denial of *Defendants' Motion to Dismiss* for lack of subject matter jurisdiction involves a controlling question of law. While resolution of this issue would not terminate the action or determine the outcome of the litigation, it would determine the future course of litigation. If the Fifth Circuit reverses this Court's denial of the *Defendants' Motion to Dismiss*, then the result would be termination of the action in *this* Court. Plaintiffs recognize that while reversal on interlocutory appeal would not terminate this case on the merits, it would require the case be transferred to the Eastern District. (*See* Doc. 54 at 5.)

Plaintiffs mistakenly argue that the controlling question of law determination must result in the termination of the action. But, as explained above, that is not the question. Rather, a transfer of venue would have a significant impact on subsequent proceedings, and that is sufficient.

Plaintiffs rely on *Gruver*, 2019 WL 6245421, at *3, in arguing that the question of law must be "pure" in that the "court of appeals could decide [the question] quickly and cleanly without having to study the record." (Doc. 54 at 5.) However, *Gruver* dealt with whether the plaintiffs could state a claim upon which relief could be granted under Title IX based on the particular factual scenario presented in the case. *Gruver*, 2019 WL 6245421, at *2. The same is true for *Williams v. Taylor*, No. 15-321, 2015 WL 4755162, at *2 (E.D. La. Aug. 11, 2015), in which the plaintiff argued, in pertinent part, that the court erred in evaluating the evidence and pleadings and concluding that the defendant was in bad faith. Each of these cases involved a motion for interlocutory appeal concerning an issue that required the court to apply the law to the unique facts of the case rather than a pure question of law.

16

Here, however, the *Motion for Interlocutory Appeal* involves a threshold question of law—whether the Eastern District has exclusive subject matter jurisdiction over all matters involving Louisiana Supreme Court districts under the Consent Decree. Courts have granted certification for interlocutory appeal when an order involved subject matter jurisdiction. *See, e.g.*, *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1330 (2d Cir. 1972). In addition, many courts do not use this pure question of law standard to determine the first prong of 1292(b). *See* 16 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3930 (3d ed. 2020). "A *controlling* question of law—although not consistently defined—at the very least means a question of law the resolution of which could materially advance the ultimate termination of the litigation—thereby saving time and expense for the court and the litigants." *Ryan v. Flowserve Corp.*, 444 F. Supp. 2d 718, 723 (N.D. Tex. 2006). Because resolution on appeal of whether this Court has subject matter jurisdiction would impact the course of litigation and could terminate the suit in this Court, it is a controlling question of law satisfying the first prong of 28 U.S.C. § 1292(b).

### 2. Substantial grounds for difference of opinion

There are also substantial grounds for difference of opinion regarding the controlling question of law in the Court's *Order*. "The threshold for establishing the 'substantial ground for difference of opinion' . . . required for certification pursuant to § 1292(b) is a high one." *S. U.S. Trade Ass'n v. Unidentified Parties*, No. 10-1669, 2011 WL 2790182, at *2 (E.D. La. July 14, 2011) (quoting *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Grp.*, 233 F. Supp. 2d 16, 19 (D.D.C. 2002). Mere disagreement with the Court's *Order* is not sufficient to satisfy the second prong of 1292(b). *Id.*; *see La. Generating LLC*, 2012 WL 4588437, at *2 ("An interlocutory appeal assuredly does not lie simply to determine the correctness of a judgment."). Courts

examine the controlling law to determine to what extent it is unclear. *Mitchell*, 2014 WL 1764779, at *5 (quoting *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010)). "Courts traditionally will find that a substantial ground for difference of opinion exists . . . 'if novel and difficult questions of first impression are presented.'" *Id.* "A substantial ground for difference of opinion 'usually only arises out of a genuine doubt as to the correct applicable legal standard relied on in the order.'" *La. Generating LLC*, 2012 WL 4588437, at *2 (quoting *Prop. One, Inc. v. USAgencies, L.L.C.*, 830 F. Supp. 2d 170, 182–83 (M.D. La. 2011)).

