UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

LOUISIANA STATE CONFERENCE OF
THE NATIONAL ASSOCIATION FOR
THE ADVANCEMENT OF COLORED
PEOPLE, ET AL.

VERSUS

STATE OF LOUISIANA, ET AL.

CIVIL ACTION

NO. 19-479-JWD-SDJ

### RULING AND ORDER

This matter comes before the Court on two motions made by Intervenors John L. Weimer, Greg Champagne, Mike Tregre, and Craig Webre, in their individual capacities as voters from Louisiana Supreme Court District Six (the "Intervenor Voters") and John L. Weimer, in his capacity as a candidate for Louisiana Supreme Court Justice from District Six (the "Intervenor Candidate") (collectively, the "Intervenors"). The first motion was made in the *Motion to Intervene* (Doc. 109). There, Intervenors asked the Court to modify its May 4, 2022, order staying all Louisiana Supreme Court elections indefinitely, (Doc. 101) ("Consent Stay Order"), so that the upcoming election in Louisiana Supreme Court District Six can proceed, (Doc. 109 at 1). The Court will refer to this part of the *Motion to Intervene* as the *Motion to Lift Stay*.

The second motion was the *Motion for Temporary Restraining Order to Maintain the Status Quo* (Doc. 114) ("*Motion for TRO*"). In that motion, Intervenors seek "a temporary restraining order to maintain the status quo to permit qualifying of a candidate for District Six to proceed notwithstanding the Consent Stay order, and then . . . a preliminary injunction modifying the Consent Stay to permit the District Six election to proceed on November 8, 2022, pursuant to existing election laws and the State Constitution." (*Id.* at 6.)

These motions are opposed in part by the other parties in this case. Specifically, Defendant Secretary of State R. Kyle Ardoin expressed at a status conference that he had no position on these motions and that he would conduct the elections as directed by the Court and Louisiana law. Plaintiffs have orally opposed Intervenors' motions, but, as far as written briefs go, Plaintiffs filed only a short response to the *Motion to Intervene*, (Doc. 121), and nothing in response to the *Motion for TRO*.

Rather, the main opposition to Intervenors' requests has come from the State of Louisiana, as represented by Attorney General Jeff Landry and his office. The State has opposed these motions at status conferences, (*see* Docs. 113, 128), and it has filed a brief to oppose the *Motion for TRO*, (Doc. 126). Intervenors filed a reply to this brief. (Doc. 127.)

Oral argument was heard at prior status conferences. (*See* Doc. 113, 128.) Although the Court set a hearing on the *Motion for TRO* for Friday, July 15, 2022, the Court has reconsidered and finds that further argument is not necessary and that no hearing is required in light of this ruling.

The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, the *Motion to Lift Stay* is granted, and the *Motion for TRO* is denied as moot.

**I.    Relevant Background**

    **A. The Lawsuit and Appeal**

In September of 2021, the Fifth Circuit concisely summarized the basis of Plaintiffs' claims in this lawsuit:

> The seven members of the Louisiana Supreme Court are currently elected from these seven single-member districts:



> *See* LA. S. CT., *Maps of Judicial Districts*, https://www.lasc.org/About/MapsofJudicialDistricts (last visited Aug. 24, 2021).
>
> Plaintiffs claim this system unlawfully dilutes black votes. So, in 2019 they sued in the Middle District of Louisiana under section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10101 *et seq.* ("VRA"). *See generally Brnovich v. Democratic Nat'l Comm.*, ––– U.S. –––, 141 S. Ct. 2321, 2330–33, 210 L. Ed. 2d 753 (2021). They allege Louisiana's demography would support two majority-black districts. But Louisiana has only one—District 7—created as a result of the "*Chisom* decree," a 1992 consent decree arising out of prior VRA litigation. Plaintiffs thus seek to create a second majority-black district, alleging it could be drawn in District 5, which includes East Baton Rouge Parish and surrounding parishes.

*Allen v. Louisiana*, 14 F.4th 366, 369 (5th Cir. 2021).