The *Order* acknowledges that the jurisdictional question at issue is "a close one." (Doc. 47 at 21.) On the one hand, Defendants assert that there are substantial grounds for difference of opinion here because voting rights jurisprudence is unique in that "any specific [elected] body of government can only have *one* map setting forth its electoral boundaries at any single point in time." (Doc. 51-1 at 5.) The unsettled law, according to Defendants, raises genuine doubt as to the proper application of the law. (Doc. 51-1 at 5.) On the other hand, Plaintiffs argue that Defendants ignore the primary aim of *Chisom* to ensure black voters in Orleans Parish have equal opportunity to elect candidates of their choice. (Doc. 54 at 7.)

While the *Chisom* Consent Judgment does contain provisions focused solely on the Orleans district, other language in the Consent Judgment is broader to include all districts. For example, the Consent Judgment states, "The relief contained in this consent judgment will ensure that the system for electing the Louisiana Supreme Court is in compliance with section 2 of the Voting Rights Act." (Doc. 27-3 at 4.) Even more importantly, the Consent Judgment provides:

> Legislation will be enacted in the 1998 regular session of the Louisiana Legislature which provides *for the reapportionment of the seven districts of the Louisiana Supreme Court in a manner that complies with the applicable federal voting law,* taking into account the most recent census data available. The reapportionment will provide for a single-member district that is majority black in voting age population that includes Orleans Parish in its entirety. *The reapportionment shall be effective*

18

*on January 1, 2000, and future Supreme Court elections after the effective date shall take place in the newly reapportioned districts.*

(Doc. 27-3 at 7 (emphasis added).)

The Consent Judgment instructed the Legislature to reapportion the Supreme Court into seven districts in the 1998 Regular Session. However, the legislation reapportioning the Supreme Court Districts, Act 776, was enacted in 1997 rather than 1998 due to a change in how the Louisiana Legislature conducted its business. *Chisom v. Jindal*, 890 F. Supp. 2d at 706. The plain language of the Consent Decree suggests that all seven districts of the Louisiana Supreme Court could be redrawn, not merely the Orleans Parish district. Further, this paragraph expressly provides that "future elections . . . shall take place in the newly reapportioned districts"—that is, those redrawn in compliance with the *Chisom* decree. Since the *Complaint* requests the enjoining of all future elections under the current method and for a declaration that the current apportionment violates Section 2 of the Voting Rights Act, it is not unreasonable to place this case within the scope of the *Chisom* Consent Decree. However, the preamble of the Consent Judgment and other parts of the agreement limit the decree to Orleans Parish. Because the language of the Consent Judgment varies on this issue, reasonable minds could differ as to whether the Consent Judgment applies to all districts or exclusively Orleans Parish.

There are also substantial grounds for difference of opinion in the *Order*'s distinguishing the case at issue from *Chisom*. Plaintiffs are from East Baton Rouge Parish, placing them outside the *Chisom* class, and they seek relief by a redrawing of District 5, whereas *Chisom* was a class action suit on behalf of all African Americans registered to vote in Orleans Parish. *See Chisom v. Edwards*, 659 F. Supp. at 183. But, the Consent Judgment includes broader language that goes beyond simply a redrawing of District 5. Plaintiffs urge that the redrawing of District 5 can be done without affecting District 1, the only district governed by the Consent Decree. However, as

19

already noted, the plain language of the Consent Decree is not limited to District 1. Further,

Plaintiffs cannot agree to facts that are in the control of the Legislature, who are ultimately

charged with finalizing the districts. The redrawing of District 5 could require at least one other

district to be redrawn. Because the Consent Decree includes language suggesting it applies to

each and every one of the seven Supreme Court districts and the redrawing of District 5 could

require an adjustment of one or more neighboring districts, the instant case may fall within the

jurisdiction of the *Chisom* Consent Judgment. The net *effect* of the relief the *Chisom* plaintiffs

sought is identical to the relief sought by the instant Plaintiffs: a redrawing of all *seven* districts

by the Legislature to ensure compliance with the Voting Rights Act. Again, reasonable minds

could differ on the issue of whether this case falls within the jurisdiction of the Consent Decree.