The State had moved to dismiss this case for lack of subject matter jurisdiction. *Id.* at 368. The basis of the State's motion was that "a federal consent decree—the '*Chisom* decree'—created Louisiana's one majority-black supreme court district." *Id.* The State argued that "the *Chisom* decree centralize[d] perpetual federal control over all supreme court districts in the Eastern District of Louisiana, which issued the decree." *Id.*

3

But, according to the Fifth Circuit, this Court "rejected that reading for good reason: it is plainly wrong. . . . Louisiana would inflate the *Chisom* decree beyond its terms and the lawsuit that spawned it. The present suit, however, addresses a different electoral district untouched by the decree." *Id.* The Fifth Circuit thus affirmed the Court's decision on this issue. *Id.*

The case was not stayed by this Court pending the interlocutory appeal. (Doc. 58.) Thus, after the mandate was issued, (Doc. 79), and following discussions with the Magistrate Judge over deadlines, (Docs. 87–88), on March 15, 2022, a scheduling order was entered setting a discovery deadline of May 20, 2022, expert discovery due by July 1, 2022, and a trial starting on September 19, 2022. (Doc. 91.)

### B. The Instant Motion

On April 19, 2022, this Court conducted a status conference in this matter to hear an update from the parties and get their position on settlement. (Doc. 97 at 1.) According to the *Minute Entry*, following this update, the Court stated that it would "stay and administratively close this case to allow the parties [ ] time to attempt to resolve the matter." (*Id.*) The Court then "reserve[d] entering the stay order at [that] time to allow the parties to file a Motion to Stay the upcoming Louisiana Supreme Court elections," with appropriate authority. (*Id.*)

Following Defendant's motion, (Doc. 100), the Court entered the following Consent Stay Order:

> **ORDER**
> Considering the foregoing Consent Motion to Stay all Louisiana Supreme Court elections filed by all parties in this matter,
> IT IS HEREBY ORDERED that all Louisiana Supreme Court elections are stayed until the State's Supreme Court voting districts have been reapportioned subject to the ability of either Party to seek to terminate the stay if the parties are unable to reach agreement, the Legislature does not approve districts agreed upon by the Parties, or the voters refuse to approve any proposed constitutional amendments.

> IT IS FURTHER ORDERED that every 45-days, the parties will submit to the Magistrate Judge Under Seal a joint statement of the actions taken, and progress made in the resolution of the case.

(Doc. 101.)

## II.    Discussion

### A.  Parties' Arguments

In short, Intervenors have asked the Court to modify or lift the Consent Stay Order to allow the upcoming elections in District Six to proceed. They do so in light of their right to vote in the upcoming Supreme Court election and Intervenor Candidate's right to seek judicial office in that district. According to Intervenors, a "consent order relating to one District does not govern 'the other six Districts,' and a possible need to redraw lines in one district to achieve a remedy in another district does not extend a court's subject matter jurisdiction to another district." (Doc. 114-1 at 12 (quoting *Allen v. State of Louisiana*, No. 20-30734, slip op. at 1, 12 (5th Cir. Sept. 17, 2021)).)

The State, on the other hand, characterizes this Consent Stay Order as either a consent decree or a preliminary or permanent injunction. In the State's view, this order either cannot or should not be altered by the Court. The State lodges a number of other objections, including untimeliness and a lack of changed circumstances.

Both sides expressly claim they will suffer prejudice—the Intervenors from the loss of their rights, the Intervenor Candidate from the possibility that he will be unable to seek office in the future, and the State from the effect any lift would have on efforts to settle. Further, both Intervenors and the State maintain that ruling against them will result in a cloud over and uncertainty with future elections.

### B. Applicable Law

"[C]onsent decrees are contractual in nature, so parties may fairly expect such orders to be enforced as both a contract and a judicial decree." *Moore v. Tangipahoa Par. Sch. Bd.*, 864 F.3d 401, 407 (5th Cir. 2017) (cleaned up). "As a judicial decree, such injunctions are subject to the rules generally applicable to other judgments and decrees, including modification." *Id.* (cleaned up). "Further, individuals and entities subject to injunctions must have fair notice of the terms of the injunction and any modifications that take place." *Id.* (cleaned up). "Upon proper notice, the district court may modify the terms of an injunction *sua sponte*." *Id.*

"[S]ound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen." *Id.* at 406. That is, "[t]he district court ha[s] the authority to modify the terms of the injunction when faced with changed circumstances." *Id.* at 407.

"Decrees entered after litigation and those entered by consent are treated in the same fashion on a motion to modify or vacate." 11 Mary Kay Kane, *Federal Practice & Procedure (Wright & Miller)* § 2961 (3d ed. 2022). The Fifth Circuit has said in the context of ordinary injunctions:

> It is often loosely stated that the purpose of a preliminary injunction is to preserve the status quo. . . . It must not be thought, however, that there is any particular magic in the phrase 'status quo.' The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits. It often happens that this purpose is furthered by preservation of the status quo, but not always. If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, by the issuance of a mandatory injunction, or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury. The focus always must be on prevention of

6

> injury by a proper order, not merely on preservation of the status quo.
>
> . . .
>
> There is no doubt that the district court has continuing jurisdiction over a preliminary injunction. In the exercise of that jurisdiction, the court is authorized to make any changes in the injunction that are equitable in light of subsequent changes in the facts or the law, or for any other good reason.

*Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576, 578 (5th Cir. 1974). *See also Wright & Miller*, at § 2961 (recognizing that there is a "universally recognized principle that a court has continuing power to modify or vacate a final decree"). And a leading treatise has recognized:

> Inasmuch as an injunctive decree is drafted in light of what the court believes will be the future course of events, a court must continually be willing to redraft the order at the request of the party who obtained equitable relief in order to ensure that the decree accomplishes its intended result. Conversely, a court must never ignore significant changes in the law or in the circumstances underlying an injunction lest the decree be turned into an "instrument of wrong."

*Wright & Miller*, at § 2961. Again, the Court has "wide discretion" in this area. *Id.*

Additionally, consent decrees "are interpreted 'according to general principles of contract law.' " *Allen*, 14 F.4th at 371 (quoting *Frew v. Janek*, 780 F.3d 320, 327 (5th Cir. 2015) (cleaned up)). The Court "consult[s] the contract law of the relevant state, here Louisiana." *Id.* (citing La. Civ. Code art. 2045 *et seq.*). "Under Louisiana law, courts seek the parties' common intent starting with the contract's words, which control if they are clear and lead to no absurdities." *Id.* (citing La. Civ. Code arts. 2045, 2046). "Furthermore, a contract is to be construed as a whole and each provision in the contract must be interpreted in light of the other provisions." *Id.* (quoting *Baldwin v. Bd. of Sup'rs for Univ. of La. Sys.*, 2014-0827, p. 7 (La. 10/15/14), 156 So. 3d 33, 38 (citing La. Civ. Code art. 2050)). "When a contract resolves a lawsuit, it 'extends only to those matters the

7

parties intended to settle and the scope of the transaction cannot be extended by implication.' " *Id.* (quoting *Trahan v. Coca Cola Bottling Co. United, Inc.*, 2004-0100, p. 15 (La. 3/2/05), 894 So. 2d 1096, 1107 (citing La. Civ. Code art. 3073; *Ortego v. State, Dept. of Transp. & Dev.*, 96-1322, p. 7 (La. 2/25/97), 689 So. 2d 1358, 1363; *Brown v. Drillers, Inc.*, 93-1019 (La. 1/14/94), 630 So. 2d 741, 748)). "Such a contract 'must be considered as a whole and in light of attending events and circumstances.' *Id.* (quoting *Trahan*, 894 So. 2d at 1107); *see also* La. Civ. Code art. 3076 ("A compromise settles only those differences that the parties clearly intended to settle, including the necessary consequences of what they express.").

### C. Analysis

Having carefully considered the matter, the Court finds that, even if the Consent Stay Order were a preliminary injunction or consent decree (which the Court finds questionable but which both parties seem to agree it is), then modifying that order is appropriate. The Court bases this conclusion on a number of factors.

"The court first look[s] to the decree's four corners and read[s] it holistically." *Allen*, 14 F.4th at 372 (citing La. Civ. Code arts. 2045, 2050). Here, the plain language of the Consent Stay Order was written so as to postpone Supreme Court elections to allow the parties an opportunity to settle *this case*, which is a dispute over *District Five*. Nothing on the face of this order limits the Court's own ability to modify the stay either on its own, should circumstances warrant, or on the motion of an affected third party, should he or she be adversely affected by the stay. And the State's position—that it could obtain an indefinite suspension of all elections without factual findings or extensive legal analysis, and thereby foreclose the ability of affected parties to challenge such an order—would certainly lead to absurd consequences. Thus, the Court must reject this interpretation of the Consent Stay Order.

Rather, this Court's intent is found in the manner in which the Consent Stay Order was adopted. At a status conference for the purpose of discussing settlement the Court announced it would "stay and administratively close this case to allow the parties [ ] time to attempt to resolve the matter." (Doc. 97 at 1.) The Court then "reserve[d] entering the stay order at [that] time to allow the parties to file a Motion to Stay the upcoming Louisiana Supreme Court elections," with appropriate authority. (*Id.*) Again, the Court signed this order without conducting a hearing, listening to testimony, or issuing formal findings of fact and conclusions of law—precisely because it believed that the Court could revisit and re-assess the appropriateness of the order should a third party raise an objection.