### 3. Immediate appeal may materially advance the ultimate termination of the litigation

Lastly, resolution of the jurisdictional question might materially advance the litigation. 28

U.S.C. § 1292(b) does not require the appeal to certainly advance the termination of the

litigation. It only requires such appeal *may* advance the ultimate termination of the litigation if

permitted. *Scott v. Ruston La. Hosp. Co.*, No. 16-0376, 2017 WL 1364219, at *5 (W.D. La. Apr.

12, 2017).

Plaintiffs argue that this third prong of § 1292 is not satisfied based on *United States v.

Louisiana*, 2016 WL 4522171, at *4, but *United States v. Louisiana* is distinguishable from the

present case. In *United States v. Louisiana*, this Court determined that the third prong was not

satisfied because the plaintiff failed to establish that there were substantial grounds for difference

of opinion on the order. *Id.* While in both cases the plaintiffs argued that an appeal could prevent

potential waste of time and judicial resources, *United States v. Louisiana* involved a motion for

partial summary judgment rather than a motion to dismiss. It was a request for interlocutory

appeal to determine the correct standard to apply to the facts of the case, and there was no evidence that resolution could advance the termination of the litigation. *Id.*

Here, interlocutory appeal of the *Defendants' Motion to Dismiss* satisfies the first two prongs of 1292(b) and would materially advance the ultimate termination of the litigation by determining whether the Middle District can hear this case at all. It could terminate the litigation in this Court and expedite the transfer to the Eastern District if deemed appropriate. Interlocutory review may make further action either futile or unnecessary. *See Mitchell*, 2014 WL 1764779, at *4. Avoidance of a post-trial appeal is sufficient to satisfy the third prong of §1292. *See Cazorla v. Koch Foods of Miss.*, 838 F.3d 540, 548 (5th Cir. 2016). Because the first two requirements of 28 U.S.C. § 1292(b) have been established and resolution on the *Order* could result in dismissal and/or transfer of venue to the Eastern District, the final prong for the Court to certify the interlocutory appeal has been met.

For all these reasons, the Court will grant that part of the *Motion for Interlocutory Appeal* requesting certification under § 1292(b).  The Court now turns to the next issue raised by Defendants' *Motion for Interlocutory Appeal*: whether to grant a stay of these proceedings pending the appeal.

### D.  Stay of Proceedings

#### 1. Relevant Standard

A district judge may order a stay of proceedings pursuant to 28 U.S.C. § 1292(b). "A stay pending appeal 'simply suspends judicial alteration of the status quo.'" *Veasey v. Perry*, 769 F.3d 890, 892 (5th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 429 (2009)), *motion to vacate stay denied,* 135 S. Ct. 9 (2014). While a district court is granted discretion in its decision on whether to grant a stay when a stay is not required, "the exercise of that discretion is not unbridled." *In re*

*First S. Sav. Ass'n*, 820 F.2d 700, 709 (5th Cir. 1987). "[R]ather, the court must exercise its discretion in light of what this court has recognized as the four criteria for a stay pending appeal." *Id.* The stay factors considered in § 1292(b) appeals are the same as in any other stay pending appeal. *See Ministry of Oil of the Republic of Iraq v. 1,032,212 Barrels of Crude Oil Aboard the United Kalavrvta*, No. G-14-249, 2015 WL 851920, *4 (S.D. Tex. Feb. 26, 2015). Those four traditional factors include: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the parties interested in the proceeding; and (4) [whether] the public interest favors a stay." *Weingarten Realty Inv'rs v. Miller*, 661 F.3d 904, 910 (5th Cir. 2011) (citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

### 2. Parties' Arguments

In the instant motion, Defendants request the Court to order a stay of proceedings pending the outcome of the appeal. (Doc. 51-1 at 9.) Defendants assert that all four stay factors support a stay here. (Doc. 56 at 5.) Defendants explain that it is in the interest of all parties to settle the jurisdictional issue to avoid litigating an issue only to have it subsequently dismissed or transferred. (Doc. 51-1 at 9.) They also explain that the public interest will be furthered by the correct application of the law, and without appeal on this issue a confusing outcome may result. (Doc. 51-1 at 9–10.) For these reasons, Defendants argue, a stay is appropriate to prevent unnecessary litigation and to further the interests of the parties and the public. (Doc. 51-1 at 9–10.)