Further, the Court's intent must be seen in the context of the countless other cases in which it has entered stay orders to allow parties an opportunity to resolve cases without resorting to trial. In the Court's view, this Consent Stay Order was like any other interlocutory order entered before a final judgment that could be "revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." *See* Fed. R. Civ. P. 54(b).

Indeed, as *Allen* made clear, this Court must "properly read the decree in light of the [instant] lawsuit it [attempts to] settle[ ]." *Allen*, 14 F.4th at 372 (citing La. Civ. Code art. 3073, 3076; *Trahan*, 894 So. 2d at 1107). Again, the Fifth Circuit explained in *Allen*:

> Plaintiffs claim this system [of electing seven members to the Louisiana Supreme Court] unlawfully dilutes black votes. So, in 2019 they sued in the Middle District of Louisiana under section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10101 *et seq.* ("VRA"). *See generally Brnovich v. Democratic Nat'l Comm.*, ⎯⎯ U.S. ⎯⎯, 141 S. Ct. 2321, 2330–33, 210 L. Ed. 2d 753 (2021). They allege Louisiana's demography would support two majority-black districts. But Louisiana has only one—District 7—created as a result of the "*Chisom* decree," a 1992 consent decree arising out of prior VRA litigation. *Plaintiffs thus seek to create a second majority-black district, alleging it could be drawn in District 5, which includes East Baton Rouge Parish and surrounding parishes.*

9

*Id.* at 369 (emphasis added).  Thus, contrary to the State's position, the creation of a second majority-minority district in District Five is not "ancillary" to the current lawsuit; it is central to it.

Of course, *Allen* controls this case in other ways too.  In *Allen*, the State argued, as it does here, that the *Chisom* decree called for the reapportionment of all seven districts, but "Louisiana misses the context of that statement." *Id.* at 372.  The appellate court explained:

> "So, while the [*Chisom*] decree does reference the anticipated restructuring of all districts, its focus is on the one majority-black district—today's District 7—sought by the *Chisom* suit. That suit had nothing to do with the other districts and, accordingly, the decree has nothing to say about how they are to be apportioned. Louisiana's squinting at one statement in the decree ignores the rule that "[o]ne provision of a contract should not be construed separately at the expense of disregarding other provisions."

*Allen*, 14 F.4th at 372 (5th Cir. 2021).  Likewise, the Consent Stay Order here was entered in an effort to allow the parties to settle the instant case—one focused on District Five—and what happens in one district does not automatically control what will happen in the others.

Perhaps most importantly, the *Allen* court stated:

> Louisiana next focuses on the decree's statement that "future Supreme Court elections ... shall take place in the newly reapportioned districts." From this, Louisiana draws the conclusion that the decree "dictat[es] the perpetuation" of the entire 1997 redistricting, vesting the Eastern District with "exclusive jurisdiction" over "*all future* elections" in all "seven Louisiana Supreme Court districts" (emphasis in brief).
>
> This overreads the decree extravagantly. Louisiana forgets "the inherent limitation upon federal judicial authority" that "federal-court decrees must directly address and relate to the constitutional violation itself." *Bd. of Educ. of Okla. City Pub. Sch. v. Dowell*, 498 U.S. 237, 247, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991) (quoting *Milliken v. Bradley*, 433 U.S. 267, 282, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977)). The violation alleged in *Chisom* was vote dilution in the at-large district, not in the other five single-member districts or statewide. The decree was tailored to remedy that violation. But Louisiana wants us to read the decree as "perpetuat[ing]" federal

> control over *all* elections in *all* districts. That we cannot do. Even if the decree supported Louisiana's maximalist reading (it does not, *see supra*), a federal consent decree cannot manacle a state's entire judicial election system based on an alleged violation in *one* district. A federal court would lack authority to enter such a decree, even if the parties asked it to. So, we reject Louisiana's argument that the *Chisom* decree extends continuing federal judicial control over every election in every supreme court district.

*Allen*, 14 F.4th at 372–73.

For similar reasons, based on the Fifth Circuit's reasoning, "[t]he violation alleged in [the instant case] was vote dilution in [District Five], not in the other . . . single-member districts or statewide. The decree [must be] tailored to remedy that violation." *Id.* Ultimately, "a federal consent decree cannot manacle a state's entire judicial election system based on an alleged violation in *one* district. A federal court would lack authority to enter such a decree, even if the parties asked it to." *Id.* The Court sees no reason why this reasoning does not apply with equal force to the Consent Stay Order, which must be construed in a way to conform to the "inherent limitation upon federal judicial authority" and the fact that "federal-court decrees must directly address and relate to the constitutional violation itself." *Id.*

Further, the State's efforts to distinguish *Allen* are unconvincing. The State maintains that *Allen* involved jurisdiction while the instant case involves comity. But, even if the State was correct, the Court still finds that comity favors lifting the stay. The underlying reasoning of *Allen* applies, whether as a matter of jurisdiction or federalism.