In their *Opposition*, Plaintiffs assert that a stay is unwarranted based on the four factors traditionally used by courts to determine whether to grant a stay of appeal: "(1) whether a stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the

applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the parties interested in the proceeding; and (4) whether the public interest favors a stay." (Doc. 54 at 9–10 (quoting *Weingarten*, 661 F.3d at 910).)

Plaintiffs argue that each of these factors weighs in favor of this Court denying a stay. (Doc. 54 at 9–10.) First, Plaintiffs contend that Defendants are unlikely to succeed on the merits because *Chisom v. Roemer* "remains law of the land" and "the most likely outcome of this litigation is that Plaintiffs will prevail, resulting in the creation of a majority-minority Supreme Court district in the Baton Rouge area (which need not change the contours of Supreme Court District 1)." (Doc. 54 at 9–10.) Second, Plaintiffs state Defendants will not be irreparably harmed if the Court denies Defendants' request for stay because Defendants failed to put on evidence of sufficient harm. (Doc. 54 at 11.) Plaintiffs state the Defendants' assertions that the alleged "jurisdictional dispute" and the potential for lengthy litigation or possible re-litigation upon transfer or dismissal are insufficient to establish irreparable harm. (Doc. 54 at 11–12.) Third, Plaintiffs rely on a variety of cases to prove that they will be "substantially injured as a result of continued delay and ongoing disenfranchisement under the Voting Rights Act." (Doc. 54 at 12.) Plaintiffs explain that, similar to the *Chisom v. Edwards* case, "no amount of financial compensation will ever redress the harm Plaintiffs suffer with each passing election, and, indeed, with each passing day in which the State undervalues their roles as voters and citizens by diluting their votes in violation of Section 2." (Doc. 54 at 12.) Fourth, Plaintiffs assert that the public interest favors resolution of this case because it concerns a state violation of federal statutory voting rights. (Doc. 54 at 13.) Plaintiffs reject Defendants' argument that the public interest would only be served by "correct application of the law in this matter" by explaining that the law here has been correctly applied. (Doc. 54 at 13.) Plaintiffs argue that the public interest will

actually be served by "rectifying the State's ongoing violation of VRA Section 2 with respect to the election of Supreme Court justices" and stopping "the kind of vote dilution in the Baton Rouge area alleged in the Complaint." (Doc. 54 at 13.) Plaintiffs conclude that denial of Defendants' request for stay would actually best serve the public interest. (Doc. 54 at 13.)

Defendants' *Reply* reemphasizes Defendants' request for the Court to stay the matter pending the interlocutory appeal based on the stay factors pursuant to § 1292(b). (Doc. 56 at 5–6.)

### 3. Analysis

As to the first factor, whether the applicant is likely to succeed on the merits, Defendants fail to present any evidence or persuasive argument demonstrating a likelihood of success on the merits. In fact, Defendants assert in their *Reply* that if the Court grants certification for interlocutory appeal, "it is implied that a stay would be warranted until the jurisdiction of the Court could be confirmed by the Fifth Circuit." (Doc. 56 at 4–5.) However, the language 28 U.S.C. § 1292(b) does not offer such an implication. Rather, 28 U.S.C. § 1292(b) expressly provides that district court proceedings are not stayed unless so ordered.

This first factor is the most critical factor in the Court's stay analysis. *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981). While Defendants successfully established that there is substantial ground for difference of opinion based on the *Order*, the first and most critical factor of the stay analysis is not satisfied due to lack of additional evidence of success on merits.