The State also asserts that the Fifth Circuit would have ruled differently had it known of the malapportioned issue detailed in its original motion to stay. However, this argument again ignores the fact that the Court conducted no hearing on this issue and made no express finding on it.

11

The State also argues that what happens in District Six affects District Five because the two share a border. But this is essentially the same argument the Fifth Circuit rejected in *Allen*; District Six elections have as much to do with District Five as District Five elections have to do with District Seven. And just as the *Chisom* decree cannot control District Five, so too can the Consent Stay Order not control District Six.

In sum, the Court finds that this case is controlled by *Allen*, and the State's efforts to distinguish that ruling are unconvincing. Under that decision, the Court must modify the Consent Stay Order so as to allow the District Six election to proceed as previously scheduled.

Additionally, "[t]he district court ha[s] the authority to modify the terms of the injunction when faced with changed circumstances," *Moore*, 864 F.3d at 407, and, here, the Court finds such a change has occurred. Specifically, there is an actual challenge by Intervenors, who are District Six voters and a candidate seeking office in that district. Defendants contend that this was possible at the time the Consent Stay Order was issued, but, again, nothing about that possibility forecloses modification to the order, particularly when the Intervenors have moved any challenge away from the theoretical and to the specific and concrete. Thus, this change in circumstances justifies a modification to the Consent Stay Order.

Lastly, again, the "[C]ourt is authorized to make any changes in the injunction that are equitable in light of subsequent changes in the facts or the law, or for any other good reason," and one such good reason is the prevention of harm to another. *See Canal Auth.*, 489 F.2d at 578. In particular, here, any prejudice to the State or Plaintiffs by lifting the stay is greatly exceeded by prejudice to the Intervenors in maintaining it. If the stay is not lifted, Intervenor Voters will indefinitely lose their right to vote for a Louisiana Supreme Court justice in their district, and Intervenor Candidate must indefinitely postpone his candidacy, with the possibility that he will be

unable to run in the future because of age limits. (*See also Order Granting Intervention*, Doc. 129 at 6–8 (describing the injury suffered by Intervenors if the Consent Stay Order remains in place).) Conversely, any prejudice to Plaintiffs and Defendants is minimal; there is nothing to stop them from continuing their efforts to settle the case and redraw the voting districts, all of which will require Legislative approval and potentially a constitutional amendment. Even if settlement talks between Plaintiffs and the State break down, the parties will simply have to have the Voting Rights Act claim decided at trial, in the ordinary course of litigation.

In sum, even if the Consent Stay Order were a consent decree or preliminary injunction, modifying that order is warranted. Consequently, the Court will vacate the Consent Stay Order and allow the District Six elections to proceed as previously scheduled. The parties will be given an opportunity to submit a new order staying the case to facilitate settlement.

### III.    Conclusion

Accordingly,

**IT IS ORDERED** that the *Motion to Intervene* (Doc. 109) filed by the John L. Weimer, Greg Champagne, Mike Tregre, and Craig Webre, in their individual capacities as voters from Louisiana Supreme Court District Six and John L. Weimer, in his capacity as a candidate for Louisiana Supreme Court Justice from District Six is **GRANTED.** The May 4, 2022 Consent Stay Order (Doc. 101) which stayed all Louisiana Supreme Court elections indefinitely is hereby **VACATED**. Plaintiffs and Defendants may move to stay and administratively close this case so that they may pursue a settlement of Plaintiffs' claims. However, the upcoming election in Louisiana Supreme Court District Six is hereby allowed to proceed as previously scheduled before the stay.

**IT IS FURTHER ORDERED** (1) that the *Motion for Temporary Restraining Order to Maintain the Status Quo* (Doc. 114) is **DENIED AS MOOT**; (2) that the July 15, 2022, hearing on that motion is **CANCELLED** as unnecessary; and (3) that the *State of Louisiana's Motion to Clarify* (Doc. 133) the procedures for the July 15, 2022, hearing is **DENIED AS MOOT**.

Signed in Baton Rouge, Louisiana, on July 13, 2022.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**