The second prong of the stay analysis is whether the applicant will be irreparably injured absent a stay. Defendants fail to provide support for this prong of the analysis as well. If the Court of Appeals reverses the *Order*, Defendants will not be "irreparably injured." The Fifth Circuit has held that time and expenses of litigation without more do not constitute irreparable

injury. *Weingarten*, 661 F.3d at 913.  If time and cost of litigation were sufficient to constitute irreparable injury, every case in which a court has granted an interlocutory appeal based on a motion to dismiss would satisfy this factor of the stay analysis. Further, Defendants fail to establish how they will be harmed by proceeding with discovery in this Court, as that would presumably happen even if the matter is transferred to the Eastern District.

The third prong of the stay analysis is whether issuance of the stay will substantially injure the parties interested in the proceeding. "An injury is irreparable if it 'cannot be undone through monetary remedies.' The right at issue in this case, the right to vote, is entirely nonpecuniary, and no amount of financial compensation can redress its deprivation." *Chisom v. Edwards*, 690 F. Supp. 1524, 1535 (E.D. La. 1987) (quoting *Spiegel v. City of Houston*, 636 F.2d 997, 1001 (5th Cir. 1981)), *vacated*, 853 F.2d 1186 (5th Cir. 1988). While the Fifth Circuit has not held that deprivation of voting rights constitutes irreparable injury per se, other courts have recognized that "[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (citing *ACLU of Ky. v. McCreary Cty., Ky.*, 354 F.3d 438, 445 (6th Cir. 2003)); s*ee also Jones v. Governor of Fla.*, 950 F.3d 795, 828–829 (11th Cir. 2020) (finding that district court did not abuse its discretion in finding that plaintiffs would suffer a irreparable injury if they were precluded from voting in election in which they were constitutionally entitled to vote); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) (holding that plaintiffs "would certainly suffer irreparable harm if their right to vote were impinged upon"). "A restriction on the fundamental right to vote therefore constitutes irreparable injury." *Obama for Am.*, 697 F.3d at 436. Although Defendants assert that it is in the interest of both parties to avoid lengthy and expensive litigation, that concern is irrelevant to the stay analysis. In fact, denying a stay would allow the discovery to proceed in the

Middle District, and this would advance the litigation rather than stall it (as a grant of stay would). Thus, the third factor of the stay analysis is not met.

The fourth and final prong of the stay analysis is whether the public interest favors a stay. In addressing the fourth prong, Defendants assert that the public interest would be served by "correct application of the law." (Doc. 51-1 at 9.) However, Defendants do not provide support for the proposition that only a grant of stay would result in "correct application of the law" whereas a denial of stay would not. A denial of stay of proceedings here would permit the Court to move forward with the case despite the appeal and would favor resolution of the dispute as quickly as practicable. As Plaintiffs note, the public interest favors prompt resolution of cases concerning federal voting rights violations. *See O'Keefe v. New York City Bd. Of Elections*, 246 F. Supp. 978, 980 (S.D.N.Y. 1965) (describing the Voting Rights Act as "a statute affecting the public interest") (cited in *Aubin v. Columbia Cas. Co.*, No. 16-290, 2017 WL 1416814, *2 (M.D. La. Apr. 19, 2017)). Indeed, the history of the VRA "reflect[s] a strong national mandate for the immediate removal of all impediments, intended or not, to equal participation in the election process. Thus when [it] is violated the public as a whole suffers irreparable injury." 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948 (1973). Here, denying a stay would benefit the public interest by allowing the case to progress while the interlocutory appeal is considered.

For these reasons, none of the four factors favor the Court granting a stay pending appeal. As a result, the Defendants' request for stay of proceedings is denied.

## III.    Conclusion

Accordingly,

**IT IS ORDERED** that the *Joint Motion for Certification of Order for Interlocutory Appeal* (Doc. 51) filed by Defendants the State of Louisiana and the Secretary of State of Louisiana is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** in that the Court certifies the interlocutory appeal.  However, the Court **DENIES** Defendants' request for a stay of proceedings pending the interlocutory appeal.

Signed in Baton Rouge, Louisiana, on <u>October 19, 2020</u>.

_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**